

STATE OF C
CLEVELANL ~~~~~~

**FILED**

**JUL 24 2023**

In the office of the
Court Clerk MARILYN WILLIAMS

IN THE DISTRICT COURT OF CLEVELAND COUNTY
STATE OF OKLAHOMA

DAVID BYRD and REGINA BYRD

*Plaintiffs,*

vs.

STATE FARM FIRE AND CASUALTY
COMPANY and RITA
WALLENBERG INSURANCE
AGENCY, INC.,

*Defendants.*

CASE NO. CJ-23-139

## AMENDED PETITION

**COMES NOW** Plaintiffs, David Byrd and Regina Byrd, and for their causes of action

against Defendants, State Farm Fire and Casualty Company ("State Farm") and Rita Wallenberg

Insurance Agency, Inc. ("Wallenberg"), hereby allege and state as follows:

## PARTIES

1.    Plaintiffs, David Byrd and Regina Byrd, are citizens of the State of Oklahoma.

2.    Defendant State Farm is a foreign insurer licensed to do business in the State of

Oklahoma.

3.    Defendant Wallenberg was a domestic corporation that owned and operated as a

captive State Farm agency in Cleveland County, Oklahoma. This agency has since filed for

dissolution. Rita Wallenburg as the principal shareholder and owner of the Wallenburg Agency is

personally liable for all claims against her dissolved corporation pursuant to 18 O.S. § 1100.3. Ms.

Wallenburg is a resident of Oklahoma.

```
EXHIBIT
3
```

4.      Plaintiffs entered into a contract of insurance with Defendant State Farm to provide replacement cost coverage for their residence, household contents, and other structures ("Insured Property"). Plaintiffs purchased a State Farm homeowners' replacement cost insurance policy, Policy No. 36-EJ-4452-8 (the "Policy"), through the offices of Wallenburg. At the time Plaintiffs purchased the Policy from Defendants, Wallenburg was an agent and/or ostensible agent of State Farm.

5.      Venue is proper pursuant to 12 O.S. §§ 137 and 139.

## FACTUAL BACKGROUND

6.      Plaintiffs engaged Wallenberg as their insurance agent. Plaintiffs requested that Wallenberg obtain a replacement cost policy that would provide coverage for their home in the event of a loss (*i.e.*, homeowners' replacement coverage). To that end, Plaintiffs disclosed their specific concerns and insurance needs to Wallenberg. Above all, given Oklahoma's extreme weather, Plaintiffs specifically requested a policy that would fully replace their roof in the event of a loss, without exclusion of any weather-related losses. Wallenberg assured Plaintiffs that Wallenberg would be able to obtain said coverage for the home and roof without issue.

7.      State Farm considers its agents—here, Wallenberg—to be the first line of underwriting. As the first line of underwriting, State Farm requires the agents to conduct an inspection of the Insured Property before State Farm will issue replacement cost coverage and, assuming coverage is issued, maintain current information about the Insured Property via periodic inspections thereafter. Among other things, Wallenberg was to independently verify the condition of the Insured Property, take accurate measurements of the dwelling and roof, and obtain and independently confirm information regarding the dwelling's amenities and construction quality. Indeed, to qualify for full replacement cost coverage on the roof (as opposed to actual cash value,

2

"ACV"), Wallenberg was required to verify the roof's condition to ensure it satisfied State Farm's underwriting guidelines.

8.      With this, the roof's age, condition, and predominate surface materials were all factors that dictated the calculation of the increased premium associated with this type of coverage and affected Plaintiffs' eligibility to obtain replacement cost coverage for Plaintiffs' roof. An inspection by Wallenburg would have been necessary and required to determine the roof's eligibility. Indeed, Wallenburg expressly conditioned Plaintiffs' insurance coverage options on said inspection and the Insured Property's conformance with State Farm's underwriting guidelines. In the event the roof was ineligible for the requested replacement cost coverage (*i.e.*, old, worn, in poor condition, or otherwise affected by pre-existing conditions), Wallenburg had an independent duty to report the same to Plaintiffs and State Farm.

9.      Neither Wallenburg nor State Farm advised Plaintiffs at any time that Plaintiffs' roof was ineligible for the requested replacement cost coverage due to it being too old, worn, in poor condition, plagued by pre-existing damage/issues, or any other reason. Likewise, neither Wallenburg nor State Farm ever advised Plaintiffs that Plaintiffs' roof had any pre-existing damage or other conditions that would exclude or limit application of the roof's replacement cost coverage.

10.     Rather, Wallenburg specifically advised and represented to Plaintiffs that the roof was in good condition, satisfied all of State Farm's guidelines and underwriting requirements (*i.e.*, its age, physical condition, etc.), and therefore qualified and was eligible for full replacement cost coverage (versus ACV)—the best policy State Farm offered. Wallenburg represented to Plaintiffs that he did, in fact, procure coverage that would fully restore the Insured Property and roof to its pre-loss condition in the event of damage and/or loss (no matter the extent of damage sustained).

11.     Having assured Plaintiffs that Plaintiffs' Insured Property met all underwriting guidelines and that Plaintiffs' Insured Property and roof qualified for the replacement cost coverage, Wallenburg procured, and State Farm issued, the Policy (with full replacement cost coverage for the roof) and issued premium statements, which Plaintiffs—relying on Wallenburg's assurances—timely paid. Wallenburg assured Plaintiffs the Policy provided the broadest form of coverage available today and, despite the associated increased premium costs, was an outstanding value for Plaintiffs' insurance dollars. At all times material hereto, the subject Policy remained in full force and effect, and Plaintiffs complied with the terms and conditions thereof.

12.     In procuring the Policy for Plaintiffs, Wallenburg also independently established, calculated, and set the Policy's replacement cost limits. Wallenburg ostensibly based the Policy's replacement costs limits on its inspection, measurements, and calculations, which would capture and account for any customized or specialty components of the Insured Property. Further, Wallenburg calculated the Policy's replacement cost limits—which directly affect Plaintiffs' premiums—as if Plaintiffs' home was in perfect condition. Wallenburg represented that its replacement cost calculation reflected the specific dollar amount Plaintiffs were actually reasonably likely to incur in replacing the Insured Property (*i.e.*, 100% insurance-to-value). Wallenburg assured Plaintiffs that the amount of coverage it independently selected and calculated was accurate, correct, commensurate with actual reconstruction costs, and represented 100% of the Insured Property's insurance-to-value, such that Plaintiffs would be able to fully restore the Insured Property without incurring out-of-pocket expenses in the event of a loss.

13.     Neither Wallenburg nor State Farm required or otherwise asked Plaintiffs to calculate or request a specific amount of coverage for the Insured Property. Instead, Wallenburg asked general questions about the Insured Property and, aside from answering those questions,

4

Plaintiffs had no input regarding the amount of coverage Wallenburg independently selected and calculated. Then, Wallenburg recommended and represented to Plaintiffs that they should ensure Plaintiffs' Insured Property to 100% of its replacement cost value, as determined by Wallenburg utilizing State Farm's valuation software and information from Wallenburg's purported inspection.

14.     At all relevant times, Wallenburg represented herself as an expert—highly proficient in using State Farm's valuation software, which Wallenburg further represented as a reliable and accurate tool. Given Wallenburg's purported expertise and specialized knowledge of insurance policies, Plaintiffs reasonably relied on Wallenburg's representations.

15.     Wallenburg was required by State Farm's internal policies to confirm the accuracy of any information he gathered and/or relied upon to calculate the Insured Property's replacement cost. Specifically, Wallenburg was required to independently verify both the pre-filled information State Farm's replacement cost valuation software tool auto-populated, as well as the specific information concerning the grade and quality of materials in Plaintiffs' home.

16.     State Farm further represented to Plaintiffs, directly and through Wallenburg, its agent, that State Farm would conduct itself in accordance with Oklahoma law and would fully and fairly investigate and pay claims. Plaintiffs also relied on said representations.

17.     State Farm further represented to Plaintiffs, directly and through its agent, Defendant Wallenburg, that they would conduct themselves in accordance with Oklahoma law and would fully and fairly investigate and pay claims. Plaintiffs also relied on said representations.

18.     In June 2022, Plaintiffs discovered wind/hail damage to their roof and timely filed a claim with State Farm on their Policy.

19.     On or about June 29, 2022, State Farm confirmed Plaintiffs' home had sustained wind/hail damage. Specifically, State Farm found damage to the gutter, downspout, and certain ceilings, but inexplicably did not find hail damage to the roof shingles—contending instead that the sustained damage was from "wear, tear . . . [and] deterioration." State Farm's assigned adjuster additionally advised the roof damage was "cosmetic" and was accordingly not covered under the Policy. As a result, the sustained damage identified by State Farm that was covered under the Policy was minimal. Additionally, State Farm concluded the damage did not occur in June of 2022, but purportedly a year before, on July 18, 2021.

20.     Following State Farm's scripted denial of hail damage sustained to Plaintiffs' roof, Plaintiffs engaged contractor 1st Choice Exteriors. 1st Choice Exteriors advised the roof would need to be fully replaced, estimating the cost of the replacement to be $23,953.08. Given the extensive nature of sustained hail damage, Plaintiffs were left no choice but pay 1st Choice out of pocket to replace their roof and protect their home from further damage.

21.     State Farm's denial of Plaintiffs' claim is predicated upon a systemic, state-wide Scheme designed to increase denials and/or decrease payments on valid roof claims. Under the Scheme, State Farm (1) wrongfully denies (in whole or in part) valid roof claims; (2) provides its insureds with false justification for the wrongful denials, typically through its adjusters' or agents' misrepresentations; and (3) actively and fraudulently conceals its wrongful denials and the Scheme as a whole from its insureds. In furtherance of the Scheme, State Farm (a) underscopes and undervalues damages by attributing much of the damage to non-covered, pre-existing issues without a documented pre-Policy-inception inspection or reinspection; (b) limits claim payments to damage caused by only the rarest and most severe hail storms, which State Farm accomplishes by ignoring hail damage that does not penetrate the shingle mat (*i.e.*, non-penetrative damage like

hail impacts, bruises, and granular loss does not constitute "functional" damage—and so is not covered); (c) limits claim payments to damage caused by wind contending by attributing much of the damage to non-covered, pre-existing issues; (d) limits payment of indemnity dollars by "spot repairing" damaged shingles on an unrepairable roof; (e) estimating repairs that are inconsistent with the roofing system's requirements and applicable building codes; (f) prevents policyholders from exercising their full rights following a denial or underpayment by inappropriately back-dating the date of loss; and (g) escapes making claim payments altogether by utilizing (i) inaccurate and inconsistent "estimating software" to calculate replacement cost coverages and damage estimates and (ii) company-wide Personal Program Rules within the "estimating software" to internally control and reduce the amount paid on any claim.

22. For every instance of the Scheme, State Farm wrongfully denied valid roof claims without conducting a full and fair investigation thereof. Specifically, State Farm is prohibited from denying a claim due to non-covered causes or pre-existing damage unless State Farm can substantiate those denial grounds with an inspection that *predates the inception of coverage and/or reinspection every five years thereafter*. This requirement arises under both Oklahoma law and State Farm's own guidelines, policies, and procedures. Without a prior inspection, State Farm deprives Plaintiffs of valuable evidence showing the condition of the roof before the storm. State Farm thereby deprives Plaintiffs of any meaningful opportunity to cure noted deficiencies, if any. State Farm's denial based on pre-existing damage constitutes bad faith.

23. Despite Defendants' obligations and Wallenburg's representations, neither Defendant ever conducted the required pre-inception and/or renewal inspection of Plaintiffs' Insured Property (including the roof). Specifically, Wallenburg (as State Farm's agent) sold and/or

renewed Plaintiffs' Policy and made affirmative representations as to the roof's condition while in

knowing violation of Oklahoma law and State Farm's guidelines, policies, and procedures.

24.     The manner in which State Farm handled Plaintiffs' valid roof claim illustrates

State Farm's Scheme and clearly demonstrates State Farm's bad faith. State Farm denied

Plaintiffs' hail claim under the guise of pre-existing damage—a non-covered cause of loss under

Plaintiffs' Policy—despite State Farm's failure to perform a pre-inception and/or periodic renewal

inspection (or any other inspection) demonstrating the claimed damage was, in fact, pre-existing

or otherwise non-covered. Further, State Farm impermissibly limited the scope of Plaintiffs' claim

by narrowly interpreting what constitutes "hail damage" under the Policy without disclosing that

interpretation in the Policy.

25.     State Farm's denial based on pre-existing damage and narrow interpretation of hail

damage do not square with Wallenburg's representations and assurances about the Policy's

coverage, the existence and outcome of a pre-inception inspection, and the Policy's replacement

cost values, and related premium calculations. Plaintiffs' Policy did not provide coverage as

Wallenburg promised.

26.     Plaintiffs had no means to discover that they would not be paid the Policy's full

replacement cost benefits until after the ensuing claims. Despite demand, State Farm has failed

and/or refused to pay all monies due and payable under the terms of the subject Policy.

<u>COUNT I</u>
<u>BREACH OF CONTRACT</u>

Plaintiffs fully incorporate into this paragraph each and every allegation in the preceding

paragraphs of this Amended Petition as if each were fully iterated verbatim herein, and for their

additional claims *against State Farm* hereby allege as follows:

27.     Plaintiffs entered into a contract of insurance (the Policy) with State Farm Fire and Casualty Company to provide homeowner's insurance for Plaintiffs' Insured Property. Plaintiffs' Policy was in full force and effect at all material times hereto.

28.     Wind/hail caused significant damage to Plaintiffs' Insured Property. Plaintiffs provided proper and timely notice to State Farm of the damage by filing each claim.

29.     Plaintiffs' Policy coverage includes all fortuitous losses—which necessarily includes damage sustained by wind and hail. The Policy language does not distinguish wind/hail damage coverage based on the degree of wind damage sustained or whether hail penetrates the shingle mat, nor does it make any distinction as to "cosmetic" damage.

30.     Plaintiffs have in all material ways complied with the Policy's terms and conditions.

31.     State Farm breached its contractual obligations to Plaintiffs under the Policy by failing to pay Plaintiffs all benefits to which they are entitled under the terms and conditions of the Policy and for wrongfully underpaying and denying portions of Plaintiffs' claims.

32.     Consistent with State Farm's pervasive, state-wide, fraudulent Scheme, State Farm actively, intentionally, and fraudulently concealed its Scheme to deny and/or underpay valid wind/hail damage claims from Plaintiffs. This concealment is an inherent and important aspect of State Farm's Scheme; as State Farm knew its Scheme would work only if it was kept secret.

33.     As a result of State Farm's breach of contract and other wrongful conduct, Plaintiffs have been damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, costs, and interests.

## COUNT II
## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

Plaintiffs fully incorporate into this paragraph each and every allegation in the preceding paragraphs of this Amended Petition as if each were fully iterated verbatim herein, and for additional claims *against State Farm* hereby allege as follows:

34.     At all relevant times hereto, State Farm owed Plaintiffs a duty of good faith and fair dealing.

35.     State Farm knowingly, intentionally, purposefully, wrongfully, and repeatedly breached its duty to deal fairly and in good faith by engaging in the following acts and omissions:

a.      *refusing*, without proper cause, to pay Plaintiffs all benefits State Farm owes under the Policy and pursuant to Oklahoma law;

b.      engaging in an outcome-oriented investigation on Plaintiffs' claims designed to deny and/or reduce the amount of money paid to Plaintiffs under the Policy;

c.      disregarding the documented wind speeds and hailstorms;

d.      misattributing wind/hail damage by either back-dating the loss to older storm events or disavowing any damage caused by older storms that exceed one-year from the date the claim was made;

e.      limiting Plaintiffs' rights;

f.      reducing the fair amount of Plaintiffs' claim;

g.      withholding pertinent benefits, coverages, and other provisions due to Plaintiffs under the terms and conditions of the Policy in violation of the Unfair Claims Settlement Practices Act, 36 O.S. §§1250.1-1250.16;

h.      forcing Plaintiffs to retain counsel to recover insurance benefits applicable and available under the terms and conditions of the Policy;

i.     engaging in the improper claims practices enumerated herein knowing that its insured would suffer financial harm;

j.     failing to

       i)     engage in proper claims handling practices;

       ii)     pay Plaintiffs the full and fair amount for the wind/hail damage Plaintiffs' Insured Property sustained in accordance with the Policy's terms and conditions;

       iii)     perform a proper, timely, fair, and objective investigation of Plaintiffs' damages and claims;

       iv)     inspect the Insured Property prior to inception of the coverage and/or maintain current information as to the condition of the Insured Property prior to the loss;

       v)     communicate all coverages and benefits applicable to Plaintiffs' claims;

       vi)     base its refusal to recognize and pay Plaintiffs benefits owed under the Policy for damages caused by wind and/or hail on a reasonable basis;

       vii)     notify Plaintiffs, both prior to and at the inception and renewal of the Policy, of any pre-existing damage and other conditions that, if a claim was made, would limit coverage in order to overinflate premiums to maximize State Farm's financial gains;

       viii)     disclose to Plaintiffs State Farm's lack of compliance with its own underwriting guidelines, policies, and procedures in denying coverage to Plaintiffs on the basis of pre-existing damage without the support of a prior inspection;

k.     utilizing

       i)     valuation software to calculate the replacement cost of Plaintiffs' Insured Property, knowing such software was inaccurate and systematically and methodically designed to overinflate premiums to maximize State Farm's financial gains;

       ii)     a combination of claim estimating software and unit pricing it knew to be inaccurate to calculate a damage estimate to systematically and methodically underpay homeowners' claims, including that of Plaintiffs;

       iii)     Personal Program Rules to curb and control the behavior of its claims personnel and systematically control the amount paid on any

claim as means to systematically and methodically underpay homeowners' claims, including that of Plaintiffs;

iv)  biased engineering firms to serve as ostensibly objective experts, who serve only to rubber-stamp State Farm's claims handling and engage in outcome-oriented investigations;

l.  engaging in a pattern and practice of

i)  denying claims or ensuring damage estimates fall below the deductible;

ii)  outcome-oriented investigations and claims handling practices;

iii)  denying indemnity payments owed to its first-party insureds on valid hail claims, including denial and underpayment of Plaintiffs' claims;

iv)  ignoring hail damage that does not penetrate the shingle mat, and/or intimating or disregarding opinions and findings of independent roofers so to perpetuate its fraud and further its Scheme of denying all but the most severe hail damage in dereliction of the Policy coverage and claims guidelines;

v)  adjusting Plaintiffs' claims in an arbitrary and capricious way;

vi)  using an arbitrary and capricious distinction between hail bruising and hail fracture—even though both compromise the integrity and longevity of a roof—as means of denying and/or underpaying all but the most severe roof damage claims;

vii)  disregarding granular loss as evidence of hail damage—even though it compromises the integrity and longevity of a roof—as means of arbitrarily and capriciously denying and/or underpaying all but the most severe roof damage claims;

viii)  limiting payment of indemnity dollars by "spot repairing" damaged shingles on an unrepairable roof;

ix)  using Personal Program Rules in an arbitrary and capricious way to control behavior of claims personnel and dictate on a company-wide level the amount paid on any claim;

x)  refusing arbitrarily and capriciously to issue indemnity payments owed to insureds (including Plaintiffs);

xi)  ignoring hail damage that does not penetrate the shingle mat so as to proffer a scripted denial that hail bruising or granular loss does not constitute hail damage, which State Farm intended to, and in fact did, use to rubber-stamp its prejudged bad faith claims handling practices;

12

    xii)        disregarding opinions and findings of independent roofers, contractors, engineers, and/or public adjusters so as to proffer a scripted denial that wind damaged shingles are "repairable using the proper tools and technique," which State Farm intended to, and in fact did, use to rubber-stamp its prejudged bad faith claims handling practices;

    xiii)      disregarding opinions and findings of independent roofers, contractors, engineers, and/or public adjusters so as to proffer a scripted denial that hail bruising or granular loss does not constitute hail damage, which State Farm intended to, and in fact did, use to rubber-stamp its prejudged bad faith claims handling practices;

    xiv)      denying insured's claims (including Plaintiffs' claim) based on pretextual findings of pre-existing damage; and

    xv)       a fraudulent Scheme that included the concealment through both positive acts and omissions, the sham nature of its investigations and findings, the fraudulent basis for the denial of coverage under Plaintiffs' valid insurance Policy, and other critical aspects of the Scheme.

36.    State Farm's conduct, as described above, constitutes bad faith and is a material breach of the terms and conditions of the Policy. State Farm has no reasonable basis in its refusal to recognize and pay Plaintiffs the replacement cost, as per the Policy, for wind and hail damage to Plaintiffs' Insured Property.

37.    As a consequence of State Farm's breach of the duty of good faith and fair dealing, Plaintiffs have sustained damages, including deprivation of monies rightfully belonging to Plaintiffs, and ordinary or garden variety harm of anger, stress, worry, and physical and emotional suffering that naturally results from an insurance failure, and has been damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, costs and interest.

38.    State Farm's conduct during the handling of Plaintiffs' claims demonstrate it acted intentionally, willfully, with malice, and/or in reckless disregard of the rights of others and is sufficiently egregious in nature so as to warrant the imposition of punitive damages. State Farm's

intentional, malicious actions were consistent with its overall corporate goal of increasing profits through the systematic underpayment and denial of first-party insured claims.

39.     Plaintiffs further allege State Farm enjoyed increased financial benefits and ill-gotten gains as a direct result of the wrongful conduct described above herein, which resulted in injury to Plaintiffs.

**COUNT III**
**NEGLIGENT PROCUREMENT OF INSURANCE**

Plaintiffs fully incorporate into this paragraph each and every allegation in the preceding paragraphs of this Amended Petition as if each were fully iterated verbatim herein, and for additional claims *against Defendants Wallenburg and State Farm* hereby allege as follows:

40.     At all material times hereto, Wallenburg acted as the agent, employee, or ostensible agent of State Farm, and State Farm is vicariously liable for Wallenburg's conduct.

41.     Wallenburg owed duties to Plaintiffs, including but not limited to Wallenburg's obligation to:

a.     accurately inform and advise Plaintiffs of all coverages, benefits, risks, limitations, and exclusions under the Policy; and

b.     perform a reasonable inspection of the Insured Property prior to procuring the Policy and thereafter upon renewal to ensure no changes to the Policy were necessary or required.

42.     Wallenburg is a captured agent of State Farm, and as such, serves as the first line of underwriting for State Farm. Accordingly, Wallenburg was required to (among other obligations):

a.     know of the specific property to be insured, including the condition of the roof and the quality and grade of materials in the property;

14

b.  inspect Plaintiffs' Insured Property (including the roof) and independently verify its condition prior to the Policy's inception and confirm the Insured Property was acceptable to State Farm, consistent with its internal underwriting guidelines;

c.  maintain current information about the same for each renewal; and

d.  report, to both Plaintiffs and State Farm, the existence and effect of any wear, tear, deterioration, pre-existing damage, age-related issues, or other problems with the roof that may (under State Farm's guidelines and requirements) compromise Plaintiffs' eligibility for and the application of the requested replacement cost coverage.

43. Wallenburg was negligent and/or breached the duties owed to Plaintiffs by (at least):

a.  Failing to

   i)     procure and renew an all-risk replacement cost policy that provided coverage for all fortuitous losses and any weather-related damage—big or small, functional, or cosmetic—regardless of the severity, nature or type;

   ii)    confirm at time of procurement and renewal whether the Insured Property (including the roof) met all underwriting guidelines, particularly with regard to the condition of the roof and pre-existing damage;

   iii)   follow and abide by State Farm's underwriting policies/guidelines at time of procurement and renewal;

   iv)    failing to perform all necessary inspections of the Insured Property at time of procurement and renewal;

   v)     confirm the accuracy of the pre-filled information provided by State Farm's replacement cost estimating tool;

   vi)    purposely failing to report pre-existing damage to the Insured Property in order to overinflate Plaintiffs' Policy limits and premiums;

   vii)   accurately and truthfully answer Plaintiffs' questions regarding the Policy coverages; and

   viii)  disclose State Farm's limited and undefined definition of hail.

b.  Procuring and renewing

    i)       illusory coverage purportedly providing full replacement coverage on Plaintiffs' Insured Property (including the roof);

    ii)      Policy purporting to provide full replacement coverage on Plaintiffs' Insured Property (including the roof) that does not realistically provide the coverage promised, given the exceedingly narrow and rare circumstances in which hail damage is covered;

    iii)     a Policy which did not accurately reflect the replacement cost of Plaintiffs' Insured Property (*i.e.*, an amount that was 100% insurance to value as promised); and

    iv)     a Policy (with calculated coverages) that, as written, does not provide coverage to fully restore Plaintiffs' Insured Property back to its pre-loss condition, in contradiction to what Wallenburg promised.

c. Reporting to State Farm and Plaintiffs that the Insured Property (including the roof) was in good condition and met all underwriting requirements prior to the inception of coverage and thereafter with each renewal;

d. Utilizing valuation software to calculate replacement cost values knowing such software was inaccurate and in no way commensurate with the estimating software used in claims; and

e. Utilizing valuation software to calculate the replacement cost of Plaintiffs' Insured Property, knowing such software was inaccurate and systematically and methodically designed to overinflate premiums to maximize the Defendants' financial gains.

44. Based on Wallenburg's representations and duties to Plaintiffs, Plaintiffs reasonably believed the Policy conformed to Plaintiffs' discussions and agreement with Wallenburg.

45. Plaintiffs relied on Wallenburg's representations. Based on Wallenburg's representations, Plaintiffs trusted and believed Wallenburg had the requisite insurance agent skills and expertise to properly procure the insurance coverage Plaintiffs requested—including full

replacement cost coverage for Plaintiffs' roof—especially since Plaintiffs explicitly disclosed Plaintiffs' insurance needs. Specifically, Plaintiffs relied on Wallenburg to procure a replacement cost policy that:

    a.  set forth coverages that represented 100% of the actual cost to repair and/or replace the subject Insured Property (including the roof) back to its pre-loss condition in the event of a loss;

    b.  reflected accurate replacement cost values that were commensurate with actual reconstruction costs based on the condition and specific amenities and details of their home and roof, and

    c.  would provide coverage on all fortuitous losses—big or small, functional, or cosmetic—without exception, exclusion, or limitation, including any and all weather-related damage.

46.    Wallenburg knew (or should have known) Plaintiffs relied on its representations that Plaintiffs' Insured Property had met all underwriting requirements, that all inspections had occurred, and that the coverage was as Wallenburg represented. Further, it was foreseeable that failure to procure coverage as Plaintiffs requested and Wallenburg promised could unnecessarily expose Plaintiffs to significant harm, losses, and damages.

47.    As a result of Defendants' conduct, Plaintiffs have sustained damages, including deprivation of monies rightfully belonging to Plaintiffs, and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering, and have been damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, costs and interest.

48.    Defendants' conduct was intentional, willful, malicious and in reckless disregard

of the rights of the Plaintiffs and is sufficiently egregious in nature so as to warrant the imposition of punitive damages.

**COUNT IV**
**CONSTRUCTIVE FRAUD AND NEGLIGENT MISREPRESENTATION**

Plaintiffs fully incorporate into this paragraph each and every allegation in the preceding paragraphs of this Amended Petition as if each were fully iterated verbatim herein, and for Plaintiffs' additional claims *against Defendants Wallenburg and State Farm* hereby allege as follows:

49.    Wallenburg represented to Plaintiffs that State Farm homeowners' insurance would provide the necessary protection for Plaintiffs' Insured Property. In doing so, Wallenburg not only represented to Plaintiffs she was an expert in the insurance industry, but also possessed the experience to get the dependable, comprehensive full replacement coverage that would apply to all accidental losses (no matter the severity) without any limitations, exclusions, or conditions for weather-related causes of loss to meet Plaintiffs' specific insurance needs. Wallenburg touts that she and her team have over 80-years of combined insurance experience and as such enjoy educating clients—like Plaintiffs—about coverage to ensure their insurance needs are met.

50.    Indeed, Wallenburg assured Plaintiffs the Policy was one of true, guaranteed replacement and their roof would be fully replaced in the event of a weather-related loss. By this, Wallenburg explained the Policy covered all weather-related events and whatever the damage sustained it was covered. Wallenburg made these assurances by advocating that with a homeowner's policy with State Farm all Plaintiffs requested insurance needs were specifically met.

51.    By this, Wallenburg represented to Plaintiffs that State Farm sold the requested coverage, but the Insured Property (and more specifically the roof) would first have to qualify by

18

meeting all underwriting guidelines, which require a property inspection. These requirements are based on the training and underwriting materials State Farm provides to each of its captive agents. State Farm's agents are bound to adhere to this training and the underwriting guidelines per their contracts with State Farm.

52. Wallenburg had a duty to exercise reasonable diligence and skill in obtaining and accurately notifying Plaintiffs of the nature and character of the insurance procured.

53. Wallenburg breached the duties she owed to Plaintiffs by misrepresenting and/or concealing pertinent material facts from Plaintiffs as follows:

a. Selling and renewing illusory replacement cost insurance coverage on the roof and representing to Plaintiffs at the time the Policy was issued and with each renewal that Plaintiffs' roof met all underwriting guidelines and that any sustained damage (regardless of the severity) would be fully replaced knowing such statement was untrue.

b. Misrepresenting to Plaintiffs at the time the Policy was procured and with each renewal, as follows:

| | |
|---|---|
| xvi) | the Insured Property (including the roof) met all underwriting requirements; |
| ii) | the Insured Property (including the roof) was in good condition; |
| iii) | the Insured Property (including the roof) had no pre-existing issues—including deterioration or granular loss—that would limit or restrict coverage in the event of either a partial or total loss; |
| iv) | the Insured Property (including the roof) was eligible for the comprehensive full replacement coverage (rather than ACV) based on the roof's age and condition so to overinflate premiums to maximize the Defendants' financial gains; |
| v) | the Policy provided the requested guaranteed replacement coverage; |
| vi) | the Policy was not subject to any exclusions, limitation, or conditions; |
| vii) | the Policy covered all fortuitous losses; |

19

viii)   the Policy fully covered weather-related damage (even cosmetic, whether big or small);

ix)   that the Policy covered all forms of hail damage;

x)   that the Policy covered all forms of wind damage;

xi)   that the Policy provides broad coverage that is essential in case of a wind/hailstorm;

xii)   failing to disclose State Farm's limited and undefined definition of hail.

xiii)   Wallenburg was an expert, proficient in accurately calculating replacement cost values using State Farm's valuation software;

xiv)   Wallenburg followed and met State Farm's underwriting policies/guidelines by applying first-hand knowledge it obtained from inspections of Plaintiffs' Insured Property (including the structure, roof, specific amenities, construction qualities, age, and condition) to calculate the replacement cost values using State Farm's valuation software Defendants;

xv)   the replacement cost valuation (as calculated by Wallenburg) was accurate and commensurate with current market and reconstruction costs in an amount necessary for Plaintiffs to replace and/or rebuild Plaintiffs' Insured Property back to its pre-loss condition in the event of a loss;

xvi)   the replacement cost valuation (as calculated by Wallenburg), for which premiums were paid, was equal to the estimated replacement cost (100% insurance-to-value);

xvii)   the valuation software utilized was accurate and commensurate with the estimating software that would be used in claims; and

xviii)   Defendants properly conducted all necessary inspections of the Insured Property.

54.   Each of the forgoing representations were false. Indeed, State Farm's captive agents cannot bind a replacement cost policy without first affirmatively representing that the property to be insured satisfies State Farm's underwriting guidelines. Should the property fail to satisfy the guidelines, the coverage on the roof is either limited to ACV or policy cannot bind at all. Accordingly, in every instance wherein a State Farm agent issues and renews a replacement cost policy, the agent must first represent the home meets State Farm's underwriting guidelines. This representation necessarily includes a representation that the home is free from pre-existing

damage—like the presence of deterioration and granular loss—that would violate those same guidelines. Indeed, properties with pre-existing damage, including and especially roof damage, do not qualify under these guidelines and are deemed an unacceptable risk to State Farm. Had Wallenburg not represented Plaintiffs' Insured Property met State Farm's underwriting guidelines, Plaintiffs would have either been limited to ACV coverage on the roof—or depending on the roof's condition—the Policy would not have been issued at all.

55.    As a result of Wallenburg's breach of duty, it gained an advantage for itself by misleading Plaintiffs to Plaintiffs' prejudice.

56.    Wallenburg's misrepresentations constitute constructive fraud.

57.    Plaintiffs were misled and induced to accept, purchase, and renew the State Farm replacement cost policy (which included the roof) by Wallenburg's misrepresentations and constructive fraud. Plaintiffs relied on Wallenburg's misrepresentations to Plaintiffs' detriment.

58.    Wallenburg is the agent and/or ostensible agent of State Farm for purposes of these misrepresentations, and as such, State Farm is vicariously liable for them.

59.    As a result of the Defendants' constructive fraud and misrepresentations, Plaintiffs have sustained damages, including deprivation of monies rightfully belonging to Plaintiffs, and ordinary or garden variety harm of anger, stress, worry, and physical and emotional suffering, and have been damaged in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of attorneys' fees, costs and interest. Plaintiffs are further entitled to reformation of the insurance contract to provide coverage consistent with Wallenburg's misrepresentations.

60.    The conduct of Defendants was intentional, willful, malicious, and in reckless disregard of the rights of the Plaintiffs, and/or was grossly negligent, and is sufficiently egregious in nature so as to warrant the imposition of punitive damages.

21

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, David Byrd and Regina Byrd, pray for judgment against

Defendants, State Farm Fire and Casualty Company and Rita Wallenberg Insurance Agency, for:

(a)      Actual and punitive damages each in an amount in excess of $75,000.00;

(b)      Disgorgement of the increased financial benefits derived by any and/or all of the

Defendants as a direct result of the Defendants' wrongful conduct; and

(c)      Prejudgment interests, costs and attorneys' fees.

Respectfully submitted,

Jeff D. Marr, OBA #16080
Carole Dulisse, OBA #18047
MARR LAW FIRM
4301 Southwest Third Street
Oklahoma City, Oklahoma 73108
Telephone: (405) 236-8000
Facsimile: (405) 236-8025
Email:  jeffdmarr@marrlawfirm.com
         cdulisse@marrlawfirm.com

*-and-*

Reggie N. Whitten, OBA No. 9576
Michael Burrage, OBA No. 1350
J. Revell Parrish, OBA No. 30205
**WHITTEN BURRAGE**
512 North Broadway Avenue, Suite 300
Oklahoma City, OK  73102
Telephone:    405.516.7800
Facsimile:    405.516.7859
Email: rwhitten@whittenburragelaw.com
        mburrage@whittenburragelaw.com
        rparrish@whittenburragelaw.com

        -and-

Chad E. Ihrig, OBA No. 19491
Nick Marr, OBA No. 34284
Ashton Poarch, OBA No. 34308
**NIX PATTERSON, LLP**
8701 Bee Cave Road
Building 1, Suite 500
Austin, Texas 78746
Telephone:    512.328.5333
Facsimile:    512.328.5335
Email: cihrig@nixlaw.com
        nmarr@nixlaw.com
        apoarch@nixlaw.com

***Attorneys for Plaintiffs***

**ATTORNEYS' LIEN CLAIMED**
**JURY TRIAL DEMANDED**