IN THE DISTRICT COURT OF CLEVELAND COUNTY
STATE OF OKLAHOMA

DAVID BYRD and REGINA BYRD,     )
     )
     Plaintiffs,     )
     )
vs.     )
     )  Case No. CJ-2023-139
STATE FARM FIRE AND CASUALTY     )
COMPANY and RITA WALLENBERG     )
INSURANCE AGENCY, INC.,     )
     )
     Defendants.     )
     )

## DEFENDANT RITA WALLENBERG INSURANCE AGENCY, INC.'S MOTION TO DISMISS

Timila S. Rother, OBA #14310
Paige A. Masters, OBA #31142
Amanda M. Finch, OBA #34650
**CROWE & DUNLEVY, PC**
Braniff Building
324 N. Robinson Ave., Suite 100
Oklahoma City, Oklahoma 73102
Telephone:  (405) 235-7700
Facsimile:  (405) 239-6651
timila.rother@crowedunlevy.com
paige.masters@crowedunlevy.com
amanda.finch@crowedunlevy.com

**ATTORNEYS FOR DEFENDANT
RITA WALLENBERG INSURANCE
AGENCY, INC.**


EXHIBIT
5

This is a dispute that has nothing to do with insurance agent Rita Wallenberg ... except that she is an Oklahoma resident and thus her presence as a party destroys diversity jurisdiction. Rather, this is a dispute between Plaintiffs, David and Regina Byrd ("Plaintiffs"), and Defendant, State Farm Fire and Casualty Company ("State Farm"), about the scope of repairs necessary to return Plaintiffs' house to its pre-loss condition after a covered hailstorm. In fact, the only damages alleged stem from State Farm's partial denial of Plaintiffs' claim because it found hail did not damage Plaintiffs' shingles. Plaintiffs disagreed with State Farm's determination and demanded a total roof replacement. This dispute as to the scope of repair is between Plaintiffs and State Farm and no one else. Accordingly, State Farm is the only proper Defendant.

Plaintiffs allege obscure and confusing facts and irrelevant legal argument to sue non-diverse defendant, Rita Wallenberg Insurance Agency ("Wallenberg" or "the Wallenberg Agency"). Specifically, Plaintiffs allege negligent procurement of insurance and negligent misrepresentation/constructive fraud based on alleged representations at policy inception (e.g., that Wallenberg inspected the property, that it was in good condition, and that it met State Farm's underwriting guidelines for issuance of a replacement cost value ["RCV"] policy) and policy renewal. Even if Wallenberg made these representations, Plaintiffs cannot state a claim against Wallenberg, as stated more fully below.  Wallenberg is instead another in a long line of agents (in a long line of other cases) sued for the sole purpose of eliminating State Farm's statutory right to defend claims by local Plaintiffs in federal court.

In fact, this is one of dozens of cases against State Farm, filed by the same group of attorneys and defended by the undersigned counsel, alleging that dozens of different agents made essentially identical misrepresentations and committed identical underwriting failures, based on which those Oklahoma-based agents are also sued. The allegations are implausible when alleged

as to one agent but are outright impossible when alleged as to all. And, there are many other identical petitions suing State Farm and local agents being defended by different counsel. There is no reasonable explanation for the joinder of this many agents, to this many cases on parroted oral misrepresentations by each agent except that they are Oklahoma residents who destroy diversity and prevent removal.

However, the Court need not know this entire charade to decide this Motion to Dismiss. The Wallenberg Agency cannot be liable for fraud or negligent procurement based upon the asserted theory that Plaintiffs requested a policy to restore their roof to its pre-loss condition but did not receive the requested coverage because State Farm did not agree to pay to replace their roof. The dispute, apparent even from the vague facts pled by Plaintiffs, has everything to do with the scope of repairs and nothing to do with the coverage procured by the agent. Nothing that the Wallenberg Agency did or did not do resulted in State Farm's determination that Plaintiffs' entire roof did not sustain wind or hail damage.[1] In short, the policy procured is not what caused the injury alleged. For these and other reasons, set forth more fully below, Plaintiffs' Amended Petition against the Wallenberg Agency should be dismissed, pursuant to 12 O.S. § 2012(B)(6).

## THE ALLEGATIONS IN PLAINTIFFS' AMENDED PETITION

Plaintiffs' Amended Petition is nearly identical to the dozens of others their counsel have filed against State Farm and State Farm agents for other insureds. Like all the others, this petition begins by alleging "Plaintiffs entered into a contract of insurance with Defendant State Farm to provide replacement cost coverage" for the at-issue property. Am. Pet., ¶ 4. The policy was "purchased ... through the offices of Wallenberg," who at the time "was an agent and/or ostensible

---

[1] If Plaintiff had requested a policy that covered hail and State Farm had denied the claim because hail is not a covered peril, that would have been a dispute about whether the agent procured the correct coverage under a policy.

agent of State Farm." *Id.* Plaintiffs contends they "requested that Wallenberg obtain a replacement policy that would provide coverage for their home in the event of a loss (i.e., homeowners' replacement cost coverage)," and that they "specifically requested a policy that would fully replace their roof in the event of a loss." *Id.* at ¶ 6.

Plaintiffs assert that State Farm requires agents to conduct "an inspection of the Insured Property before State Farm will issue replacement cost coverage and, assuming coverage issues, maintain current information about the Insured Property via periodic inspections." *Id.* at ¶ 7. Plaintiffs maintain that this inspection was, in part, to "verify the roof's condition to ensure it satisfied State Farm's underwriting guidelines." *Id.* They also allege "the age, condition, and predominate surface materials were all factors that dictated the calculation of the increased premium associated with this type of coverage and affected Plaintiffs' eligibility to obtain replacement cost coverage for [their] roof." *Id.* at ¶ 8. To determine the roof's eligibility for insurance, Plaintiffs contend, "an inspection by Wallenberg would have been necessary and required," for "[i]n the event the roof was ineligible for the requested replacement cost coverage ... Wallenberg had an independent duty to report the same to Plaintiffs and to State Farm." *Id.*

Plaintiffs allege that "[n]either Wallenberg nor State Farm advised [them] at any time that [their] roof was ineligible for the requested replacement cost coverage due to the type of policy in force or due to it being too old, worn, in poor condition, plagued by pre-existing damage/issues, or any other reason." *Id.* at ¶ 9. Rather, Plaintiffs assert "Wallenberg represented to Plaintiffs that the roof was in good condition, satisfied all of State Farm's guidelines and underwriting requirements (i.e., its age, physical condition, etc.), and therefore qualified and was eligible for full replacement cost coverage (versus ACV)." *Id.* at 10.

Next, Plaintiffs allege that Wallenberg, "[i]n procuring the Policy for [them] … independently established, calculated and set the Policy's replacement cost limits" and "recommended and represented to Plaintiffs that they should insure [their dwelling] to 100% of its replacement cost value, as determined by Wallenberg utilizing State Farm's valuation software." *Id.* at ¶ 13. Plaintiffs even go so far as to claim they had "no input in the amount of coverage Wallenberg independently selected and calculated." *Id.* They also say that Wallenberg "represented [State Farm's valuation software w]as a reliable and accurate tool" and "assured Plaintiffs that the amount of coverage … calculated was accurate, correct, commensurate with actual reconstruction costs, and represented 100 % of the Insured Property's insurance-to-value, such that Plaintiffs would be able to fully restore the Insured Property." *Id.* at ¶¶ 12-13.

The Amended Petition, then turns to the real reason Plaintiffs bring this action—State Farm's partial denial of their claim. Plaintiffs alleges that "[i]n June 2022, [they] discovered wind/hail damage to their roof and …filed a claim with State Farm," and "[o]n or about June 29, 2022" State Farm "confirmed Plaintiffs' home had sustained wind/hail damage … to the gutter, downspout, and certain ceilings, but inexplicably did not find hail damage to the roof shingles." *Id.* at ¶¶ 18-19. Plaintiffs disagreed with State Farm's assessment of damages, and thus "engaged contractor 1st Choice Exteriors." *Id.* at ¶ 20. According to Plaintiffs, 1st Choice Exteriors "advised the roof would need to be fully replaced" which would cost "$23,953.08." *Id.* Plaintiffs then, without asserting that they provided State Farm with this information, complain they "were left with no choice but to pay out of pocket to replace their roof." *Id.*

Like those before them, Plaintiffs contend this partial denial of their claim was "predicated upon a systematic, state-wide Scheme designed to increase denials and/decrease payments on valid roof claims." *Id.* at ¶ 21. Plaintiffs assert that this Scheme consists of State Farm "underscop[ing]

and undervalue[ing] damages by attributing much of the damage to non-covered preexisting issues ..." among other theories. *Id.*

Plaintiffs do not, however, provide any facts to support their bald allegation that State Farm "attribute[ed] much of the damage to preexisting issues," alleging instead that Plaintiffs' claim was underpaid because State Farm "did not find hail damage to the roof shingles" (which is true). *Id.* at ¶ 19. Nonetheless, they include yet another (incorrect) allegation replicated in substance from Petitions filed by their counsel in other cases, that "State Farm is prohibited from denying a claim due to non-covered causes or pre-existing damage unless State Farm can substantiate those denial grounds with an inspection that predates the inception of coverage and/or reinspection every five years thereafter." *Id.* at ¶ 22. "Without such prior inspection," Plaintiffs urge, "State Farm's denial based on pre-existing damage constitutes bad faith." *Id.*

Plaintiffs sue State Farm for breach of contract and the duty of good faith and fair dealing on grounds it failed to provide coverage to pay Plaintiffs all benefits to which they were entitled by refusing to cover hail damage that does not penetrate the shingle mat, along with a long list of other generic misconduct. *Id.* at ¶¶ 34-39. They allege that "[a]s a consequence of State Farm's breach of the duty of good faith and fair dealing, [they] have sustained damages, including the deprivation of monies rightfully belonging to [them], and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering that naturally results from an insurance failure ... in an amount in excess of $75,000." *Id.* at ¶ 37.

Plaintiffs then turn to their "legal" theories against the Wallenberg Agency, asserting "negligent procurement of insurance" based on allegations they requested and "relied on Wallenberg to procure a replacement cost policy." *Id.* at ¶ 45. They allege the Wallenberg Agency was required to "inspect Plaintiffs' Insured Property (including the roof) and independently verify

its condition prior to the Policy's inception" so it could determine whether the property "was acceptable to State Farm, consistent with its internal underwriting guidelines." *Id.* at ¶ 42(b). Plaintiffs contend the Wallenberg Agency reported that the Insured Property (including the roof) was in good condition and met all underwriting requirements," and accordingly, admits "Wallenberg procured, and State Farm issued, the Policy (with full replacement cost coverage for the roof)." *Id.* at ¶¶ 43(c), 11. They still contend, however, that "Wallenberg was negligent and/or breached the duties owed to Plaintiffs" by engaging in the same acts and omissions their counsel have asserted, in large part, against multiple other agents, including failing to comply with State Farm underwriting guidelines, procuring a Policy that does not accurately reflect the replacement cost of Plaintiffs' property and is "illusory" because State Farm did not pay to replace Plaintiffs' roof. *Id.* at ¶¶ 43(a)(i)-(viii), (b)(i)-(iv), (c)-(e). They assert the exact same damages against the Wallenberg Agency for negligent procurement as they do against State Farm for bad faith. *Compare id.* at ¶ 47, *with id.* at ¶ 37.

Plaintiffs also assert a constructive fraud/negligent misrepresentation claim against the Wallenberg Agency based on repeat allegations. *Id.* at ¶¶ 49-60. They contend "Wallenberg had a duty to exercise reasonable diligence and skill in obtaining and accurately notifying Plaintiffs of the nature and character of the insurance procured," and the Wallenberg Agency breached this duty by making numerous misrepresentations (largely copied and pasted from Petitions suing other agents), including statements that Plaintiffs' property met State Farm's underwriting guidelines, the property was in good condition and eligible for "the comprehensive full replacement insurance coverage (rather than ACV)," the replacement cost valuation the Wallenberg Agency calculated was sufficient to replace the Insured Property in the event of a loss, and that the Policy covered "all fortuitous losses" and "weather-related damage (even cosmetic, whether big or small)." *Id.* at

¶ 53. Again, they assert they suffered the same damages as a result of the Wallenberg Agency's misrepresentations that they suffered due to State Farm's alleged bad faith. *Compare id.* at ¶ 59, *with id.* at ¶ 37.

## ARGUMENT AND AUTHORITIES

### I. PLAINTIFFS' CLAIMS AGAINST THE WALLENBERG AGENCY ARE BARRED BY THE STATUE OF LIMITATIONS.

Plaintiffs claims for negligent procurement and constructive fraud, to the extent premised on the allegation that they did not receive the insurance coverage they requested, are absolutely barred by the two-year statute of limitations. *See* 12 O.S. § 95A(3). Notably, Plaintiffs' roof was replaced following a May 2010 hail storm. *See* Underwriting Note, attached hereto as Ex. 6. So, they would have been on notice then as to what their Policy covered, and thus, their claims for negligent procurement or misrepresentation asserted more than twelve years later, in 2023, based on the actions of the agent in selling the policy would be long ago barred by the two-year statute of limitations for torts, and must be dismissed. *See* 12 O.S. § 95(3).

### II. PLAINTIFFS CANNOT STATE A CLAIM FOR NEGLIGENT PROCUREMENT.

Plaintiffs' allegations against the Wallenberg Agency, when amalgamated, plead only that (1) Plaintiffs asked the Wallenberg Agency to procure a full RCV policy, (2) the Wallenberg Agency represented Plaintiffs' home and roof were in good condition and eligible for RCV coverage, (3) the Wallenberg Agency assured Plaintiffs "the amount of coverage" under the policy procured could "fully restore the Insured Property and roof ... in the event of damage and/or loss," (4) the Wallenberg Agency procured and State Farm issued the RCV policy, (5) the Wallenberg Agency breached duties owed to Plaintiffs because the policy procured did not "realistically provide the coverage promised, given the exceedingly narrow and rare circumstances in which hail

damage is covered" and did not "fully restore Plaintiffs' Insured Property back to its pre-loss condition"; and (6) "[a]s a result of Defendants' conduct, Plaintiffs have sustained damages, including deprivation of monies rightfully belonging to them." Am. Pet., ¶¶ 40-48. These "copy-cat" facts are largely irrelevant and entirely untrue.  However, even if taken as true, Plaintiffs cannot possibly state a claim against the Wallenberg Agency with these facts—much less the truth.

Oklahoma law recognizes a cause of action for negligent procurement against an insurance agent under certain circumstances. *See Swickey v. Silvey Cos.*, 1999 OK CIV APP 48, ¶ 8, 979 P.2d 266, 268. "An agent has the duty to act in good faith and use reasonable care, skill and diligence in the procurement of insurance." 1999 OK CIV APP 48, ¶ 13, 979 P.2d at 269. Only if *"by the agent's fault*, insurance is not procured as promised *and the insured suffers a loss*" as a result can an agent be liable in tort for breaching this duty of care. *Id.* (emphasis added). To prevail on a claim for negligent procurement, "'a plaintiff must show that the insurance agent agreed to procure insurance coverage effective as of a certain date and time, or of a certain breadth, and then failed to do so.'" *Pardue v. Humble Ins. Agency*, No. CIV-14-1049-D, 2016 WL 4275816, at *2 (W.D. Okla. Aug. 12, 2016) (quoting *Hardison v. Balboa Ins. Co.*, 4 F. App'x 663, 673 (10th Cir. 2001)). Here, Plaintiffs cannot possibly state a claim for negligent procurement because (a) the policy requested was procured, (b) the policy type/coverage did not cause Plaintiffs' alleged injury, and (c) the agent owes no underwriting duty to the insured.

## A. The Wallenberg Agency Procured a Replacement Cost Policy that Covered Hail.

Plaintiffs' claim for negligent procurement is facially inexplicable. They allege they asked for a full replacement cost insurance policy (Am. Pet., ¶ 6) and then admit, as they must, that "State Farm issued[ ] the Policy (with *full replacement cost coverage ...*)." *Id.* at ¶ 11 (emphasis added). Indeed, there is no doubt it is an RCV policy.

"Replacement cost insurance provides greater coverage than an actual cash value policy and 'is designed to cover the difference between what property is actually worth and what it would cost to rebuild or repair that property.'" *Graves v. Am. Fam. Mut. Ins. Co.*, 686 F. App'x 536, 538 (10th Cir. 2017) (citation omitted). "Under a replacement cost policy, the insured must actually repair or replace the damaged property in order to recover the full replacement cost; otherwise, the insured may recover only the actual cash value.... The reason for this requirement 'is to prevent an insured from directly profiting through the receipt of cash funds beyond the actual cash value of the loss.'" *Id.* (citation and internal quotations omitted). *See also Frontline Fellowship, Inc. v. Bhd. Mut. Ins. Co.*, No. CIV-21-357-PRW, 2022 WL 16856111, at *3-4 (W.D. Okla. Nov. 10, 2022).

In addition to Plaintiffs' concession that the Wallenberg Agency procured them a policy "with full replacement cost coverage," the Declarations to Plaintiffs' Policy show that their dwelling coverage was "A1 Replacement Cost – Similar Construction." Renewal Declarations, Ex. 2.[2] This section of the Policy provides that "until actual repair or replacement is completed, [State Farm] will pay only the *actual cash value* of the damaged part of the property, up to the applicable limit of liability shown in the *Declarations*, not to exceed the cost to repair or replace the damaged part of the property." Policy, § 1.a.(1), p. 18, Ex. 1. "[W]hen the repair or replacement is actually completed, [State Farm] will pay the covered additional amount [Plaintiffs] actually and necessarily spend to repair or replace the damaged part of the property, or an amount up to the applicable limit of liability shown in the *Declarations*, whichever is less." Policy, § 1.a.(2), p. 18, Ex. 1. Therefore, the fact that Plaintiffs received exactly the policy they requested, as shown by

---

[2] Because "[t]he interpretation of an insurance policy is a question of law," *Cherokee Nation v. Lexington Ins. Co.*, 2022 OK 71, ¶ 9, 521 P.3d 1261, 1266, Defendant provides the Court with Plaintiffs' Policy.

the face of the Policy and as conceded in their Amended Petition, is grounds for dismissal under § 2012(B)(6). Order at 5, *Marino v. State Farm Fire & Cas. Co.*, No. CIV-22-0885-HE (W.D. Okla. Aug. 7, 2023) (denying motion to remand because it was "undisputed that the policy the [plaintiffs] wanted – one for full cost replacement coverage of their property – was in fact delivered"), attached hereto as Ex. 3; Order at 6, *Goebel v. State Farm Fire & Cas. Co.*, No. CIV-22-0882-HE (W.D. Okla. Aug. 7, 2023) (same), attached hereto as Ex. 4.

Apparently cognizant of this fatal flaw, Plaintiffs also allege the "full replacement coverage" was, in reality, "illusory," (Am. Pet., ¶ 43(b)(i)), without any explanation of how any conduct by the Wallenberg Agency made it illusory. Indeed, it seems plain that "illusory" is simply another way of saying Plaintiffs disagreed with State Farm's claim decision. And if the notion that "full replacement coverage" was illusory is based on the complaint that State Farm will find the presence of hail damage only when it bruises the mat, as suggested by a global reading of Plaintiff's Amended Petition, that has nothing to do with the policy procured by the agent. It is instead simply a (false) statement about State Farm's claim handling philosophy. In sum, Plaintiffs' Amended Petition, the Policy, and the law make plain that Plaintiffs received exactly what they allege they asked the Wallenberg Agency to procure—a full replacement cost policy.

### B. Plaintiffs Fail to Show that the Wallenberg Agency's Alleged Conduct Injured Plaintiffs.

Even if the Policy were different than requested, that is not what caused the disagreement between State Farm and Plaintiffs regarding the scope of damage to Plaintiffs property related to this claim and thus is not what caused their alleged injury. As with all negligence claims, a required element of a negligent procurement claim is *causation*. Plaintiffs must show they "suffered damages flowing from the breach of the agent's duty of care." *Castens v. Conseco Life Ins. Co.*, No. 11-CV-628-TCK-FHM, 2012 WL 610001, at *2 (N.D. Okla. Feb. 24, 2012). That is, "there

must be 'some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.'" *West v. Chaparral Energy, LLC*, No. CIV-16-264-F, 2018 WL 8264627, at *4 (W.D. Okla. Aug. 13, 2018) (quoting *Steed v. Bain-Holloway*, 2015 OK CIV APP 68, 356 P.3d 62, 68). Causation is entirely absent here.

The injury alleged by Plaintiffs from the conduct of the agent and of State Farm in this case is the same—failure to pay to replace Plaintiffs' roof. Am. Pet., ¶ 19. The cause of that alleged injury, according to Plaintiffs, is State Farm concluding there was no "hail damage to the[ir] roof shingles." *Id.* RCV instead of ACV only matters if there is a loss from a covered peril (otherwise there is no loss to calculate). *See* Policy, § 1, p.12, Ex. 1 ("*We* will pay for accidental direct physical loss to the property ...."). State Farm found no hail damage to the shingles on Plaintiffs' roof, and so the cost to repair or replace them never arose.  Not only does this show that the alleged absence of RCV coverage did not injure Plaintiffs, it also negates any claim the RCV coverage, under these facts, was illusory. It was instead simply immaterial. Thus, Plaintiffs' negligent procurement claim should be dismissed. *See West*, 2018 WL 8264627 at *4 (dismissing negligence claim for plaintiff's failure to sufficiently allege facts to establish causation).

*Gellner v. Progressive Northern Insurance Co.* is instructive on the element of causation. No. 21-CV-0401-CVE-JFJ, 2021 WL 5789146 (N.D. Okla. Dec. 7, 2021). In *Gellner* the insureds submitted a claim for property damage to their boat, claiming it collided with an object in the water. *Id.* at *1. Their insurer denied the claim finding the damage was caused by wear and tear and lack of maintenance. *Id.* The insureds sued the insurer for breach of contract and bad faith and their agent for negligent procurement. *Id.*

The insurer removed the case to federal court, arguing in part, that the plaintiffs' claims had nothing to do with the nature of the insurance policy issued and therefore plaintiffs had not

stated a viable claim against the agent. *Id.* The court agreed, finding that there was "no possibility that plaintiff could recover against" the agent; the insurer did "not deny that the insurance policy cover[ed] damage caused by collisions" and did "not dispute that plaintiffs' claim would be covered if plaintiffs could establish that damage to the boat was caused by a collision." *Id.* at *3. The court reasoned that the case was "simply a garden variety breach of insurance contract claim against the insurer, and there [were] no allegations in the Petition suggesting that the insurer's decision on plaintiffs' claim would have been different if the insurance agent had obtained some other insurance policy." *Id.* Instead, the "outcome of plaintiffs' claims against [the insurer] depend[ed] upon the cause of the damage to the boat, not the lack of collision coverage in the insurance policy," and thus, plaintiffs had not stated a viable claim against the agent. *Id.*

Plaintiffs allege State Farm wrongly refused to pay the entirety of their claim because it found no damage to the shingles of Plaintiffs' roof and thus, did not pay to replace Plaintiffs' roof. Am. Pet., ¶ 19. But, like *Gellner*, State Farm does not deny that the policy covers wind and hail damage. In fact, State Farm paid Plaintiffs for the damage to their ceilings, gutters, and various soft metal components on the roof. As a result, absent from the Amended Petition is any explanation of how State Farm's claim decision would be different if the agent had bound coverage exactly as Plaintiffs allege they requested (which the agent in fact did). Thus, there is not and cannot be any allegation that the alleged failure to procure coverage as requested injured Plaintiffs. As in *Gellner*, there is "no possibility that [P]laintiff could recover against" the Wallenberg Agency under Oklahoma law based on this theory. *Gellner*, 2021 WL 5789146 at *3.

### C. Plaintiffs Fail to Show that Wallenberg Owed an Underwriting Duty to Plaintiffs.

Plaintiffs' Amended Petition is replete with out-of-date generalizations about an agent's inspection and/or underwriting obligations and allegations Plaintiffs were misinformed or

uninformed about underwriting inspections. *See, e.g.,* Am. Pet., ¶¶ 7-9, 41-43, 53-54. The allegations are based on flawed reading of State Farm's underwriting guidelines, but it is immaterial because any inspection or underwriting duties by an agent that exist are duties owed to State Farm and not the insureds. Plaintiffs vaguely link these (non-existent) underwriting duties to the negligent procurement claim by alleging the Wallenberg Agency breached a duty owed to them by failing to confirm "whether the Insured Property (including the roof) met all underwriting guidelines, particularly with regard to the condition of the roof and any preexisting damage." Am. Pet., ¶ 43(a)(ii). This argument is indecipherable because an insurance policy issued, under which Plaintiffs sue State Farm for benefits. Therefore, the house did satisfy State Farm's underwriting requirements.[3]

Regardless, this theory presupposes a duty to the insured with regard to underwriting which does not exist. The courts to address the issue are in agreement that an agent owes no underwriting duty to the insured. *Marino,* No. CIV-22-885-HE (W.D. Okla. Aug. 7, 2023), at 6, Ex. 3 ("[P]laintiff has not identified any Oklahoma case suggesting that whatever role an agent plays in the underwriting process results in a duty owed to the insured."); *Goebel,* No. CIV-22-882-HE (W.D. Okla. Aug. 7, 2023), at 7, Ex. 4 ("[T]here is no basis shown for concluding that [State Farm Agent] Garetson undertook or otherwise had a duty beyond securing the issuance of the initial and renewal policies for full replacement coverage."). This makes sense, as insurance companies conduct underwriting for their own benefit—to recognize and reduce risk—and not as a service to inform prospective (or existing) insureds of the condition of their house. *See Gray,* 464 F. Supp.

---

[3] Further, there can be no question that the roof, which was brand new in 2010, was in good condition and met all underwriting guidelines. This would also negate any issue, if one even existed, as to alleged pre-existing damage to the roof when the Policy was issued in 2006.

2d at 109.[4] There is no underwriting duty which could be breached and thus the Wallenberg Agency should be dismissed.

### III.  PLAINTIFFS CANNOT STATE A CLAIM AGAINST THE WALLENBERG AGENCY FOR CONSTRUCTIVE FRAUD AND NEGLIGENT MISREPRESENTATION.

Plaintiffs' claim for "constructive fraud and negligent misrepresentation"[5] is an effort at establishing a different legal theory on the same erroneous facts, and it fails for the same reasons and more. To state a claim for constructive fraud, a plaintiff must allege facts to show (1) defendant owed plaintiff a duty of full disclosure; (2) defendant misstated a fact or failed to disclose a fact to plaintiff; (3) defendant's misstatement or omission was material; (4) plaintiff relied on defendant's material misstatement or omission; and (5) plaintiff suffered damages as a result. *Lillard*, 267 F. Supp. 2d at 1113. "[T]he circumstances constituting fraud or mistake shall [also] be stated with particularity." 12 O.S. § 2009(B). To do so, Plaintiffs' Amended Petition must set forth "'the *time, place, and content* of an alleged false representation.'" *Gianfillippo v. Northland Cas. Co.*, 1993 OK 125, ¶ 11, 861 P.2d 308, 311. Plaintiffs' Amended Petition does not set forth facts to establish each element of their claim, let alone with the particularity required by § 2009. The claim,

---

[4] Even if Plaintiffs' Policy was not an RCV policy (it is) and even if the dispute was the scope of coverage instead of the scope of the loss (it isn't), Oklahoma courts have repeatedly held that an insurance agent need only offer coverage mandated by law and coverage for the needs that are disclosed by the insureds, and this duty is not expanded by a general request for full or adequate coverage. *Rotan v. Farmers Ins. Grp. of Cos.*, 2004 OK CIV APP 11, ¶ 3, 83 P.3d 894, 895; *Rivera v. Hartford Ins. Co.*, No. CIV-14-1082-HE, 2014 WL 7335320, at *2 (W.D. Okla. Dec. 19, 2014). General assertions, like Plaintiffs make here, that an agent failed to "procure the replacement cost insurance coverage Plaintiffs requested," *Rivera*, 2014 WL 7335320 at *2, or that the policy "did not serve to actually replace [plaintiffs'] ... property when it was damaged or destroyed by a covered loss," *Country Gold, Inc. v. State Auto Prop. & Cas. Ins. Co.*, No. CIV-14-1398-D, 2015 WL 431638, at *2 (W.D. Okla. Feb. 2, 2015), do not provide a basis for a negligent procurement claim. *See Rivera*, 2014 WL 7335320 at *2; *Country Gold*, 2015 WL 431638, at *3.

[5] Negligent representation is one type of constructive fraud and requires the same elements to be met. *See, e.g., CashCall, Inc. v. BancFirst*, No. CIV-16-927-W, 2016 WL 9559037, at *5 n.10 (W.D. Okla. Dec. 15, 2016).

therefore, should be dismissed. 1993 OK 125, ¶ 13, 861 P.2d at 311 (affirming dismissal of fraud claim for failure to allege requisite elements).

In their Amended Petition, Plaintiffs allege the Wallenberg Agency made multiple misrepresentations and/or omissions which fall into three categories: (1) representations regarding Plaintiffs' eligibility for replacement cost value coverage, including those relating to the completion of inspections, compliance with underwriting guidelines, and good condition of Plaintiffs' property (Am. Pet., ¶ 53(a), (b)(xvi)-(iv), (b)(xviii); (2) representations regarding the calculation of the replacement cost value of Plaintiffs' property using State Farm's valuation tool (*Id.* at ¶ 53(b)(xiii)-(xvii); and (3) representations regarding the coverage provided by Plaintiffs' Policy (*Id.* at ¶ 53(b)(v)-(xii). They say these misrepresentations were made by Defendant Wallenberg (*Id.* at ¶ 53), but they do not say who at the agency made these misrepresentations, when or where they were allegedly made, the context in which they were made, or even specifically what was said. In that regard, the Amended Petition falls far short of satisfying § 2009(B).

Further fatal to the claim is that none of these alleged misrepresentations *caused* the damages of which Plaintiffs complain. That is, even assuming these statements were spoken by Wallenberg (they were not), the element of causation is absent. The only injury alleged by Plaintiffs for any claim is that "[a]s a result of the ***Defendants'*** [conduct]"—not Defendant Wallenberg alone—"Plaintiffs have sustained damages, including deprivation of monies rightfully belonging to them, and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering." *Compare* Am. Pet. at ¶ 47, *with id.* at ¶ 37 (bad faith claim), *and id.* at ¶ 59 (negligent procurement claim). ***Plaintiffs suffered no damage from the alleged misrepresentations because none are the reason for the scope of damage determination in this claim.*** The only "deprivation of monies" identified (or even plausible) was State Farm's refusal to

pay to replace Plaintiffs' roof because it determined the shingles were not damaged by hail. That decision had nothing to do with inspections being completed, whether the Insured Property met all "underwriting guidelines," whether Plaintiffs had RCV coverage, or how State Farm pays a claim under RCV provisions. *Cf. Smith*, 2014 WL 1382488 at *4 n.7 ("[P]laintiffs cannot recover for alleged misrepresentations regarding coverage for a total loss when their home was not totally destroyed").

Plaintiffs also cannot establish the existence of a "legal or equitable duty" on the part of *Wallenberg* as must exist to state a claim for negligent misrepresentation/constructive fraud. The only duty actually alleged in the constructive fraud claim is the same duty alleged for negligent procurement—to "exercise reasonable diligence and skill in obtaining and accurately notifying Plaintiffs of the nature and character of the insurance procured." Am. Pet., ¶ 52. That does not suffice. *Country Gold, Inc.*, 2015 WL 431638 at *4. The duty from which a negligent procurement theory arises, "to act in good faith and to exercise reasonable care, skill and diligence in the procurement of insurance," does not automatically establish the "legal or equitable" duty required for a constructive fraud claim. *See, e.g., Siddique v. W. Heritage Ins. Co.*, No. CIV-14-456-SPS, 2015 WL 2451734, at *3 (E.D. Okla. May 21, 2015). To the extent Plaintiffs' claim is premised on an alleged underwriting duty or duty to inspect, such legal duty does not exist, as demonstrated in § II(C), *supra*. *See, e.g., In re SandRidge Energy, Inc.*, No. CIV-13-102-W, 2013 WL 12094215, at *10 (W.D. Okla. Sept. 11, 2013) (dismissing fraud claim where "there [we]re no allegations in the Complaint that [defendants] owed the plaintiffs a duty of disclosure").

Moreover, the allegations in the Amended Petition make clear that the alleged statements were not misstatements at all but spoke the truth. Plaintiffs' house *did* satisfy underwriting and qualified for replacement cost coverage. The Policy that State Farm issued, and under which

Plaintiffs sue and seek benefits, *is* an RCV policy. *See* § II(A), *supra*. *See also Smith*, 2014 WL 1382488 at *2 (rejecting claim agent misrepresented property would be replaced without any deduction for depreciation where policy provided for replacement without depreciation if the insured repaired or replaced the property). Plaintiffs' Policy covers hail damage, as well. Policy, § I, p.12, Ex. 1. State Farm's claim decision simply found that hail did not damage Plaintiffs' shingles. Am. Pet., ¶ 19. Thus, Plaintiffs' roof did not warrant replacement. *Id.* at ¶ 19.

Plaintiffs could not have reasonably relied upon any alleged misrepresentations about their Policy, anyhow, because they received a copy. It has long been the law that insureds have a duty "to read and know the contents of the polic[y]" before they accept it and an applicant "who accepts [a policy] the provisions of which are plain, clear, and free from all ambiguity, is chargeable with knowledge of the terms and legal effect." *Liverpool & L. & G. Ins. Co. v. T.M. Richardson Lumber Co.*, 1902 OK 7, 69 P. 936, 937; *see also Country Gold*, 2015 WL 431638 at *4 (dismissing constructive fraud claim in part because there was no dispute plaintiff received policy and thus could not have reasonably relied upon any misrepresentations about it); *Siddique*, 2015 WL 2451734 at *4-5 (same). There were no misrepresentations, no duty, and no injury.

IV.    **PLAINTIFFS' AMENDED PETITION FAILS TO SATISFY THE MOTION TO DISMISS STANDARD.**

"The purpose of a motion to dismiss is to test the legal sufficiency of the pleadings." *Patel v. OHM Med. Ctr., Inc.*, 1999 OK 33, ¶ 43, 987 P.2d 1185, 1202. To survive a motion to dismiss, a Petition must contain "[a] short and plain statement of the claim showing that the pleader is entitled to relief," 12 O.S. § 2008(A)(1), "to give an opposing party fair notice of the claim and the grounds upon which it rests." *Ind. Nat'l Bank v. State Dep't of Human Servs.*, 1994 OK 98, ¶ 2, 880 P.2d 371, 375. Dismissal is proper under 12 O.S. § 2012(B)(6) where, as here, Plaintiffs'

Amended Petition fails to set forth (1) a cognizable legal theory of liability or (2) facts to support any cognizable legal theory. *Lockhart v. Loosen*, 1997 OK 103, ¶ 4, 943 P.2d 1074, 1078.

As demonstrated above, Plaintiffs cannot possibly set forth facts to support a cognizable legal theory of liability against the Wallenberg Agency. Plaintiffs' use of a parroted Petition filed by their attorneys against State Farm and dozens of other agents without regard to the facts of each case is further proof. Plaintiffs' counsel repeats, occasionally rearranging, the same allegations every time, against every agent, as if every case were the same and every agent a liar.

The impermissibility of this tactic was expressly recognized by United States District Judge Joe Heaton in a trio of recent orders denying Motions to Remand based upon fraudulent joinder and dismissing the agent in each case. In those cases, the court held that the lack of "good faith basis for a substantial portion of the facts alleged and which are relied on in an effort to state a claim against the resident defendant ... constitute[ed] fraud in the pleadings of jurisdictional facts." *Goebel*, No. CIV-22-882-HE, at 3, 5, Ex. 4 (finding plaintiff's petition "replete with false statements," most notably the "substantially identical allegations being implausibly made against State Farm agents in dozens of other cases"); *Marino*, No. CIV-22-885-HE, at 2, Ex. 3 (finding plaintiff's "substantially identical, cookie-cutter allegations," "for which there [was] zero evidence" constituted "actual fraud in the pleading of ... jurisdictional facts").

Nevertheless Plaintiffs' counsel's continues to use their "form" Petition, or "formulaic view of what a court might accept as a basis for claim" without "a real factual basis," *Marino*, No. CIV-22-885-HE, ECF No. 52, at 5. For example, just as in *Goebel* and *Marino*, Plaintiffs' counsel again allege, amongst other practically identical accusations, that the agent assured Plaintiffs that they qualified for the "best policy State Farm offered," that the Policy provided the "broadest form of coverage available today," and they would conduct themselves "in accordance with Oklahoma

law and would fully and fairly investigate and pay claims." *Compare* Am. Pet., ¶¶ 10-11, 16 *with*

*Marino*, No. CIV-22-885-HE, at 4, Ex. 3 *and Goebel*, No. CIV-22-882-HE, at 4, Ex. 4. Plaintiffs'

counsel have been warned that filing such a pleading, "containing false and/or inaccurate

statements," as Plaintiffs' counsel has again done here, in federal court "is likely to result in

significant sanctions." *Baltazar v. State Farm Fire & Cas. Co.*, No. CIV-22-928-HE (W.D. Okla.

Aug. 8, 2023), at 4 (attached hereto as Ex. 5). Plaintiffs' counsel's Petitions remain substantially

unchanged from case to case, without regard to the specific factual or legal nuances of each

individual case. Plaintiffs have no cognizable claim against the Wallenberg Agency, and the claims

asserted against it should be dismissed.

## CONCLUSION

Based on the foregoing, there is no avenue through which Plaintiffs can establish a claim

against the Wallenberg Agency. Therefore, pursuant to 12 O.S. § 2012(B)(6), the Wallenberg

Agency respectfully moves to dismiss the Amended Petition against it. Leave to amend should not

be granted because the defects identified herein are fatal and cannot be remedied. *See* 12 O.S. §

2012(G) ("On granting a motion to dismiss a claim for relief, the court shall grant leave to amend

*if the defect can be remedied*") (emphasis added); *Williams v. Indep. Sch. Dist. No. 7 of Harrah*,

1994 OK CIV APP 87, ¶ 8, 881 P.2d 760, 763.

Respectfully submitted,

Timila S. Rother, OBA # 14310
Paige A. Masters, OBA # 31142
Amanda M. Finch, OBA #34650
**CROWE & DUNLEVY, PC**
Braniff Building
324 N. Robinson Ave., Suite 100
Oklahoma City, Oklahoma 73102
Telephone: (405) 235-7700

Facsimile: (405) 239-6651
timila.rother@crowedunlevy.com
paige.masters@crowedunlevy.com
amanda.finch@crowedunlevy.com

**ATTORNEYS FOR DEFENDANT RITA
WALLENBERG INSURANCE
AGENCY, INC.**

## CERTIFICATE OF SERVICE

This is to certify that on the 21st day of August 2023, the undersigned caused a true and correct copy of the above and foregoing to be mailed to:

Jeffrey D. Marr
Carole Dulisse
**MARR LAW FIRM**
4301 Southwest Third Street
Oklahoma City, Oklahoma 73108

Reggie N. Whitten
Michael Burrage
J. Revell Parrish
**WHITTEN BURRAGE**
512 North Broadway Ave., Suite 300
Oklahoma City, Oklahoma 73102

Chad E. Ihrig
Nick Marr
Ashton Poarch
**NIX PATTERSON, LLP**
8701 Bee Cave Road
Building 1, Suite 500
Austin, TX 78746

_____
Amanda M. Finch

21



**State Farm**®

This policy is one of the broadest forms available today, and provides you with outstanding value for your insurance dollars.  However, we want to point out that every policy contains limitations and exclusions.  Please read your policy carefully, especially "Losses Not Insured" and all exclusions.

# State Farm® Homeowners Policy

**Oklahoma**
HW-2136



EXHIBIT

1

# HOMEOWNERS POLICY
## TABLE OF CONTENTS

AGREEMENT ............................................. 1

DEFINITIONS ........................................... 1

DEDUCTIBLE ........................................... 5

SECTION I – PROPERTY COVERAGES ..................... 5

  COVERAGE A – DWELLING............................. 5

    Dwelling............................................. 5

    Other Structures.................................... 5

    Property Not Covered.............................. 5

  COVERAGE B – PERSONAL PROPERTY .............. 5

    Property Covered .................................. 5

    Special Limits of Liability ........................ 6

    Property Not Covered ............................. 6

  COVERAGE C – LOSS OF USE ....................... 8

    Additional Living Expense ....................... 8

    Fair Rental Value................................... 8

    Prohibited Use...................................... 8

  SECTION I – ADDITIONAL COVERAGES............. 8

    Debris Removal .................................... 8

    Temporary Repairs................................ 9

    Trees, Shrubs, and Landscaping ................ 9

    Fire Department Service Charge................. 9

    Property Removed ................................. 9

    Credit Card, Bank Fund Transfer Card, Forgery, and Counterfeit Money................ 9

    Power Interruption ............................... 10

    Refrigerated Products .......................... 10

    Arson Reward...................................... 10

    Volcanic Action ................................... 10

    Collapse ........................................... 10

    Locks and Remote Devices.................... 11

    Fuel Oil Release .................................. 11

    Tear Out ........................................... 11

    Home Certification............................... 11

INFLATION COVERAGE ........................... 11

SECTION I – LOSSES INSURED ................... 12

  COVERAGE A – DWELLING...................... 12

  COVERAGE B – PERSONAL PROPERTY ......... 12

SECTION I – LOSSES NOT INSURED............ 14

SECTION I – LOSS SETTLEMENT ............... 18

  COVERAGE A – DWELLING...................... 18

    A1 – Replacement Cost Loss Settlement – Similar Construction ........................... 18

    A2 – Replacement Cost Loss Settlement – Common Construction.......................... 18

  COVERAGE B – PERSONAL PROPERTY ......... 19

    B1 – Limited Replacement Cost Loss Settlement ...................................... 19

    B2 – Depreciated Loss Settlement............ 19

SECTION I – CONDITIONS......................... 20

    Insurable Interest and Limit of Liability ....... 20

    Your Duties After Loss ......................... 20

    Loss to a Pair or Set ........................... 20

    Appraisal........................................... 21

    Other Insurance.................................. 22

    Suit Against Us................................... 22

    Our Option......................................... 22

    Loss Payment..................................... 22

    Abandonment of Property....................... 22

    Mortgagee Clause ............................... 22

    No Benefit to Bailee............................. 23

    Recovered Property.............................. 23

    Assignment of Claim............................ 23

SECTION II – LIABILITY COVERAGES............ 23

  COVERAGE L – PERSONAL LIABILITY ......... 23

  COVERAGE M – MEDICAL PAYMENTS TO OTHERS .......................................... 23

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

SECTION II – ADDITIONAL COVERAGES .............23
    Claim Expenses ...............................................24
    First Aid Expenses ..........................................24
    Damage to Property of Others .........................24
SECTION II – EXCLUSIONS ...............................24
SECTION II – CONDITIONS .......................................28
    Limit of Liability ................................................28
    Severability of Insurance .................................28
    Duties After Loss .............................................28
    Coverage M Requirements ...............................29
    Payment of Claim – Coverage M or Damage
    to Property of Others ........................................29
    Suit Against Us .................................................29
    Bankruptcy of an Insured ..................................29
    Other Insurance – Coverage L ..........................29
SECTION I AND SECTION II – CONDITIONS ............29
    Policy Period ....................................................29
    Concealment or Fraud .......................................29
    Liberalization Clause ........................................29
    Waiver or Change of Policy Provisions ............29
    Cancellation ......................................................29
    Nonrenewal ......................................................30
    Assignment of Policy ........................................30

Subrogation and Reimbursement ....................30
Death .................................................................31
Conformity to State Law ...................................31
Premium ...........................................................31
Right to Inspect ................................................32
Joint and Individual Interests ...........................32
Change of Policy Address ................................32
Electronic Delivery ...........................................32
Our Rights Regarding Claim Information ..........32
Duties Regarding Claim Information .................33
OPTIONAL POLICY PROVISIONS .............................33
    Option AI – Additional Insured .........................33
    Option BP – Business Property .........................33
    Option BU – Business Pursuits ........................33
    Option FA – Firearms ........................................34
    Option ID – Increased Dwelling Limit ...............34
    Option IO – Incidental Business .......................34
    Option JF – Jewelry and Furs ...........................35
    Option OL – Building Ordinance or Law ...........36
    Option SG – Silverware and Goldware
    Theft .................................................................37

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

# HOMEOWNERS POLICY

## AGREEMENT

*We* agree to provide the insurance described in this policy:

1. based on *your* payment of premium, in a form acceptable to *us*, for the coverages *you* chose;

2. based on *your* compliance with all applicable provisions of this policy; and

3. based on the information *you* have given *us* and *your* statements in this agreement.

*You* agree, by acceptance of this policy, that:

1. *you* will pay premiums when due and comply with the provisions of this policy;

2. the statements in this agreement are *your* statements and are true;

3. *we* insure *you* on the basis *your* statements are true; and

4. this policy contains all of the agreements between *you* and *us* and any of *our* agents.

Unless otherwise indicated in the application, *you* state that during the five years preceding the time of *your* application for this insurance *you* have not had any losses, insured or not.

When *you* request changes to this policy, or the information or factors used to calculate the premium for this policy changes during the policy period, *we* may adjust the premium in accordance with the change during the policy period and *you* must pay any additional premium due within the time *we* specify.

## DEFINITIONS

*We* define the following words and phrases for use throughout this policy.  These definitions apply to the singular, plural, and possessive forms of these words and phrases.  Defined words and phrases are printed in bold italics.

1. *"actual cash value"* means the value of the damaged part of the property at the time of loss, calculated as the estimated cost to repair or replace such property, less a deduction to account for pre-loss depreciation.  For this calculation, all components of this estimated cost including, but not limited to:

   a. materials, including any tax;

   b. labor, including any tax; and

   c. overhead and profit;

   are subject to depreciation.

   The depreciation deduction may include such considerations as:

   a. age;

   b. condition;

   c. reduction in useful life;

   d. obsolescence; and

   e. any pre-loss damage including wear, tear, or deterioration;

   of the damaged part of the property.

2. *"bodily injury"* means physical injury, sickness, or disease to a person. This includes required care, loss of services, and death resulting therefrom.

   *Bodily injury* does not include:

   a. any of the following which are communicable: disease, bacteria, parasite, virus, or other organism, any of which are transmitted by any *insured* to any other person;

   b. the actual or alleged exposure to any such disease, bacteria, parasite, virus, or other organism by any *insured* to any other person; or

   c. emotional distress, mental anguish, humiliation, mental distress, mental injury, or any similar injury unless it arises out of actual physical injury to some person.

3. *"building structure"* means a structure fully enclosed with permanent walls and a roof.  A permanent wall or roof does not include any kind of temporary materials including but not limited to tarps, plastic sheeting, or other similar material.  A structure that is otherwise fully enclosed with permanent walls and a roof, that is undergoing repairs due to a recent *loss insured*, using materials such as tarps, plastic sheeting, or other similar material, is still considered a *building structure*.

1

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

HW-2136

A *building structure* includes:

a. the foundation supporting the structure, including:

  (1) slabs;

  (2) basement walls;

  (3) crawl space walls;

  (4) footings; and

  (5) gravel, stone, or sand, used as fill material and located not more than 12 inches directly below a slab described in item a.(1), including water supply lines, domestic water pipes, and sewer pipes located within this fill material; and

b. wall-to-wall carpeting attached to the structure.

4. *"business"* means any full-time or part-time activity, trade, profession, employment, or occupation or a commercial, mercantile, or industrial undertaking of an economic nature. It does not matter whether it is continuous or regular, is a secondary or supplemental source of income, or is an *insured's* principal means of livelihood. Profit and profit motive are irrelevant.

*Business* does not include:

a. volunteer activities for a not-for-profit or non-profit organization or public agency for which no money is received other than payment of expenses;

b. incidental and infrequent personal economic activity such as a hobby, garage or yard sale, or traditional farm activities when the farm products are intended only for the personal use of the *insured*;

c. any occasional or part-time self-employed activity by a person under 19 years of age that involves no employees or subcontracted independent contractors and is a type of activity normally performed by persons under 19 years of age, including but not limited to, child care, lawn mowing, or paper delivery;

d. the ownership, maintenance, or use of systems and equipment used to generate electrical power up to but not exceeding 125 percent of the actual electrical power usage by the *residence premises* in the 12-month period prior to the date of the loss; or

e. ownership of the *residence premises* by the person or organization shown in the *Declarations* as Additional Insured.

5. *"Declarations"* means the policy *Declarations*, any amended *Declarations*, the most recent renewal *Declarations*, an Evidence of Insurance form, or any endorsement changing any of these.

6. *"diminution in value"* means any reduction in the value of any covered property prior to or following repair or replacement as compared to the value of that property immediately before the loss.

7. *"dwelling"* means the *building structure* on the *residence premises* used as the primary private residence and includes structures attached to the *dwelling*.

8. *"fungus"* means any type or form of *fungus*, including mold, mildew, mycotoxins, spores, scents, or byproducts produced or released by fungi.

9. *"insured"* means:

a. *you*;

b. *your relatives*; and

c. any other person under the age of 21 in the care of a person described above.

Under Section II, *insured* also means:

d. the person or organization legally responsible for animals or watercraft to which this policy applies. However, the animal or watercraft must be owned by *you* or a person included in 9.b. or 9.c. above. A person or organization using or having custody of these animals or watercraft in the course of a *business*, or without permission of the owner, is not an *insured*; and

e. with respect to any vehicle to which this policy applies, any person while engaged in *your* employment or the employment of a person included in 9.b. or 9.c. above.

10. *"insured location"* means:

a. the *residence premises*;

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

b. the part of any other premises, other structures, and grounds used by *you* as a residence. This includes premises, structures, and grounds *you* acquire while this policy is in effect for *your* use as a residence;

c. any premises used by *you* in connection with the premises included in 10.a. or 10.b. above;

d. any part of a premises not owned by an *insured* but where an *insured* is temporarily residing;

e. land owned by or rented to an *insured* on which a one or two family dwelling is being constructed as a residence for an *insured*;

f. individual or family cemetery plots or burial vaults owned by an *insured*;

g. any part of a premises occasionally rented to an *insured* for purposes other than *business*;

h. vacant land owned by or rented to an *insured*. For the purposes of this definition, vacant land does not include:

   (1) farm land;

   (2) land containing a residence; or

   (3) land containing fences, corrals, boat docks, tool sheds, barns, grain bins, and similar structures, unless they are used solely for the personal use of the *insured*; or

i. farm land (without buildings), rented or held for rental to others, but not to exceed a total of 500 acres, regardless of the number of locations.

11. *"loss insured"* means a loss as described under SECTION I – LOSSES INSURED, COVERAGE A – DWELLING and SECTION I – LOSSES INSURED, COVERAGE B – PERSONAL PROPERTY.

12. *"motor vehicle"*, when used in Section II of this policy, means:

    a. a land *motor vehicle* designed for travel on public roads or subject to motor vehicle registration;

    b. a trailer or semi-trailer designed for travel on public roads and subject to motor vehicle registration;

c. a "recreational or utility vehicle" while off an *insured location*. "Recreational or utility vehicle" means a motorized vehicle designed for recreation or utility purposes, used principally off public roads, and that is owned or leased by an *insured*. This includes, but is not limited to, a motorized all-terrain vehicle, side-by-side vehicle, utility work vehicle, amphibious vehicle, dune buggy, go-cart, golf cart, snowmobile, trailbike, minibike, and personal assistive mobility device. "Leased" does not include temporary rental;

d. a "locomotive" while off an *insured location*. "Locomotive" means a self-propelled vehicle for pulling or pushing freight or passenger cars on tracks that is large enough to carry a person and is owned or leased by an *insured*. "Leased" does not include temporary rental;

e. a bulldozer, track loader, backhoe, high-hoe, trencher, grader, crane, self-propelled scraper, excavator, pipe-layer, cherry picker, telehandler, logging vehicle, mining vehicle, or road building vehicle that is owned or leased by an *insured* while off an *insured location*. "Leased" does not include temporary rental; and

f. any vehicle while being towed or pushed by or carried on a vehicle included in 12.a. through 12.e. above.

The following are not *motor vehicles*:

a. a boat, camper, home, or utility trailer not being towed or pushed by or carried on a vehicle included in 12.a. through 12.e. above;

b. a motorized land vehicle in storage on an *insured location* not intended to be operated for an extended period of time and rendered inoperable by placing the vehicle on blocks or removing parts essential for its operation;

c. a motorized golf cart while used for golfing purposes;

d. a motorized vehicle or trailer designed to assist persons with disabilities that is not designed for travel on public roads or subject to motor vehicle registration; or

3

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

HW-2136

e. a commercially manufactured two, three, or four wheeled personal conveyance powered only by or assisted by an unmodified motor or engine with a manufacturer's power rating of no more than 1 horsepower and capable of a top speed of no more than 20 miles per hour.

13. *"occurrence"*, when used in Section II of this policy, means an accident, including accidental exposure to conditions, which first results in:

a. *bodily injury*; or

b. *property damage*;

during the policy period. All *bodily injury* and *property damage* resulting from one accident, series of related accidents, or from continuous and repeated exposure to the same general conditions is considered to be one *occurrence*.

14. *"property damage"* means physical damage to or destruction of tangible property, including loss of use of this property. Theft or conversion of property by any *insured* is not *property damage*.

15. *"relative"* means any person related to *you* by:

a. blood;

b. adoption;

c. marriage; or

d. civil union, domestic partnership, or other substantially similar legal relationship that is recognized and valid in the state where, and at the time when, the legal relationship was established;

and who resides primarily with *you*.

16. *"residence employee"* means an employee of an *insured*, or an employee leased to an *insured* by a labor leasing firm under an agreement between an *insured* and the labor leasing firm, who performs duties, including household or domestic services, in connection with the maintenance or use of the *residence premises*. This includes employees who perform similar duties elsewhere for *you*. This does not include employees while performing duties in connection with the *business* of an *insured*.

17. *"residence premises"* means:

a. the one, two, three, or four family dwelling, other structures and grounds; or

b. that part of any other *building structure*;

where *you* reside and which is shown in the *Declarations*.

18. *"State Farm Companies"* means one or more of the following:

a. State Farm Mutual Automobile Insurance Company;

b. State Farm Fire and Casualty Company; and

c. subsidiaries or affiliates of either 18.a. or 18.b. above.

19. *"vacant dwelling"* means:

a. a dwelling:

(1) that has not been occupied as a residence for more than 30 consecutive days immediately before the loss; and

(2) where a predominant amount of personal property has been removed or is absent such that the dwelling is not functional as a habitual place of residence.

A dwelling will be considered occupied only if it is being used as a habitual place of residence with *your* knowledge and approval.

b. A dwelling that is under active construction will not be considered a *vacant dwelling*. A dwelling is under active construction when it is:

(1) being built as a new structure;

(2) being repaired due to damage otherwise covered by this policy; or

(3) undergoing substantial improvements, renovations, remodeling, or modifications;

and the construction results in substantial continuing activities by persons associated with the construction project at the premises during the relevant time periods.

20. *"we"*, *"us"*, and *"our"* mean the Company shown in the *Declarations*.

21. *"you"* and *"your"* mean the person or persons shown as "Named Insured" in the *Declarations*. If a "Named Insured" shown in the *Declarations* is a human being, then *you* and *your* include:

a. a spouse of a "Named Insured";

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

HW-2136

b. a party to a civil union with a "Named Insured";

c. a domestic partner of a "Named Insured"; or

d. a person in a substantially similar legal relationship with a "Named Insured";

if such relationship is recognized and valid in the state where, and at the time when, the legal relationship was established, so long as the person in the above relationship resides primarily with that "Named Insured".

## DEDUCTIBLE

In case of loss under this policy, *we* will pay, subject to specified policy limits, only that part of the amount of the loss that exceeds the deductible amount shown in the *Declarations*. Deductibles will be applied per occurrence. Deductibles apply to specific losses as described in this policy.

## SECTION I – PROPERTY COVERAGES

### COVERAGE A – DWELLING

1. **Dwelling.** *We* cover the *dwelling* and materials and supplies located on or adjacent to the *residence premises* for use in the construction, alteration, or repair of the *dwelling* or other structures on the *residence premises*.

2. **Other Structures.** *We* cover other structures on the *residence premises*, separated from the *dwelling* by clear space. Structures connected to the *dwelling* by only a fence, utility line, or similar connection are considered to be other structures.

   *We* do not cover other structures:

   a. not permanently attached to or otherwise forming a part of the realty;

   b. used either completely or in part for *business* purposes unless such use consists solely of office space for paperwork, computer work, or use of a telephone, and consists solely of activities that are:

      (1) duties of the *insured's* employment by another; and

      (2) performed solely by the *insured*; or

   c. rented or held for rental unless:

      (1) rented to a person who is a tenant of the *dwelling*;

      (2) rented for use solely as a private garage; or

      (3) rented either completely or in part, for exclusive use as a residence, for no more than 30 nights in the 12-month period prior to the date of the loss.

3. **Property Not Covered.** *We* do not cover:

   a. land, including the land necessary to support any Coverage A property. *We* also do not cover:

      (1) any costs required to replace, rebuild, stabilize, or otherwise restore the land; or

      (2) the costs of repair techniques designed to compensate for or prevent land instability to any property, whether or not insured under Coverage A;

   b. trees, shrubs, live or artificial plants, lawns, or artificial grass, except as provided in **SECTION I – ADDITIONAL COVERAGES, Trees, Shrubs, and Landscaping**; or

   c. systems and equipment used to generate electrical power exceeding 125 percent of the actual electrical power usage by the *residence premises* in the 12-month period prior to the date of the loss.

### COVERAGE B – PERSONAL PROPERTY

1. **Property Covered.**

   a. *We* cover personal property owned or used by an *insured* while it is anywhere in the world. This includes structures not permanently attached to or otherwise forming a part of the realty. At *your* request, *we* will cover personal property:

      (1) owned by others while the property is on the part of the *residence premises* occupied exclusively by an *insured*;

      (2) owned by a guest or a *residence employee*, while the property is in any other residence occupied by an *insured*; and

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

(3) owned by roomers, boarders, tenants, and other residents, any of whom are related to *you*.

b. *We* cover personal property usually located at an *insured's* residence, other than the *residence premises*, for up to $1,000 or 10% of the Coverage B limit, whichever is greater. This limitation does not apply to personal property:

(1) in a newly acquired principal residence for the first 30 days after *you* start moving the property there. If the *residence premises* is a newly acquired principal residence, personal property in *your* immediate past principal residence is not subject to this limitation for the first 30 days after the inception of this policy; and

(2) of a student who is an *insured* while located at a residence away from the *residence premises*.

**Special Limits of Liability.** These limits do not increase the Coverage B limit. The special limit for each of the following categories is the total limit for each loss for all property in that category:

a. $200 on money, coins, and medals, including any of these that are a part of a collection, bank notes, bullion, gold other than goldware, silver other than silverware, and platinum;

b. $1,500 on property used or intended for use in a *business*, including merchandise held as samples or for sale or for delivery after sale, while on the *residence premises*. This coverage is limited to $750 on such property away from the *residence premises*.

Electronic data processing system equipment or the recording or storage media used with that equipment is not included under this coverage, and is addressed in item c. below;

c. $10,000 on electronic data processing system equipment used or intended for use in a *business*, including but not limited to computers, tablets, mobile personal communication equipment, global positioning systems, mobile personal electronic devices used for the reproduction of sound,

and standard media or non-media equipment for use with the above devices;

d. $1,500 on securities, checks, cashiers checks, travelers checks, money orders, gift certificates, gift cards, rechargeable debit cards, phone cards, and other negotiable instruments, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, passports, and tickets;

e. $1,500 on watercraft of all types and outboard motors, including their trailers, furnishings, and equipment;

f. $1,500 on trailers not used with watercraft;

g. $2,500 on stamps, trading cards, and comic books, including any of these that are a part of a collection;

h. $2,500 for loss by theft of firearms;

i. $2,500 for loss by theft of silverware and goldware;

j. $5,000 on any one article and $10,000 in the aggregate for loss by theft of any rug, carpet (except wall-to-wall carpet), tapestry, wall-hanging, or other similar article;

k. $1,000 on commercially manufactured two, three, or four wheeled personal conveyances powered only by or assisted by an unmodified motor or engine with a manufacturer's power rating of no more than 1 horsepower and capable of a top speed of no more than 20 miles per hour. This does not include such conveyances that are:

(1) designed for assisting persons with disabilities;

(2) not designed for travel on public roads; and

(3) not subject to motor vehicle registration; and

l. $1,000 for loss by theft of jewelry, watches, fur garments and garments trimmed with fur, and precious and semi-precious stones.

2. **Property Not Covered. *We*** do not cover:

a. articles separately described and specifically insured in this or any other insurance;

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

b.　animals, birds, or fish;

c.　any engine-propelled or motor-propelled vehicle or machine, including parts, designed for movement on land, except as provided in **Special Limits of Liability**, item k.  However, *we* do cover those vehicles or machines:

　(1)　that are:

　　(a)　not designed for travel on public roads; and

　　(b)　not subject to motor vehicle registration;

　(2)　and that are:

　　(a)　used primarily to service the *insured location*; or

　　(b)　designed for assisting persons with disabilities;

d.　any electronic equipment, devices, or accessories designed for the recording, reproduction, or storage of audio, video, photos, or other data that is permanently installed in or permanently fastened to an engine-propelled or motor-propelled vehicle or hard-wired directly to the vehicle's electrical system.  *We* also do not cover removable products that may be used with the equipment or devices described above, including but not limited to tapes, discs, videos, or memory cards while in an engine-propelled or motor-propelled vehicle;

e.　aircraft and parts.  This does not apply to unmanned aircraft systems used as model aircraft and operated solely for recreational or hobby purposes;

f.　property of roomers, boarders, tenants, and other residents not related to *you*;

g.　property regularly rented or held for rental to others by an *insured*. This does not apply to property of an *insured*:

　(1)　in a sleeping room when the *dwelling* is rented in part, for use as a permanent residence, by either one or two full-time roomers or boarders; or

　(2)　on the *residence premises* if it is rented, either completely or in part, for exclusive use as a residence, for no more than 30 nights in the 12-month period prior to the date of the loss;

h.　property rented or held for rental to others away from the *residence premises*;

i.　any radio devices or transmitters, global positioning systems, radar or laser detectors, antennas, and all other similar equipment that is permanently installed in or permanently fastened to an engine-propelled or motor-propelled vehicle or that is hard-wired directly to the vehicle's electrical system;

j.　books or records of accounts receivable, abstracts or other journals, architectural or technical drawings, card index systems, or other records.  This does not apply to any recording or storage media for electronic data processing.  *We* will cover the cost of blank books, cards, or other blank material plus the cost of labor *you* incur for transcribing or copying such records;

k.　recording or storage media for electronic data processing that cannot be replaced with property of like kind and quality on the current retail market;

l.　purchased or created audio, video, photos, or other data that cannot be replaced with like kind and quality on the current retail market and that is transferred or downloaded onto mobile communication equipment, global positioning systems, or electronic devices designed for the recording, reproduction, or storage of audio, video, photos, or other data;

m.　contraband, or any property used in the course of illegal consumption, possession, import, export, or trade;

n.　outdoor hardscape property used for aesthetic purposes except as provided in **SECTION I – ADDITIONAL COVERAGES, Trees, Shrubs, and Landscaping**; or

o.　electronic currency, digital currency, virtual currency, crypto-currency, and other similar mediums of exchange.

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

## COVERAGE C – LOSS OF USE

The most *we* will pay for the sum of all losses combined under **Additional Living Expense, Fair Rental Value,** and **Prohibited Use** is the limit of liability shown in the *Declarations* for **Coverage C – Loss of Use.**

1.  **Additional Living Expense.** When a *loss insured* causes the *residence premises* to become uninhabitable, *we* will pay the reasonable and necessary increase in cost incurred by an *insured* to maintain their normal standard of living for up to 24 months. *Our* payment is limited to incurred costs for the shortest of:

    a.  the time required to repair or replace the premises;

    b.  the time required for *your* household to settle elsewhere; or

    c.  24 months.

    This period of time is not limited by the expiration of this policy.

    *We* will not pay more than the limit of liability shown in the *Declarations* for **Coverage C – Loss of Use.** Any normal expenses that are reduced or discontinued due to a *loss insured* will be subtracted from any amount owed.

2.  **Fair Rental Value.** When a *loss insured* causes that part of the *residence premises* rented to others or held for rental by *you* to become uninhabitable, *we* will pay its fair rental value. Payment will be for the shortest time required to repair or replace the part of the premises rented or held for rental, but not to exceed 12 months. This period of time is not limited by the expiration of this policy. Fair rental value will not include any expense that does not continue while that part of the *residence premises* rented or held for rental is uninhabitable.

3.  **Prohibited Use.** *We* will pay Additional Living Expense and Fair Rental Value, for a continuous period not to exceed two weeks, beginning when a civil authority issues an order of evacuation or prohibits *your* use of the *residence premises*, provided that:

    a.  direct physical damage occurs to any property, other than covered property located on the *residence premises*, arising from a cause of loss that would be a *loss insured* under this policy

    if the damage had occurred to property on the *residence premises*;

    b.  the *residence premises* is within one mile of property damaged by a cause of loss identified in 3.a. above; and

    c.  the action of the civil authority is taken in response to:

        (1)  dangerous physical conditions resulting from the continuation of the cause of loss identified in 3.a. above;

        (2)  dangerous physical conditions resulting from the damage caused by the cause of loss identified in 3.a. above; or

        (3)  the need to gain free access to property damaged by the cause of loss identified in 3.a. above.

    *We* will not pay for loss or expense due to cancellation of a lease or agreement.

## SECTION I – ADDITIONAL COVERAGES

The following Additional Coverages are subject to all the terms, provisions, exclusions, and conditions of this policy.

1.  **Debris Removal.** *We* will pay the reasonable expenses *you* incur in the removal of debris of covered property damaged by a *loss insured*. This expense is included in the limit applying to the damaged property. The following coverages and limits also apply:

    a.  When the amount payable for the property damage plus the debris removal exceeds the limit for damaged property, an additional 5% of that limit is available for debris removal expense. This additional amount of insurance does not apply to **SECTION I – ADDITIONAL COVERAGES, Trees, Shrubs, and Landscaping.**

    b.  *We* will also pay up to $1,000 total for each loss to cover the reasonable expenses *you* incur in the removal of tree debris and stumps from the *residence premises*, unless otherwise excluded. This coverage applies when:

        (1)  the tree has caused a *loss insured* to Coverage A property; or

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

(2) the tree debris felled by windstorm, hail, or weight of snow or ice blocks:

    (a) the driveway, on the *residence premises*, and prevents land *motor vehicle* access to or from the *dwelling*; or

    (b) a ramp designed to assist persons with disabilities, on the *residence premises*, and prevents access to or from a *building structure*.

2. **Temporary Repairs.** If damage is caused by a *loss insured*, *we* will pay the reasonable and necessary cost *you* incur for temporary repairs to covered property to protect the property from further immediate damage or loss. This coverage does not increase the limit applying to the property being repaired.

3. **Trees, Shrubs, and Landscaping.** *We* will pay for accidental direct physical loss to outdoor:

    a. trees, shrubs, live or artificial plants, and lawns;

    b. artificial grass; and

    c. hardscape property used for aesthetic purposes not permanently affixed to realty;

on the *residence premises*, caused by the following perils: **Fire or lightning, Explosion, Riot or civil commotion, Aircraft, Vehicles** (not owned or operated by a resident of the *residence premises*), **Vandalism or malicious mischief,** or **Theft.**

The limit for this coverage, including the removal of debris, will not exceed 5% of the amount shown in the *Declarations* for COVERAGE A – DWELLING. *We* will not pay more than $750 for any one outdoor tree, shrub, plant, or hardscape item, including debris removal expense. This coverage may increase the limit otherwise applicable. *We* will not pay for any loss to property grown for *business* purposes.

4. **Fire Department Service Charge.** *We* will pay up to $500 per occurrence for fire department charges incurred when the fire department is called to save or protect Coverage A property from fire, lightning, or explosion. No deductible applies to this coverage. This coverage may increase the limit otherwise applicable.

5. **Property Removed.** *We* will pay for any accidental direct physical loss to covered property while being removed from a premises endangered by a *loss insured*. This coverage also applies to the property

for up to 30 days while removed. *We* will also pay for reasonable expenses incurred by *you* for the removal and return of the covered property. This coverage does not increase the limit applying to the property being removed.

6. **Credit Card, Bank Fund Transfer Card, Forgery, and Counterfeit Money.**

    a. *We* will pay up to $1,000 for:

      (1) the legal obligation of an *insured* to pay because of the theft or unauthorized use of credit cards and bank fund transfer cards issued to or registered in an *insured's* name. If an *insured* has not complied with all terms and conditions under which the cards are issued, *we* will not pay for use by an *insured* or anyone else;

      (2) loss to an *insured* caused by forgery or alteration of any check or negotiable instrument; and

      (3) loss to an *insured* through acceptance in good faith of counterfeit United States or Canadian paper currency.

    No deductible applies to this coverage.

    *We* will not pay more than the limit stated above for forgery or alteration committed by any one person. This limit applies when the forgery or alteration involves one or more instruments in the same loss.

    b. *We* will not pay for loss arising out of *business* pursuits or dishonesty of an *insured*.

    c. Defense:

      (1) *We* may make any investigation and settle any claim or suit that *we* decide is appropriate. *Our* obligation to defend claims or suits ends when the amount *we* pay for the loss equals *our* limit of liability.

      (2) If claim is made or a suit is brought against an *insured* for liability under the Credit Card or Bank Fund Transfer Card coverage, *we* will provide a defense. This defense is at *our* expense by counsel of *our* choice.

      (3) *We* have the option to defend at *our* expense an *insured* or an *insured's* bank

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

against any suit for the enforcement of payment under the Forgery coverage.

7. **Power Interruption.** *We* will pay for accidental direct physical loss caused directly or indirectly by a change of temperature that results from power interruption that takes place on the *residence premises*. The power interruption must be caused by a *loss insured* occurring on the *residence premises*. The power lines off the *residence premises* must remain energized. This coverage does not increase the limit applying to the damaged property.

8. **Refrigerated Products.** Coverage B is extended to cover the contents of deep freeze or refrigerated units on the *residence premises* for loss due to power failure or mechanical failure. If mechanical failure or power failure is known to *you*, all reasonable means must be used to protect the property insured from further damage or this coverage is void. Power failure or mechanical failure does not include:

   a. removal of a plug from an electrical outlet; or

   b. turning off an electrical switch unless caused by a *loss insured.*

   This coverage does not increase the limit applying to the damaged property.

9. **Arson Reward.** *We* will pay $1,000 for information that leads to an arson conviction in connection with a fire loss to property covered by this policy. This coverage may increase the limit otherwise applicable. However, the $1,000 limit will not be increased regardless of the number of persons providing information.

10. **Volcanic Action.** *We* will pay for accidental direct physical loss to a covered *building structure* or covered property contained in a *building structure* resulting from the eruption of a volcano when the loss is directly and immediately caused by:

    a. airborne volcanic shock waves;

    b. ash, dust, or particulate matter; or

    c. lava flow.

    *We* will also pay for the removal of that ash, dust, or particulate matter that has caused accidental direct physical loss to a covered *building structure* or covered property contained in a *building structure.*

All volcanic eruptions that occur within any 168-hour period will be considered one volcanic eruption.

This coverage does not increase the limit applying to the damaged property.

11. **Collapse.** *We* will pay for accidental direct physical loss to covered property involving the abrupt, entire collapse of a *building structure* or any part of a *building structure.*

    a. Collapse means the abrupt and entire falling down, caving in, or falling into pieces of a *building structure* or any part of a *building structure.* Collapse does not include any of the following:

       (1) settling, cracking, crumbling, deterioration, shrinking, bulging, expansion, sagging, bowing, leaning, or bending;

       (2) substantial structural impairment;

       (3) imminent or threatened collapse;

       (4) a *building structure* or any part of a *building structure* that is in danger of falling down or caving in; or

       (5) a part of a *building structure* that is standing even if:

           (a) it has separated from another part of the *building structure*; or

           (b) it shows evidence of settling, cracking, crumbling, deterioration, shrinking, bulging, expansion, sagging, bowing, leaning, or bending.

    b. The collapse must be directly and immediately caused by one or more of the following:

       (1) perils described in SECTION I – LOSSES INSURED, COVERAGE B – PERSONAL PROPERTY. These perils apply to *building structures* covered under Coverage A or Coverage B for loss insured by this Additional Coverage;

       (2) decay or deterioration of, or damage from animals, birds, or insects to:

           (a) a connector; or

           (b) a structural member of a *building structure*;

10

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

HW-2136

The decay, deterioration, or damage must be hidden from view and unknown to all *insureds* prior to the collapse;

(3) weight of contents, equipment, animals, or people;

(4) weight of ice, snow, sleet, or rain that collects on a roof, porch, or deck; or

(5) use of defective material or methods in the construction (includes remodeling or renovation) of the *building structure*, if the collapse occurs during the course of the construction of the *building structure*.

Loss to awnings, fences, patios, pavement, swimming pools, underground pipes, flues, drains, cesspools, septic tanks, foundations (including slabs, basement walls, and crawl space walls), retaining walls, bulkheads, piers, wharfs, docks, trellises, or antennas and their supporting structures is not included under items (2), (3), and (4) immediately above unless the loss is the direct and immediate result of the collapse of a *building structure* or any part of a *building structure*.

This coverage does not increase the limit applying to the damaged property.

12. **Locks and Remote Devices.** *We* will pay up to $1,000 for each loss for the reasonable expenses *you* incur to rekey, replace, recode, program, or reprogram locks on exterior doors to the *dwelling* or other structures located on the *residence premises* when the keys or remote devices used with those doors are part of a covered theft loss. This coverage includes remote devices designed solely for locking, unlocking, opening, or closing doors, including garage doors and gates.

No deductible applies to this coverage.

13. **Fuel Oil Release.** *We* will pay up to $10,000 for each loss for accidental direct physical loss to covered property caused by the abrupt and accidental escape of liquid fuel oil from a fixed household tank, apparatus, or pipes that are part of a heating unit for the *dwelling*. This includes damage to covered property resulting from an accidental spill or overflow of fuel oil in the course of filling a fixed household tank.

This coverage includes surface clean up only. *We* will not pay for:

a. the cost to repair or replace the fuel oil tank, apparatus, and pipes; or

b. the cost of testing, monitoring, removing, treating, or detoxifying of soil, air, or water.

This coverage does not increase the limit applying to the damaged property.

14. **Tear Out.** If a *loss insured* to Coverage A property is caused by water, steam, or sewage escaping from a system or appliance, *we* will also pay the reasonable cost *you* incur to tear out and replace only that particular part of the *building structure* necessary to gain access to the specific point of that system or appliance from which the water, steam, or sewage escaped. *We* will not pay for the cost of repairing or replacing the system or appliance itself. This coverage does not increase the limit applying to Coverage A property.

15. **Home Certification.** If damage to covered property is caused by a *loss insured*, *we* will pay the reasonable increase in cost to repair or replace only the damaged property to maintain the *dwelling's* FORTIFIED HOME or FORTIFIED FOR SAFER LIVING certification in place at the time of the loss. This coverage does not increase the limit applying to the damaged property.

*We* will not pay:

a. any increase in cost until the repair or replacement of the property is complete; or

b. for increased costs resulting from enforcement of any ordinance or law regulating the construction or repair of the *dwelling* except as provided under **OPTIONAL POLICY PROVISIONS, Option OL – Building Ordinance or Law.**

This coverage does not apply if Loss Settlement provision A2 – Replacement Cost Loss Settlement – Common Construction is shown in the *Declarations*.

**INFLATION COVERAGE**

The limits of liability shown in the *Declarations* for Coverage A, Coverage B, and when applicable, Option ID will be increased at the same rate as the increase in the Inflation Coverage Index shown in the *Declarations*.

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

To find the limits on a given date:

1. divide the Index on that date by the Index as of the effective date of this Inflation Coverage provision; then

2. multiply the resulting factor by the limits of liability for Coverage A, Coverage B, and Option ID separately.

The limits of liability will not be reduced to less than the amounts shown in the *Declarations*.

If during the term of this policy the Coverage A limit of liability is changed at *your* request, the effective date of this Inflation Coverage provision is changed to coincide with the effective date of such change.

## SECTION I – LOSSES INSURED

### COVERAGE A – DWELLING

*We* will pay for accidental direct physical loss to the property described in Coverage A, unless the loss is excluded or limited in **SECTION I – LOSSES NOT INSURED** or otherwise excluded or limited in this policy. However, loss does not include and *we* will not pay for, any *diminution in value*.

### COVERAGE B – PERSONAL PROPERTY

*We* will pay for accidental direct physical loss to the property described in Coverage B caused by the following perils, unless the loss is excluded or limited in **SECTION I – LOSSES NOT INSURED** or otherwise excluded or limited in this policy. However, loss does not include and *we* will not pay for, any *diminution in value*.

1. **Fire or lightning.**

2. **Windstorm or hail.** This peril does not include loss to property contained in a structure caused by rain, snow, sleet, sand, or dust. This limitation does not apply when the direct force of wind or hail damages the structure causing an opening in a roof or wall and the rain, snow, sleet, sand, or dust enters through this opening.

    This peril includes loss to watercraft of all types and their trailers, furnishings, equipment, and outboard motors, only while inside a *building structure*.

3. **Explosion.**

4. **Riot or civil commotion.**

5. **Aircraft,** including self-propelled missiles and spacecraft.

6. **Vehicles,** meaning accidental direct physical loss to covered property caused by the weight, force, power, or movement of a vehicle.

    a. This includes:

    (1) the impact of a vehicle;

    (2) an object propelled from the tire or body of a vehicle;

    (3) the upset or collision of a vehicle with a stationary object or other vehicle, including damage to personal property carried on the exterior of the vehicle; or

    (4) a vehicle door or trunk lid being closed on personal property.

    b. This peril does not include loss:

    (1) to personal property that falls off a vehicle and strikes the ground, any other surface, or any object;

    (2) caused by shifting of the load being carried in or on a vehicle; or

    (3) to the vehicle itself unless the vehicle is property covered under **COVERAGE B – PERSONAL PROPERTY** and the loss is caused by the weight, force, power, or movement of another vehicle.

7. **Smoke,** meaning abrupt and accidental damage from smoke.

    This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

8. **Vandalism or malicious mischief,** meaning only willful and malicious damage to or destruction of property.

9. **Theft,** including attempted theft and loss of property from a known location when it is probable that the property has been stolen.

    This peril does not include:

    a. loss of a precious or semi-precious stone from its setting;

    b. loss caused by theft:

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

(1) committed by an *insured* or by any other person regularly residing on the *insured location*. Property of a student who is an *insured* is covered while located at a residence away from the *residence premises*, if the theft is committed by a person who is not an *insured*;

(2) in or to a dwelling under construction or of materials and supplies for use in the construction until the dwelling is completed and occupied; or

(3) from the part of a *residence premises* rented to others:

    (a) caused by a tenant, members of the tenant's household, or the tenant's employees unless the *residence premises* is rented, either completely or in part, for exclusive use as a residence, for no more than 30 nights in the 12-month period prior to the date of the loss;

    (b) of money, bank notes, bullion, gold, goldware, silver, silverware, pewterware, platinum, coins, and medals;

    (c) of securities, checks, cashiers checks, travelers checks, money orders, gift certificates, gift cards, rechargeable debit cards, phone cards, and other negotiable instruments, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, passports, tickets, and stamps; or

    (d) of jewelry, watches, fur garments and garments trimmed with fur, and precious and semi-precious stones; or

c. loss caused by theft that occurs away from the *residence premises* of:

(1) property while at any other residence owned, rented to, or occupied by an *insured*, except while an *insured* is temporarily residing there. Property of a student who is an *insured* is covered while at a residence away from the *residence premises*;

(2) watercraft of all types, including their furnishings, equipment, and outboard motors; or

(3) trailers and campers designed to be pulled by or carried on a vehicle.

If the *residence premises* is a newly acquired principal residence, property in the immediate past principal residence will not be considered property away from the *residence premises* for the first 30 days after the inception of this policy.

10. **Falling objects.** This peril does not include loss to property contained in a structure unless the roof or an exterior wall of the structure is first damaged by a falling object. Damage to the falling object itself is not included.

11. **Weight of ice, snow, or sleet** that causes damage to property contained in a structure.

12. **Abrupt and accidental discharge or overflow** of water, steam, or sewage from within a plumbing, heating, air conditioning, or automatic fire protective sprinkler system, or from within a household appliance.

This peril does not include loss:

a. to the system or appliance from which the water, steam, or sewage escaped;

b. caused by or resulting from:

    (1) freezing;

    (2) water or sewage from outside the *residence premises* plumbing system that enters through sewers or drains, or water that enters into and overflows from within a sump pump, sump pump well, or any other system designed to remove subsurface water that is drained from the foundation area; or

    (3) the pressure from or presence of tree, shrub, or plant roots; or

c. that occurs or develops over a period of time and is caused by or resulting from:

    (1) condensation or the presence of humidity, moisture, or vapor; or

    (2) seepage or leakage of water, steam, or sewage that is:

© Copyright, State Farm Mutual Automobile Insurance Company, 2017

    (a)  continuous;

    (b)  repeating;

    (c)  gradual;

    (d)  intermittent;

    (e)  slow; or

    (f)  trickling.

13. **Abrupt and accidental tearing asunder, cracking, burning, or bulging** of a steam or hot water heating system, an air conditioning system, an automatic fire protective sprinkler system, or an appliance for heating water.

This peril does not include loss:

a. caused by or resulting from freezing; or

b. that occurs or develops over a period of time and is caused by or resulting from:

  (1)  condensation or the presence of humidity, moisture, or vapor; or

  (2)  seepage or leakage of water or steam that is:

    (a)  continuous;

    (b)  repeating;

    (c)  gradual;

    (d)  intermittent;

    (e)  slow; or

    (f)  trickling.

14. **Freezing** of a plumbing, heating, air conditioning, or automatic fire protective sprinkler system, or of a household appliance.

This peril does not include:

a. loss to a portable hot tub or portable spa unless *you* have used reasonable care to prevent freezing; or

b. loss on the *residence premises* unless *you* have used reasonable care to:

  (1)  maintain heat in the *building structure* at 55 degrees Fahrenheit or higher; or

  (2)  shut off the water supply and drain the system and appliances of water.

However, if the *building structure* is protected by an automatic fire protective sprinkler system, *you* must use reasonable care to continue the water supply and maintain heat in the *building structure* at 55 degrees Fahrenheit or higher for coverage to apply.

15. **Abrupt and accidental damage** to electrical appliances, devices, fixtures, and wiring from an increase or decrease of artificially generated electrical current. *We* will pay up to $3,000 under this peril for each damaged item described above.

16. **Breakage of glass**, meaning damage to personal property caused by breakage of glass that is a part of a structure on the *residence premises*. *We* will not pay for loss or damage to the glass.

17. **Wild bears or deer**, meaning damage caused by wild bears or deer to property located in a *building structure*.

## SECTION I – LOSSES NOT INSURED

1. *We* will not pay for any loss to the property described in Coverage A that consists of, or is directly and immediately caused by, one or more of the perils listed in items a. through m. below, regardless of whether the loss occurs abruptly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:

a. collapse, except as specifically provided in **SECTION I – ADDITIONAL COVERAGES, Collapse;**

b. freezing of a plumbing, heating, air conditioning, or automatic fire protective sprinkler system or of a household appliance; or discharge, leakage, or overflow from within the system or appliance caused by freezing. This does not apply if *you* have used reasonable care to:

  (1)  maintain heat in the *building structure* at 55 degrees Fahrenheit or higher; or

  (2)  shut off the water supply and drain the system and appliances of water.

However, if the *building structure* is protected by an automatic fire protective system, *you* must use reasonable care to continue the water supply and maintain heat in the

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

*building structure* at 55 degrees Fahrenheit or higher for coverage to apply;

c. freezing, thawing, pressure, or weight of water, ice, snow, or sleet, whether driven by wind or not, to:

  (1) a swimming pool, hot tub, or spa, including their covers, filtration, and circulation systems; or

  (2) an awning, fence, pavement, patio, foundation (including slabs, basement walls, crawl space walls, and footings), retaining wall, bulkhead, pier, wharf, or dock;

d. theft in or to a dwelling under construction, or of materials and supplies for use in the construction, until the dwelling is completed and occupied;

e. theft, vandalism, malicious mischief, or breakage of glass and safety glazing materials if the dwelling is a *vacant dwelling*;

f. seepage or leakage of water, steam, or sewage that occurs or develops over a period of time:

  (1) and is:

    (a) continuous;

    (b) repeating;

    (c) gradual;

    (d) intermittent;

    (e) slow; or

    (f) trickling; and

  (2) from a:

    (a) heating, air conditioning, or automatic fire protective sprinkler system;

    (b) household appliance; or

    (c) plumbing system, including from, within or around any shower stall, shower bath, tub installation, or other plumbing fixture, including their walls, ceilings, or floors.

*We* also will not pay for losses arising from condensation or the presence of humidity, moisture, or vapor that occurs or develops over a period of time;

g. wear, tear, decay, marring, scratching, deterioration, inherent vice, latent defect, or mechanical breakdown;

h. corrosion, electrolysis, or rust;

i. wet or dry rot;

j. contamination or pollution, meaning the presence, discharge, dispersal, seepage, migration, release, or escape of contaminants or pollutants at or from any source. This does not apply if the presence, discharge, dispersal, seepage, migration, release, or escape is itself caused by a peril described in **SECTION I – LOSSES INSURED, COVERAGE B – PERSONAL PROPERTY**.

  (1) Contaminants and pollutants include but are not limited to any:

    (a) solid, liquid, gaseous, or thermal irritant, including smoke from agricultural smudging or industrial operations, smog, soot, vapor, fumes, acids, alkalis, chemicals, pathogens, noxious substances, asbestos, or lead;

    (b) contaminants or pollutants resulting from any natural resource extraction activities; or

    (c) fuel oil except as specifically provided in **SECTION I – ADDITIONAL COVERAGES, Fuel Oil Release**.

  (2) *We* also will not pay for:

    (a) losses arising from contamination or pollution caused by or resulting from defective building materials, nuclear substances, and waste. Waste includes materials to be recycled, reconditioned, or reclaimed;

    (b) the cost to extract contaminants or pollutants from land, water, or air, or the cost to remove, restore, or replace contaminated or polluted land, water, or air; or

    (c) the cost of testing, monitoring, cleaning, removing, containing, treating, detoxifying, neutralizing, remediating, disposing of, or assessing the effects of contaminants or pollutants;

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017
HW-2136

k. settling, cracking, shrinking, bulging, or expansion of pavements, patios, foundations (including slabs, basement walls, crawl space walls, and footings), walls, floors, roofs, or ceilings;

l. all animals, birds, or insects.

(1) This includes:

(a) nesting, infestation, gnawing, feeding, breeding, or discharge or release of waste products or secretions by animals, birds, or insects;

(b) costs to remove animals, birds, or insects from the covered property; and

(c) costs to prevent the animals, birds, or insects from returning to the property;

(2) However, *we* will pay for:

(a) losses caused by wild bears or deer; and

(b) the breakage of glass or safety glazing material that is a part of a *building structure*, when caused by animals, birds, or insects; or

m. pressure from or presence of tree, shrub, or plant roots.

However, *we* will pay for any resulting loss from items a. through l. unless the resulting loss is itself a Loss Not Insured as described in this Section.

2. *We* will not pay for, under any part of this policy, any loss that would not have occurred in the absence of one or more of the following excluded events. *We* will not pay for such loss regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurs abruptly or gradually, involves isolated or widespread damage, occurs on or off the *residence premises*, arises from any natural or external forces, or occurs as a result of any combination of these:

a. **Ordinance or Law**, meaning enforcement of any ordinance or law regulating the construction, repair, or demolition of a *building structure* or other structure.

b. **Earth Movement**, meaning the sinking, rising, shifting, expanding, or contracting of earth, all regardless of whether combined with water, sewage, or any material carried by, or otherwise moved by the earth. Earth movement includes but is not limited to:

(1) earthquake;

(2) landslide, mudslide, or mudflow;

(3) sinkhole or subsidence;

(4) movement resulting from:

(a) improper compaction;

(b) site selection;

(c) natural resource extraction activities; or

(d) excavation;

(5) erosion;

(6) pressure by surface or subsurface earth or fill; or

(7) any volcanic activity, except as specifically provided in **SECTION I – ADDITIONAL COVERAGES, Volcanic Action**.

However, *we* will pay for any accidental direct physical loss by fire resulting from earth movement, provided the resulting fire loss is itself a *loss insured*.

c. **Water**, meaning:

(1) flood;

(2) surface water. This does not include water solely caused by the release of water from a swimming pool, spigot, sprinkler system, hose, or hydrant;

(3) waves (including tidal wave, tsunami, and seiche);

(4) tides or tidal water;

(5) overflow of any body of water (including any release, escape, or rising of any body of water, or any water held, contained, controlled, or diverted by a dam, levee, dike, or any type of water containment, diversion, or flood control device);

(6) spray or surge from any of the items c.(1) through c.(5) described above, all whether driven by wind or not;

16

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

HW-2136

(7) water or sewage from outside the *residence premises* plumbing system that enters through sewers or drains, or water or sewage that enters into and overflows from within a sump pump, sump pump well, or any other system designed to remove subsurface water that is drained from the foundation area;

(8) water or sewage below the surface of the ground, including water or sewage that exerts pressure on, or seeps or leaks through a *building structure*, sidewalk, driveway, swimming pool, or other structure; or

(9) material carried or otherwise moved by any of the water or sewage, as described in items c.(1) through c.(8) above.

However, *we* will pay for any accidental direct physical loss by fire, explosion, or theft resulting from water, provided the resulting loss is itself a *loss insured.*

d. **Neglect,** meaning neglect of the *insured* to use all reasonable means to save and preserve property at and after the time of a loss, or when property is endangered.

e. **War,** including any undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon will be considered a warlike act even if accidental.

f. **Nuclear Hazard,** meaning any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these. Loss caused by the nuclear hazard will not be considered loss caused by fire, explosion, or smoke.

However, *we* will pay for any accidental direct physical loss by fire resulting from the nuclear hazard, provided the resulting fire loss is itself a *loss insured.*

g. *Fungus,* including:

(1) any loss of use or delay in rebuilding, repairing, or replacing covered property, including any associated cost or expense, due to interference at the *residence premises* or location of the rebuilding, repair, or replacement, by *fungus*;

(2) any remediation of *fungus,* including the cost to:

(a) remove the *fungus* from covered property or to repair, restore, or replace that property; or

(b) tear out and replace any part of the *building structure* or other property as needed to gain access to the *fungus*; or

(3) the cost of any testing or monitoring of air or property to confirm the type, absence, presence, or level of *fungus,* whether performed prior to, during, or after removal, repair, restoration, or replacement of covered property.

h. **Intentional Losses.** If any *insured* intentionally causes or procures a loss to property covered under this policy, *we* will not pay any *insured* for this loss. This applies regardless of whether the *insured* is charged with or convicted of a crime.

This does not apply to an *insured* who did not participate in, cooperate in, or contribute to causing or procuring the loss.

3. *We* will not pay for, under any part of this policy, any loss consisting of one or more of the items below. Further, *we* will not pay for any loss described in paragraphs 1. and 2. immediately above regardless of whether one or more of the following: (a) directly or indirectly cause, contribute to, or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of the loss:

a. conduct, act, failure to act, or decision of any person, group, organization, or governmental body whether intentional, wrongful, negligent, or without fault;

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

HW-2136

b.   defect, weakness, inadequacy, fault, or un-
soundness in:

(1)   planning, zoning, development, surveying,
or siting;

(2)   design, specifications, workmanship, repair,
construction, renovation, remodeling,
grading, or compaction;

(3)   materials used in repair, construction, renova-
tion, remodeling, grading, or compaction; or

(4)   maintenance;

of any property (including land, structures, or
improvements of any kind) whether on or off
the *residence premises*; or

c.   weather conditions.

However, *we* will pay for any resulting loss from
items 3.a., 3.b., and 3.c. unless the resulting loss is
itself a Loss Not Insured as described in this Sec-
tion.

## SECTION I – LOSS SETTLEMENT

Only the **Loss Settlement Provisions** shown in the
*Declarations* apply.  *We* will settle covered property
losses according to the following.  However, the valuation
of any covered property losses does not include, and *we*
will not pay, any amount for *diminution in value*.

**COVERAGE A – DWELLING**

1.   **A1 – Replacement Cost Loss Settlement – Simi-
lar Construction.**

a.   *We* will pay the cost to repair or replace with
similar construction and for the same use on
the premises shown in the *Declarations*, the
damaged part of the property covered under
**SECTION I – PROPERTY COVERAGES,
COVERAGE A – DWELLING**, except for wood
fences, subject to the following:

(1)   until actual repair or replacement is com-
pleted, *we* will pay only the *actual cash
value* of the damaged part of the property,
up to the applicable limit of liability shown
in the *Declarations*, not to exceed the
cost to repair or replace the damaged part
of the property;

(2)   when the repair or replacement is actually
completed, *we* will pay the covered addi-
tional amount *you* actually and necessarily
spend to repair or replace the damaged
part of the property, or an amount up to
the applicable limit of liability shown in the
*Declarations*, whichever is less;

(3)   to receive any additional payments on a
replacement cost basis, *you* must com-
plete the actual repair or replacement of

the damaged part of the property within
two years after the date of loss, and notify
*us* within 30 days after the work has been
completed; and

(4)   *we* will not pay for increased costs result-
ing from enforcement of any ordinance or
law regulating the construction, repair, or
demolition of a *building structure* or other
structure, except as provided under **OP-
TIONAL POLICY PROVISIONS, Option
OL – Building Ordinance or Law.**

b.   Wood Fences:  *We* will pay the *actual cash
value* for loss or damage to wood fences, not to
exceed the limit of liability shown in the *Declara-
tions* for COVERAGE A – Other Structures.

2.   **A2 – Replacement Cost Loss Settlement –
Common Construction.**

a.   *We* will pay the cost to repair or replace with
common construction and for the same use on
the premises shown in the *Declarations*, the
damaged part of the property covered under
**SECTION I – PROPERTY COVERAGES,
COVERAGE A – DWELLING**, except for wood
fences, subject to the following:

(1)   *we* will pay only for repair or replacement
of the damaged part of the property with
common construction techniques and ma-
terials commonly used by the building
trades in standard new construction.  *We*
will not pay the cost to repair or replace
obsolete, antique, or custom construction
with like kind and quality;

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

HW-2136

(2) until actual repair or replacement is completed, *we* will pay only the *actual cash value* of the damaged part of the property, up to the applicable limit of liability shown in the *Declarations*, not to exceed the cost to repair or replace the damaged part of the property as described in a.(1) above;

(3) when the repair or replacement is actually completed as described in a.(1) above, *we* will pay the covered additional amount *you* actually and necessarily spend to repair or replace the damaged part of the property, or an amount up to the applicable limit of liability shown in the *Declarations*, whichever is less;

(4) to receive any additional payments on a replacement cost basis, *you* must complete the actual repair or replacement of the damaged part of the property within two years after the date of loss, and notify *us* within 30 days after the work has been completed; and

(5) *we* will not pay for increased costs resulting from enforcement of any ordinance or law regulating the construction, repair, or demolition of a *building structure* or other structure, except as provided under OPTIONAL POLICY PROVISIONS, Option OL – Building Ordinance or Law.

b. Wood Fences: *We* will pay the *actual cash value* for loss or damage to wood fences, not to exceed the limit of liability shown in the *Declarations* for COVERAGE A – Other Structures.

**COVERAGE B – PERSONAL PROPERTY**

1. **B1 – Limited Replacement Cost Loss Settlement.**

   a. *We* will pay the cost to repair or replace property covered under SECTION I – PROPERTY COVERAGES, COVERAGE B – PERSONAL PROPERTY, except for property listed in item b. below, subject to the following:

(1) until repair or replacement is completed, *we* will pay only the *actual cash value* of the damaged property;

(2) after repair or replacement is completed, *we* will pay the difference between the *actual cash value* and the cost *you* have actually and necessarily spent to repair or replace the property; and

(3) if property is not repaired or replaced within two years after the date of loss, *we* will pay only the *actual cash value*.

   b. *We* will pay market value at the time of loss for:

(1) antiques, fine arts, paintings, statuary, and similar articles which by their inherent nature cannot be replaced with new articles;

(2) articles whose age or history contribute substantially to their value including, but not limited to, memorabilia, souvenirs, and collectors items; and

(3) property not useful for its intended purpose.

However, *we* will not pay an amount exceeding the smallest of the following for items a. and b. above:

(1) *our* cost to replace at the time of loss;

(2) the full cost of repair;

(3) any special limit of liability described in this policy; or

(4) any applicable Coverage B limit of liability.

2. **B2 – Depreciated Loss Settlement.**

   a. *We* will pay the *actual cash value* for property covered under SECTION I – PROPERTY COVERAGES, COVERAGE B – PERSONAL PROPERTY, except for property listed in item b. below.

   b. *We* will pay market value at the time of loss for:

(1) antiques, fine arts, paintings, statuary, and similar articles which by their inherent nature cannot be replaced with new articles;

(2) articles whose age or history contribute substantially to their value including, but not limited to, memorabilia, souvenirs, and collectors items; and

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

(3) property not useful for its intended purpose.

However, *we* will not pay an amount exceeding the smallest of the following for items a. and b. above:

    (1) *our* cost to replace at the time of loss;

(2) the full cost of repair;

(3) any special limit of liability described in this policy; or

(4) any applicable Coverage B limit of liability.

## SECTION I – CONDITIONS

1. **Insurable Interest and Limit of Liability.** Even if more than one person has an insurable interest in the property covered, *we* will not be liable:

   a. to the *insured* for an amount greater than the *insured's* interest; or

   b. for more than the applicable limit of liability.

2. **Your Duties After Loss.** After a loss to which this insurance may apply, *you* must cooperate with *us* in the investigation of the claim and also see that the following duties are performed:

   a. give immediate notice to *us* or *our* agent and also notify:

     (1) the police if the loss is caused by theft, vandalism, or any other criminal act; and

     (2) the credit card company or bank if the loss involves a credit card or bank fund transfer card;

   b. protect the property from further damage or loss and also:

     (1) make reasonable and necessary temporary repairs required to protect the property; and

     (2) keep an accurate record of repair expenses;

   c. prepare an inventory of damaged or stolen personal property:

     (1) showing in detail the quantity, description, age, replacement cost, and amount of loss; and

     (2) attaching all bills, receipts, and related documents that substantiate the figures in the inventory;

   d. as often as *we* reasonably require:

     (1) exhibit the damaged property;

     (2) provide *us* with any requested records and documents and allow *us* to make copies;

     (3) while not in the presence of any other *insured*:

       (a) give statements; and

       (b) submit to examinations under oath; and

     (4) produce employees, members of the *insured's* household, or others for examination under oath to the extent it is within the *insured's* power to do so; and

   e. submit to *us*, within 60 days after the loss, *your* signed, sworn proof of loss that sets forth, to the best of *your* knowledge and belief:

     (1) the time and cause of loss;

     (2) interest of the *insured* and all others in the property involved and all encumbrances on the property;

     (3) other insurance that may cover the loss;

     (4) changes in title or occupancy of the property during the term of this policy;

     (5) specifications of any damaged structure and detailed estimates for repair of the damage;

     (6) an inventory of damaged or stolen personal property described in 2.c.;

     (7) receipts for additional living expenses incurred and records supporting the fair rental value loss; and

     (8) evidence or affidavit supporting a claim under **SECTION I – ADDITIONAL COVERAGES, Credit Card, Bank Fund Transfer Card, Forgery, and Counterfeit Money** coverage, stating the amount and cause of loss.

3. **Loss to a Pair or Set.** In case of loss to a pair or set, *we* may choose to:

   a. repair or replace any part to restore the pair or set to its value before the loss; or

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

HW-2136

    b. pay the difference between the depreciated value of the property before the loss and the depreciated value of the property after the loss.

4. **Appraisal.** If *you* and *we* fail to agree on the amount of loss, either party can demand that the amount of the loss be set by appraisal. Only *you* or *we* may demand appraisal. A demand for appraisal must be in writing. *You* must comply with **SECTION I – CONDITIONS, Your Duties After Loss** before making a demand for appraisal. At least 10 days before demanding appraisal, the party seeking appraisal must provide the other party with written, itemized documentation of a specific dispute as to the amount of the loss, identifying separately each item being disputed.

    a. Each party will select a competent, disinterested appraiser and notify the other party of the appraiser's identity within 20 days of receipt of the written demand for appraisal.

    b. The appraisers will then attempt to set the amount of the loss of each item in dispute as specified by each party, and jointly submit to each party a written report of agreement signed by them. In all instances the written report of agreement will be itemized and state separately the *actual cash value*, replacement cost, and if applicable, the market value of each item in dispute.

    The written report of agreement will set the amount of the loss of each item in dispute.

    c. If the two appraisers fail to agree upon the amount of the loss within 30 days, unless the period of time is extended by mutual agreement, they will select a competent, disinterested umpire and will submit their differences to the umpire. If the appraisers are unable to agree upon an umpire within 15 days:

        (1) *you* or *we* may make a written application for a judge of a court of record in the same state and county (or city if the city is not within a county) where the *residence premises* is located to select an umpire;

        (2) the party requesting the selection described in item c.(1) must provide the other party:

        (a) written notice of the intent to file, identifying the specific location and identity of the court at least 10 days prior to submission of the written application; and

        (b) a copy of the written application; and

    (3) a written report of agreement, as required in item b., signed by any two (appraisers or appraiser and umpire) will set the amount of the loss of each item in dispute. In all instances the written report of agreement will be itemized and state separately the *actual cash value*, replacement cost, and if applicable, the market value of each item in dispute.

    d. To qualify as an appraiser or umpire for a loss to property described in **COVERAGE A – DWELLING**, a person must be one of the following and be licensed or certified as required by the applicable jurisdiction:

        (1) an engineer or architect with experience and training in building construction, repair, estimating, or investigation of the type of property damage in dispute;

        (2) an adjuster or public adjuster with experience and training in estimating the type of property damage in dispute; or

        (3) a contractor with experience and training in the construction, repair, and estimating of the type of property damage in dispute.

    e. A person may not serve as an appraiser or umpire if that person, any employee of that person, that person's employer, or any employee of their employer:

        (1) has performed services for either party with respect to the claim at issue in the appraisal; or

        (2) has a financial interest in the outcome of the claim at issue in the appraisal.

    f. Each party will be responsible for the compensation of their selected appraiser. Reasonable expenses of the appraisal and the reasonable

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

compensation of the umpire will be paid equally by *you* and *us*.

g. *You* and *we* do not waive any rights by demanding or submitting to an appraisal, and retain all contractual rights to determine if coverage applies to each item in dispute.

h. Appraisal is only available to determine the amount of the loss of each item in dispute. The appraisers and the umpire have no authority to decide:

(1) any other questions of fact;

(2) questions of law;

(3) questions of coverage;

(4) other contractual issues; or

(5) to conduct appraisal on a class-wide basis.

i. Appraisal is a non-judicial proceeding and does not provide for or require arbitration. Neither party will be awarded attorney fees. The appraisal award may not be entered as a judgment in a court.

j. A party may not demand appraisal after that party brings suit or action against the other party relating to the amount of loss.

5. **Other Insurance.** If a loss covered by this policy is also covered by other insurance, *we* will pay only *our* share of the loss. *Our* share is the proportion of the loss that the applicable limit under this policy bears to the total amount of insurance covering the loss.

6. **Suit Against Us.** No action will be brought against *us* unless there has been full compliance with all of the policy provisions. Any action by any party must be started within one year after the date of loss or damage. However, if the cause of loss or damage is burglary, theft, larceny, robbery, forgery, fraud, vandalism, malicious mischief, confiscation, wrongful conversion, disposal or concealment, the action must be started within two years from the time the cause of action accrues.

7. **Our Option.** *We* may repair or replace any part of the property damaged or stolen with similar property. Any property *we* pay for or replace becomes *our* property.

8. **Loss Payment.** *We* will adjust all losses with *you*. *We* will pay *you* unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable:

a. 60 days after *we* receive *your* proof of loss and:

(1) reach agreement with *you*; or

(2) there is a filing of an appraisal award with *us*; or

b. 30 days after *we* receive *your* proof of loss and there is an entry of a final judgment.

9. **Abandonment of Property.** *We* need not accept any property abandoned by an *insured*.

10. **Mortgagee Clause.** The word "mortgagee" includes trustee.

a. If a mortgagee is named in this policy, any loss payable under Coverage A will be paid to the mortgagee and *you*, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages.

b. If *we* deny *your* claim, that denial will not apply to a valid claim of the mortgagee, if the mortgagee:

(1) notifies *us* of any change in ownership, occupancy, or substantial change in risk of which the mortgagee is aware;

(2) pays on demand any premium due under this policy, if *you* have not paid the premium; and

(3) submits a signed, sworn statement of loss within 60 days after receiving notice from *us* of *your* failure to do so. Policy conditions relating to **Appraisal**, **Suit Against Us**, and **Loss Payment** apply to the mortgagee.

c. If *we* cancel this policy, the mortgagee will be notified at least 10 days before the date cancellation takes effect. Proof of mailing will be proof of notice.

d. If *we* pay the mortgagee for any loss and deny payment to *you*:

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

(1) *we* are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

(2) at *our* option, *we* may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, *we* will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

e. Subrogation does not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

11. **No Benefit to Bailee.** *We* will not recognize an assignment or grant coverage for the benefit of a person or organization holding, storing, or transporting property for a fee. This applies regardless of any other provision of this policy.

12. **Recovered Property.** If either *you* or *we* recover any property after loss settlement, that party must give the other prompt notice. At *your* option, *you* may keep the property or *we* will return it to *you*. Otherwise, it will become *our* property. If *you* choose to keep the property, the loss payment will be adjusted based on the amount *you* received for the recovered property.

13. **Assignment of Claim.** Assignment to another party of any of *your* rights or duties under this policy regarding any claim, or any part of any claim, will be void and *we* will not recognize any such assignment, unless *we* give *our* written consent. However, once *you* have complied with all policy provisions, *you* may assign to another party, in writing, payment of claim proceeds otherwise payable to *you*.

## SECTION II – LIABILITY COVERAGES

### COVERAGE L – PERSONAL LIABILITY

If a claim is made or a suit is brought against an *insured* for damages because of *bodily injury* or *property damage* to which this coverage applies, caused by an *occurrence*, *we* will:

1. pay up to *our* limit of liability for the damages for which the *insured* is legally liable. *We* will not pay for criminal restitution; and

2. provide a defense at *our* expense by counsel of *our* choice. *We* may make any investigation and settle any claim or suit that *we* decide is appropriate. *Our* obligation to defend any suit ends when the amount *we* pay for damages, to effect settlement or satisfy a judgment resulting from the *occurrence*, equals *our* limit of liability. *We* will not provide a defense to any *insured* for criminal prosecution or proceedings.

### COVERAGE M – MEDICAL PAYMENTS TO OTHERS

*We* will pay the necessary medical expenses incurred or medically ascertained within three years from the date of an accident causing *bodily injury*. Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, rehabilitation, pharmaceuticals, orthopedic devices, prosthetic devices, and funeral services. This coverage applies only:

1. to a person on the *insured location* with the permission of an *insured*;

2. to a person off the *insured location*, if the *bodily injury*:

   a. arises out of a condition on the *insured location* or the ways immediately adjoining;

   b. is caused by the activities of an *insured*;

   c. is caused by a *residence employee* in the course of the *residence employee's* employment by an *insured*; or

   d. is caused by an animal owned by or in the care of an *insured*; or

3. to a *residence employee* if the *occurrence* causing *bodily injury* occurs off the *insured location* and arises out of or in the course of the *residence employee's* employment by an *insured*.

### SECTION II – ADDITIONAL COVERAGES

The following Additional Coverages are subject to all the terms, provisions, exclusions, and conditions of this policy.

*We* will pay for the following in addition to the limits of liability:

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017
HW-2136

1. **Claim Expenses.** *We* will pay:

   a. expenses *we* incur and costs taxed against an *insured* in suits *we* defend. Taxed costs do not include attorney fees;

   b. premiums on bonds required in suits *we* defend, but not for bond amounts greater than the Coverage L limit. *We* are not obligated to apply for or furnish any bond;

   c. reasonable expenses an *insured* incurs at *our* request. This includes actual loss of earnings (but not loss of other income) up to $250 per day for aiding *us* in the investigation or defense of claims or suits;

   d. interest the *insured* is legally liable to pay on damages payable under Coverage L above before a judgment, but only the interest on the lesser of:

      (1) that part of the damages *we* pay; or

      (2) the Coverage L limit; and

   e. interest on the entire judgment that accrues after entry of the judgment and before *we* pay or tender, or deposit in court that part of the judgment that does not exceed the limit of liability that applies.

2. **First Aid Expenses.** *We* will pay expenses for first aid to others incurred by an *insured* for *bodily injury* covered under this policy. *We* will not pay for first aid to *you* or any other *insured*.

3. **Damage to Property of Others.**

   a. *We* will pay for *property damage* to property of others caused by the activities of an *insured*.

   b. *We* will not pay more than the smallest of the following amounts:

      (1) replacement cost at the time of loss;

      (2) full cost of repair; or

      (3) the limit of liability shown in the *Declarations* for **Damage to Property of Others** for any one *occurrence*.

   c. *We* will not pay for *property damage*:

      (1) for a loss that is recoverable under Section I of this policy. *We* also will not pay for any applicable deductible regardless of whether the amount of the loss exceeds the deductible;

      (2) caused intentionally by an *insured* 13 years of age or older;

      (3) to property, other than a rented golf cart, owned by, or rented to an *insured*, a tenant of an *insured*, or a resident in *your* household;

      (4) arising out of:

         (a) *business* pursuits;

         (b) any act or omission in connection with a premises an *insured* owns, rents, or controls, other than the *insured location*;

         (c) a condition on the *insured location* or the ways immediately adjoining; or

         (d) the ownership, maintenance, or use of a *motor vehicle*, aircraft, or watercraft, including airboat, air cushion, personal watercraft, sail board, or similar type watercraft; or

      (5) if a payment is made under **COVERAGE L – PERSONAL LIABILITY** for the same *property damage*.

## SECTION II – EXCLUSIONS

1. Coverage L and Coverage M do not apply to:

   a. *bodily injury* or *property damage* that:

      (1) was a result of a:

         (a) willful and malicious; or

         (b) criminal;

         act or omission of the *insured*;

      (2) was intended by the *insured*; or

      (3) would have been expected by the *insured* based on a reasonable person standard.

   However, exclusions a.(2) and a.(3) above do not apply to *bodily injury* or *property damage* resulting from the use of reasonable force to protect persons or property.

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

Exclusions a.(1), a.(2), and a.(3) above apply to all *bodily injury* or *property damage* even if the:

(1) *bodily injury* or *property damage* was sustained by a different person, entity, or property than was expected or intended;

(2) *bodily injury* or *property damage* was of a different kind, quality, or degree than was expected or intended;

(3) *insured* lacked the mental capacity to control his or her conduct;

(4) *insured* was not charged with or convicted of a criminal act or omission; or

(5) *insured* was impaired by drugs or alcohol;

b. *bodily injury* or *property damage* arising out of *business* pursuits of any *insured*, except as provided in item c. below. This exclusion does not apply to activities that are ordinarily incident to non-*business* pursuits;

c. *bodily injury* or *property damage* arising out of the rental of any part of any premises by any *insured*. This exclusion does not apply:

(1) to the rental of the *residence premises*:

(a) either completely or in part, for exclusive use as a residence, for up to 30 nights in the 12-month period prior to the date of the loss;

(b) in part, for use as a permanent residence, by either one or two full-time roomers or boarders; or

(c) in part, as an office, school, studio, or private garage;

(2) when the *dwelling* on the *residence premises* is a two, three, or four family *dwelling* and *you* occupy one part and rent the other part to others;

(3) to farm land (without buildings), rented to others, but not to exceed a total of 500 acres, regardless of the number of locations; or

(4) to activities that are ordinarily incident to non-*business* pursuits;

d. *bodily injury* or *property damage* arising out of the rendering or failing to render professional services;

e. *bodily injury* or *property damage* arising out of any premises currently owned or rented to any *insured* which is not an *insured location*. This exclusion does not apply to *bodily injury* to a *residence employee* arising out of and in the course of the *residence employee's* employment by an *insured*;

f. *bodily injury* or *property damage* arising out of the ownership, maintenance, use, loading, or unloading of:

(1) an aircraft. This exclusion does not apply to the ownership, maintenance, use, loading, or unloading of unmanned aircraft systems used as model aircraft:

(a) solely for recreational or hobby purposes;

(b) designed to be operated within the visual line of sight of the operator and operated within the visual line of sight of the operator; and

(c) weighing not more than 55 pounds at the time of operation;

unless the ownership, maintenance, use, loading, or unloading of such aircraft results in:

(a) *property damage* to any aircraft; or

(b) *bodily injury* or *property damage* resulting from interference with an aircraft carrying people regardless of whether the *bodily injury* or *property damage* is sustained by people or property on the aircraft or not;

(2) a *motor vehicle* owned or operated by or rented or loaned to any *insured*; or

(3) a watercraft:

(a) owned by or rented to any *insured* if it has inboard or inboard-outdrive motor power of more than 50 horsepower;

(b) owned by or rented to any *insured* if it is a sailing vessel, with or without

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017
HW-2136

auxiliary power, 26 feet or more in overall length;

(c) powered by one or more outboard motors with more than 25 total horsepower owned by any *insured*;

(d) designated as an airboat, air cushion, or similar type of craft; or

(e) owned by any *insured* if it is a personal watercraft using a water jet pump powered by an internal combustion engine as the primary source of propulsion.

This exclusion does not apply to *bodily injury* to a *residence employee* arising out of and in the course of the *residence employee's* employment by an *insured*. Exclusion f.(3) does not apply while the watercraft is on the *residence premises*;

g. *bodily injury* or *property damage* arising out of:

(1) the entrustment by any *insured* to any person;

(2) the supervision by any *insured* of any person;

(3) any liability statutorily imposed on any *insured*; or

(4) any liability assumed through an unwritten or written agreement by any *insured*;

with regard to the ownership, maintenance, or use of any aircraft, watercraft, or *motor vehicle* not covered under Section II of this policy;

h. *bodily injury* or *property damage* caused directly or indirectly by war, including undeclared war, or any warlike act including destruction, seizure, or use for a military purpose, or any consequence of these. Discharge of a nuclear weapon will be considered a warlike act even if accidental;

i. *bodily injury* to any *insured* within the meaning of part 9.a., 9.b., or 9.c. of the definition of *insured*.

This exclusion also applies to any claim made or suit brought against any *insured* within the meaning of part 9.a., 9.b., or 9.c. of the definition of *insured* to share damages with or repay someone else who may be obligated to pay damages because of the *bodily injury* sustained by any *insured* within the meaning of part 9.a., 9.b., or 9.c. of the definition of *insured*;

j. any claim made or suit brought against any *insured* by:

(1) any person in the care of any *insured* because of child care services provided by or at the direction of:

(a) any *insured*;

(b) any employee of any *insured*; or

(c) any other person actually or apparently acting on behalf of any *insured*; or

(2) any person who makes a claim because of *bodily injury* to any person in the care of any *insured* because of child care services provided by or at the direction of:

(a) any *insured*;

(b) any employee of any *insured*; or

(c) any other person actually or apparently acting on behalf of any *insured*.

This exclusion does not apply to the occasional child care services provided by any *insured*, or to the part-time child care services provided by any *insured* under 19 years of age;

k. *bodily injury* or *property damage* arising out of an *insured's* participation in, or preparation or practice for, any prearranged or organized race, speed or demolition contest, or similar competition involving a motorized land vehicle or motorized watercraft. This exclusion does not apply to a sailing vessel less than 26 feet in overall length with or without auxiliary power;

l. *bodily injury* or *property damage* arising out of the use, sale, manufacture, distribution, delivery, transfer, or possession, by any *insured*, of any substance that is illegal or is a controlled substance under either federal or state law.

© Copyright, State Farm Mutual Automobile Insurance Company, 2017

This exclusion does not apply to the legitimate use of legally prescribed drugs, under either federal or state law, by a person following orders of a licensed health care professional;

m. *bodily injury* or *property damage* arising out of the actual, alleged, or threatened presence, discharge, dispersal, seepage, migration, release, escape of, or exposure to contaminants or pollutants at or from any source or location.

Contaminants and pollutants include but are not limited to any solid, liquid, gaseous, or thermal irritant, including smoke from agricultural smudging or industrial operations, smog, soot, vapor, fumes, acids, alkalis, chemicals, pathogens, noxious substances, fuel oil, asbestos, or lead.

This exclusion does not apply to *bodily injury* or *property damage* arising out of smoke or fumes caused by fire or explosion.

*We* also do not cover:

(1) any loss, cost, or expense arising out of any request, demand, order, or statutory or regulatory requirement that any *insured* or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, remediate, dispose of, or in any way respond to or assess the effects of contaminants or pollutants;

(2) any loss, cost, or expense arising out of any claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating, disposing of, or in any way responding to or assessing the effects of contaminants or pollutants; or

(3) contamination or pollution arising out of actually or allegedly defective building materials, nuclear substances, or waste. Waste includes materials to be recycled, reconditioned, or reclaimed;

n. *bodily injury* or *property damage* arising out of any actual, alleged, or threatened:

(1) sexual harassment, sexual molestation, or sexual misconduct;

(2) physical or mental abuse; or

(3) corporal punishment;

by the *insured*;

o. *bodily injury* or *property damage* arising out of the actual, alleged, or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any *fungus* at or from any source or location.

*We* also do not cover any loss, cost, or expense arising out of any:

(1) request, demand, order, or statutory or regulatory requirement that any *insured* or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, remediate, dispose of, or in any way respond to or assess the effects of *fungus*; or

(2) claim or suit for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating, disposing of, or in any way responding to or assessing the effects of *fungus*; or

p. *bodily injury* or *property damage* arising out of the ownership, maintenance, or use of systems and equipment used to generate electrical power exceeding 125 percent of the actual electrical power usage by the *residence premises* in the 12-month period prior to the date of the loss.

2. Coverage L does not apply to:

a. liability:

(1) for *your* share of any loss assessment charged against all members of any type of association of property owners; or

(2) imposed on or assumed by any *insured* through any unwritten or written contract or agreement. This exclusion does not apply to liability for damages that the *insured* would have in absence of the contract or agreement;

b. *property damage* to property owned by any *insured* at the time of the *occurrence*;

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

c. *property damage* to property rented to, used or occupied by, or in the care, custody, or control of any *insured* at the time of the *occurrence*. This exclusion does not apply to *property damage* caused by fire, smoke, explosion, or abrupt and accidental damage from water;

d. *bodily injury* to a person eligible to receive any benefits required to be provided or voluntarily provided by an *insured* under a workers' compensation, non-occupational disability, or occupational disease law;

e. *bodily injury* or *property damage* for which an *insured* under this policy is also an insured under a nuclear energy liability policy or would be an insured but for its termination upon exhaustion of its limit of liability. A nuclear energy liability policy is a policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada, or any of their successors;

f. *bodily injury* or *property damage* arising out of any real property any *insured* has sold or transferred. This includes but is not limited to *bodily injury* or *property damage* arising out of known, unknown, hidden, or alleged property conditions, problems, or defects.

This exclusion also applies to any *property damage* to the sold or transferred real property itself.

However, this exclusion does not apply to:

(1) *bodily injury* arising out of fire, smoke, explosion, electrocution, or carbon monoxide poisoning; or

(2) *property damage* arising out of fire, smoke, or explosion.

3. Coverage M does not apply to *bodily injury*:

a. to a *residence employee* if it occurs off the *insured location* and does not arise out of or in the course of the *residence employee's* employment by an *insured*;

b. to a person eligible to receive any benefits required to be provided or voluntarily provided under any workers' compensation, non-occupational disability, or occupational disease law;

c. to a person other than a *residence employee* of an *insured*, regularly residing on any part of the *insured location*; or

d. from nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

## SECTION II – CONDITIONS

1. **Limit of Liability.** The Coverage L limit is shown in the *Declarations*. This is the limit for all damages from each *occurrence* for the policy period in which the *bodily injury* or *property damage* first occurs, regardless of the number of *insureds*, claims made, or persons injured. No additional limits or coverage will be available for the *occurrence* under any additional policy periods while this policy remains in force.

The Coverage M limit is shown in the *Declarations*. This is *our* limit for all medical expenses for *bodily injury* to one person as the result of one accident.

2. **Severability of Insurance.** This insurance applies separately to each *insured*. This condition does not increase *our* limit of liability for any one *occurrence*.

3. **Duties After Loss.** In case of an accident or *occurrence*, the *insured* must cooperate with *us* in the investigation, settlement, or defense of any claim or suit and also perform the following duties that apply. *You* must cooperate with *us* in seeing that these duties are performed:

a. give written notice to *us* or *our* agent as soon as possible, which sets forth:

(1) the identity of this policy and the *insured*;

(2) reasonably available information on the time, place, and circumstances of the accident or *occurrence*; and

28

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

HW-2136

(3) names and addresses of any claimants and available witnesses;

b. immediately forward to *us* every notice, demand, summons, or other process relating to the accident or *occurrence*;

c. at *our* request, assist in:

(1) making settlement;

(2) the enforcement of any right of contribution or indemnity against a person or organization who may be liable to an *insured*;

(3) the conduct of suits and attend hearings and trials; and

(4) securing and giving evidence and obtaining the attendance of witnesses;

d. under **SECTION II – ADDITIONAL COVERAGES, Damage to Property of Others**, exhibit the damaged property if within the *insured's* control; and

e. the *insured* must not, except at the *insured's* own cost, voluntarily make payments, assume obligations, or incur expenses. This does not apply to expense for first aid to others at the time of the *bodily injury*.

4. **Coverage M Requirements.** *We* may require the following in regard to any Coverage M claim:

a. written proof of claim, under oath if required, as soon as possible from the injured person, or when appropriate, someone acting on behalf of that person;

b. the injured person's submission to physical examinations by a physician selected by *us* when and as often as *we* reasonably require; and

c. any authorizations from the injured person as *we* may require.

5. **Payment of Claim – Coverage M or Damage to Property of Others.** Payment under either of these is not an admission of liability by an *insured* or *us*.

6. **Suit Against Us.** No action will be brought against *us* unless there has been compliance with the policy provisions.

No one will have the right to join *us* as a party to an action against an *insured*. Further, no action with respect to Coverage L will be brought against *us* until the obligation of the *insured* has been determined by final judgment on the merits, after an actual trial or by an agreement signed by *us*; but *we* will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable Limit of Liability.

7. **Bankruptcy of an Insured.** Bankruptcy or insolvency of an *insured* will not relieve *us* of *our* obligation under this policy.

8. **Other Insurance – Coverage L.** This insurance is excess over any other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

## SECTION I AND SECTION II – CONDITIONS

1. **Policy Period.** This policy applies only to loss under Section I or *bodily injury* or *property damage* under Section II that occurs during the period this policy is in effect.

2. **Concealment or Fraud.** This policy is void as to *you* and any other *insured* if *you* or any other *insured* under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss.

3. **Liberalization Clause.** If *we* adopt any revision that would broaden coverage under this policy without additional premium, within 60 days prior to or

during the period this policy is in effect, the broadened coverage will immediately apply to this policy.

4. **Waiver or Change of Policy Provisions.** A waiver or change of any provision of this policy must be in writing by *us* to be valid. *Our* request for an appraisal or examination does not waive any of *our* rights.

5. **Cancellation.**

a. *You* may cancel this policy at any time by giving *us* advance written notice of the date cancellation is to take effect. *We* may waive the requirement

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

that the notice be in writing by confirming the date and time of cancellation to *you* in writing.

b.  *We* may cancel this policy only for the reasons stated in this condition. *We* will notify *you* in writing of the date cancellation takes effect. This cancellation notice may be delivered to *you*, or mailed to *you* at *your* mailing address shown in the *Declarations*. Proof of mailing will be sufficient proof of notice:

(1)  When *you* have not paid the premium, *we* may cancel at any time by notifying *you* at least 10 days before the date cancellation takes effect. This condition applies whether the premium is payable to *us* or *our* agent or under any finance or credit plan.

(2)  When this policy has been in effect for less than 45 business days and is not a renewal with *us*, *we* may cancel for any reason. *We* may cancel by notifying *you* at least 10 days before the date cancellation takes effect.

(3)  When this policy has been in effect for 45 business days or more, or at any time if it is a renewal with *us*, *we* may cancel for the following reasons:

(a)  discovery of fraud or material misrepresentation in the procurement of the insurance or with respect to any claims submitted thereunder;

(b)  discovery of willful or reckless acts or omissions on the part of the named insured which increase any hazard insured against;

(c)  a change in the risk which substantially increases any hazard insured against after insurance coverage has been issued or renewed;

(d)  violation of any local fire, health, safety, building, or construction regulation or ordinance with respect to any insured property or the occupancy thereof which substantially increases any hazard insured against;

(e)  a determination by the Insurance Commissioner that the continuation of the policy would place the insurer in violation of the insurance laws of this state; or

(f)  conviction of the named insured of a crime having as one of its necessary elements an act increasing any hazard insured against.

*We* may cancel this policy by notifying *you* at least 30 days before the date cancellation takes effect.

(4)  When this policy is written for a period longer than one year, *we* may cancel for any reason at anniversary. *We* may cancel by notifying *you* at least 30 days before the date cancellation takes effect.

c.  When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded. The return premium will be pro rata.

d.  The return premium may not be refunded with the notice of cancellation or when this policy is returned to *us*. In such cases, *we* will refund it within a reasonable time after the date cancellation takes effect.

6.  **Nonrenewal.** *We* may elect not to renew this policy. If *we* elect not to renew, a written notice will be delivered to *you*, or mailed to *you* at *your* mailing address shown in the *Declarations*. The notice will be mailed or delivered at least 30 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

7.  **Assignment of Policy.** Assignment of this policy will be void and *we* will not recognize any such assignment, unless *we* give *our* written consent.

8.  **Subrogation and Reimbursement.**

a.  **Subrogation.**

(1)  Applicable to SECTION I:

If any *insured* to or for whom *we* make payment under this policy has rights to recover damages from another, those rights are transferred to *us* to the extent of *our* payment. That *insured* must do everything necessary to secure *our* rights and must do nothing after loss to impair them.

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

HW-2136

However before a loss, an *insured* may waive in writing all rights of recovery against any person.

(2) Applicable to SECTION II:

If any *insured* has rights to recover all or part of any payment *we* have made under this policy, those rights are transferred to *us*. An *insured* must do nothing after loss to impair them. At *our* request, an *insured* will bring suit or transfer those rights to *us* and help *us* enforce them.

Subrogation does not apply under Section II to **Medical Payments to Others** or **Damage to Property of Others**.

b. **Reimbursement.**

If *we* make payment under this policy and any *insured* to or for whom *we* make payment recovers or has recovered from another person or organization, then the *insured* to or for whom *we* make payment must:

(1) hold in trust for *us* the proceeds of any recovery; and

(2) reimburse *us* to the extent of *our* payment.

9. **Death.** If *you* die:

a. *we* insure the legal representative of the deceased. This condition applies only with respect to the premises and property of the deceased covered under this policy at the time of death;

b. *insured* includes:

(1) any member of *your* household who is an *insured* at the time of *your* death, but only while a resident of the *residence premises*; and

(2) with respect to *your* property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

10. **Conformity to State Law.** When a policy provision is in conflict with the applicable law of the state in which this policy is issued, the law of the state will apply.

11. **Premium.**

a. Unless as otherwise provided by an alternative payment plan in effect with the **State Farm Companies** with respect to the premium for this policy, the premium is due and payable in full on or before the first day of the policy period shown in the most recently issued *Declarations*.

b. The renewal premium for this policy will be based upon the rates in effect, the coverages carried, the applicable limits, deductibles, and other elements that affect the premium applicable at the time of renewal.

c. The premium for this policy may vary based upon:

(1) the purchase of other products or services from the **State Farm Companies**;

(2) the purchase of products or services from an organization that has entered into an agreement or contract with the **State Farm Companies**. The **State Farm Companies** do not warrant the merchantability, fitness, or quality of any product or service offered or provided by that organization; or

(3) an agreement, concerning the insurance provided by this policy, that the **State Farm Companies** has with an organization of which *you* are a member, employee, subscriber, licensee, or franchisee.

d. *Your* purchase of this policy may allow:

(1) *you* to purchase or obtain certain coverages, coverage options, coverage deductibles, coverage limits, or coverage terms on other products from the **State Farm Companies**, subject to their applicable eligibility rules; or

(2) the premium or price for other products or services purchased by *you*, including non-insurance products or services, to vary. Such other products or services must be provided by the **State Farm Companies** or by an organization that has entered into an agreement or contract with the **State**

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017
HW-2136

*Farm Companies*. The *State Farm Companies* do not warrant the merchantability, fitness, or quality of any product or service offered or provided by that organization.

12. **Right to Inspect.**

   a. *We* have the right but are not obligated to perform the following:

   (1) make inspections and surveys of the *insured location* at any time;

   (2) provide *you* with reports on conditions *we* find; or

   (3) recommend changes.

   Any inspections, surveys, reports, or recommendations relate only to insurability and the premiums to be charged.

   b. *We* do not:

   (1) make safety inspections;

   (2) undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public;

   (3) warrant that conditions are safe or healthful; or

   (4) warrant that conditions comply with laws, regulations, codes, or standards.

   This condition applies to *us* and to any rating, advisory, rate service, or similar organization that makes insurance inspections, surveys, reports, or recommendations on *our* behalf.

13. **Joint and Individual Interests.** When there are two or more Named Insureds, each acts for all to cancel or change this policy.

14. **Change of Policy Address.** *We* may change the Named Insured's policy address as shown in the *Declarations* and in *our* records to the most recent address provided to *us* by:

   a. *you;* or

   b. the United States Postal Service.

15. **Electronic Delivery.** With *your* consent, *we* may electronically deliver any document or notice, including a notice to renew, nonrenew, or cancel, instead

of mailing it or delivering it by other means. Proof of transmission will be sufficient proof of notice.

16. **Our Rights Regarding Claim Information.**

   a. *We* will collect, receive, obtain, use, and retain all the items described in item b.(1) below and use and retain the information described in item b.(3)(b) below, in accordance with applicable federal and state laws and regulations and consistent with the performance of *our* business functions.

   b. Subject to 16.a. above, *we* will not be restricted in or prohibited from:

   (1) collecting, receiving, or obtaining records, receipts, invoices, medical bills, medical records, wage information, salary information, employment information, data, and any other information;

   (2) using any of the items described in item b.(1) above; or

   (3) retaining:

      (a) any of the items in item b.(1) above; or

      (b) any other information *we* have in *our* possession as a result of *our* processing, handling, or otherwise resolving claims submitted under this policy.

   c. *We* may disclose any of the items in b.(1) above and any of the information described in item b.(3)(b) above:

   (1) to enable performance of *our* business functions;

   (2) to meet *our* reporting obligations to insurance regulators;

   (3) to meet *our* reporting obligations to insurance data consolidators;

   (4) to meet other obligations required by law; and

   (5) as otherwise permitted by law.

   d. *Our* rights under 16.a., 16.b., and 16.c. above will not be impaired by any:

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

HW-2136

(1) authorization related to any claim submitted under this policy; or

(2) act or omission of an *insured* or a legal representative acting on an *insured's* behalf.

17. **Duties Regarding Claim Information.** An *insured* or a legal representative acting on an *insured's* behalf

must provide *us* with any requested authorizations related to the claim. *Our* rights as set forth under **Our Rights Regarding Claim Information** of this policy will not be impaired by any:

a. authorization related to the claim; or

b. act or omission of an *insured* or a legal representative acting on an *insured's* behalf.

## OPTIONAL POLICY PROVISIONS

Each Optional Policy Provision applies only as shown in the *Declarations* and is subject to all the terms, provisions, exclusions, and conditions of this policy.

**Option AI – Additional Insured.** The definition of *insured* is extended to include the person or organization shown in the *Declarations* as an Additional Insured or whose name is on file with *us*. Coverage is with respect to:

1. **SECTION I – Coverage A, Coverage B**, or **Coverage C**; or

2. **SECTION II – Coverage L** and **Coverage M** but only with respect to the *residence premises*. This coverage does not apply to *bodily injury* to an employee arising out of or in the course of the employee's employment by the person or organization.

This option applies only with respect to the location shown in the *Declarations*.

**Option BP – Business Property.** The COVERAGE B – PERSONAL PROPERTY, Special Limits of Liability, item b., for property used or intended for use in a *business*, including merchandise held as samples or for sale or for delivery after sale, is changed as follows:

The $1,500 limit is replaced with the amount shown in the *Declarations* for this option.

**Option BU – Business Pursuits. SECTION II – EXCLUSIONS**, item 1.b. is modified as follows:

1. Section II coverage applies to the *business* pursuits of an *insured* who is a:

a. clerical office employee, salesperson, collector, messenger; or

b. teacher (except college, university, and professional athletic coaches), school principal, or school administrator;

while acting within the scope of the above listed occupations.

2. However, no coverage is provided:

a. for *bodily injury* or *property damage* arising out of a *business* owned or financially controlled by the *insured* or by a partnership of which the *insured* is a partner or member;

b. for *bodily injury* or *property damage* arising out of the rendering of or failure to render professional services of any nature (other than teaching or school administration). This exclusion includes but is not limited to:

(1) computer programming, architectural, engineering, or industrial design services;

(2) medical, surgical, dental, or other services or treatment conducive to the health of persons or animals; and

(3) beauty or barber services or treatment;

c. for *bodily injury* to a fellow employee of the *insured* injured in the course of employment; or

d. when the *insured* is a member of the faculty or teaching staff of a school or college:

(1) for *bodily injury* or *property damage* arising out of the maintenance, use, loading, or unloading of:

(a) draft or saddle animals, including vehicles for use with them; or

(b) aircraft, *motor vehicles*, recreational *motor vehicles* or watercraft, airboats, air cushions, or personal watercraft which use a water jet pump powered by an internal combustion

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

HW-2136

engine as the primary source of propulsion;

owned, operated, or hired by or for the *insured* or employer of the *insured* or used by the *insured* for the purpose of instruction in the use thereof; or

(2) under **Coverage M** for *bodily injury* to a student arising out of corporal punishment administered by or at the direction of the *insured*.

**Option FA – Firearms.** Firearms are covered for accidental direct physical loss or damage.

The limits for this option are shown in the *Declarations*. The first amount is the limit for any one article; the second amount is the aggregate limit for each loss.

The following additional provisions apply:

1. *We* will not pay for any loss to the property described in this option either consisting of, or directly and immediately caused by, one or more of the following:

   a. mechanical breakdown, wear and tear, or gradual deterioration;

   b. all animals, birds, or insects, including nesting, infestation, gnawing, feeding, breeding, or discharge or release of waste products or secretions by animals, birds, or insects. However, *we* will pay for losses caused by wild bears or deer;

   c. any process of refinishing, renovating, or repairing;

   d. dampness of atmosphere or extremes of temperatures;

   e. inherent defect or faulty manufacture;

   f. rust, fouling, or explosion of firearms;

   g. breakage, marring, scratching, tearing, or denting unless caused by fire, thieves, or accidents to conveyances; or

   h. infidelity of an *insured's* employees or persons to whom the insured property may be entrusted or rented;

2. *Our* limit for loss by any Coverage B peril except theft is the limit shown in the *Declarations* for Coverage B, plus the aggregate limit;

3. *Our* limits for loss by theft are those shown in the *Declarations* for this option. These limits apply in lieu of the Coverage B theft limit; and

4. *Our* limits for loss by any covered peril except those in items 2. and 3. above are those shown in the *Declarations* for this option.

**Option ID – Increased Dwelling Limit.** *We* will settle losses to damaged *building structures* covered under **COVERAGE A – DWELLING** according to the **Loss Settlement Provision** shown in the *Declarations*.

If the amount *you* actually and necessarily spend to repair or replace damaged *building structures* exceeds the applicable limit of liability shown in the *Declarations*, *we* will pay the additional amounts not to exceed:

1. the Option ID limit of liability shown in the *Declarations* to repair or replace the *dwelling*; or

2. 10% of the Option ID limit of liability to repair or replace *building structures* covered under COVERAGE A – DWELLING, Other Structures.

**Report Increased Values.** *You* must notify *us* within 90 days of the start of construction on any new *building structure* costing $5,000 or more; or any additions to or remodeling of *building structures* that increase their values by $5,000 or more. *You* must pay any additional premium due for the increased value. *We* will not pay more than the applicable limit of liability shown in the *Declarations* if *you* fail to notify *us* of the increased value within 90 days.

**Option IO – Incidental Business.** The coverage provided by this option applies only to that incidental *business* occupancy on file with *us*.

1. **COVERAGE A – DWELLING, Other Structures,** item 2.b. is deleted.

2. **COVERAGE B – PERSONAL PROPERTY** is extended to include equipment, supplies, and furnishings usual and incidental to this *business* occupancy. This Optional Policy Provision does not include electronic data processing system equipment or the recording or storage media used with that equipment or merchandise held as samples or for sale or for delivery after sale.

The Option IO limits are shown in the *Declarations*. The first limit applies to property on the *residence premises*. The second limit applies to property

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

while off the *residence premises*. These limits are in addition to the **COVERAGE B – PERSONAL PROPERTY, Special Limits of Liability** on property used or intended for use in a *business*.

3. Under Section II, the *residence premises* is not considered *business* property because an *insured* occupies a part of it as an incidental *business*.

4. **SECTION II – EXCLUSIONS**, item 1.b. is replaced with the following:

   b. *bodily injury* or *property damage* arising out of *business* pursuits of any *insured*, except as provided in item c. below. This exclusion does not apply to activities that are ordinarily incident to non-*business* pursuits or to *business* pursuits of an *insured* that are necessary or incidental to the use of the *residence premises* as an incidental *business*;

5. This insurance does not apply to:

   a. *bodily injury* to an employee of an *insured* arising out of the *residence premises* as an incidental *business* other than to a *residence employee* while engaged in the employee's employment by an *insured*;

   b. *bodily injury* to a student arising out of corporal punishment administered by or at the direction of the *insured*;

   c. liability arising out of any acts, errors, or omissions of an *insured*, or any other person for whose acts an *insured* is liable, resulting from the preparation or approval of data, plans, designs, opinions, reports, programs, specifications, supervisory inspections, or engineering services in the conduct of an *insured's* incidental *business* involving data processing, computer consulting, or computer programming; or

   d. any claim made or suit brought against any *insured* by:

      (1) any person in the care of any *insured* because of child care services provided by or at the direction of:

         (a) any *insured*;

         (b) any employee of any *insured*; or

         (c) any other person actually or apparently acting on behalf of any *insured*; or

      (2) any person who makes a claim because of *bodily injury* to any person in the care of any *insured* because of child care services provided by or at the direction of:

         (a) any *insured*;

         (b) any employee of any *insured*; or

         (c) any other person actually or apparently acting on behalf of any *insured*.

      Coverage M does not apply to any person indicated in d.(1) and d.(2) above.

      This exclusion does not apply to the occasional child care services provided by any *insured*, or to the part-time child care services provided by any *insured* under 19 years of age.

**Option JF – Jewelry and Furs.** Jewelry, watches, fur garments and garments trimmed with fur, precious and semi-precious stones, gold other than goldware, silver other than silverware, and platinum are covered for accidental direct physical loss or damage.

The limits for this option are shown in the *Declarations*. The first amount is the limit for any one article; the second amount is the aggregate limit for each loss. All provisions and exclusions of **SECTION I – LOSSES INSURED, COVERAGE B – PERSONAL PROPERTY, Theft** apply to Option JF.

The following additional provisions apply:

1. *We* will not pay for any loss to the property described in this option either consisting of, or directly and immediately caused by, one or more of the following:

   a. mechanical breakdown, wear and tear, or gradual deterioration;

   b. all animals, birds or insects, including nesting, infestation, gnawing, feeding, breeding, or discharge or release of waste products or secretions by animals, birds, or insects. However, *we* will pay for losses caused by wild bears or deer;

   c. inherent vice; or

   d. seizure or destruction under quarantine or customs regulations;

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017
HW-2136

2. *Our* limit for loss by any Coverage B peril except theft is the limit shown in the *Declarations* for Coverage B, plus the aggregate limit;

3. *Our* limits for loss by theft are those shown in the *Declarations* for this option. These limits apply in lieu of the Coverage B theft limit; and

4. *Our* limits for loss by any covered peril except those in items 2. and 3. above are those shown in the *Declarations* for this option.

**Option OL – Building Ordinance or Law.**

1. **Coverage Provided.** The total limit of insurance provided by this option will not exceed an amount equal to the Option OL percentage shown in the *Declarations* of the Coverage A limit shown in the *Declarations* at the time of the loss, as adjusted by the Inflation Coverage provisions of this policy. This is an additional amount of insurance and applies to *building structures* on the *residence premises*.

2. **Damaged Portions of** *Building Structure*. When a *building structure* covered under **COVERAGE A – DWELLING** is damaged by a *loss insured*, *we* will pay for the increased cost to repair or rebuild the physically damaged portion of the *building structure* caused by the enforcement of a building, zoning, or land use ordinance or law if the enforcement is directly caused by the same *loss insured* and the requirement is in effect at the time the *loss insured* occurs.

3. **Undamaged Portions of Damaged** *Building Structure*. When a *building structure* covered under **COVERAGE A – DWELLING** is damaged by a *loss insured*, *we* will also pay for:

   a. the cost to demolish and clear the site of the undamaged portions of the *building structure* caused by the enforcement of a building, zoning, or land use ordinance or law if the enforcement is directly caused by the same *loss insured* and the requirement is in effect at the time the *loss insured* occurs; and

   b. loss to the undamaged portion of the *building structure* caused by enforcement of any ordinance or law if:

      (1) the enforcement is directly caused by the same *loss insured*;

      (2) the enforcement requires the demolition of portions of the same *building structure* not damaged by the same *loss insured*;

      (3) the ordinance or law regulates the construction or repair of the *building structure*, or establishes zoning or land use requirements at the described premises; and

      (4) the ordinance or law is in force at the time of the occurrence of the same *loss insured*; or

   c. legally required changes to the undamaged portion of the *building structure* caused by the enforcement of a building, zoning, or land use ordinance or law, if:

      (1) the enforcement is directly caused by the same *loss insured*;

      (2) the requirement is in effect at the time the *loss insured* occurs; and

      (3) the legally required changes are made to the undamaged portions of specific *building structure* features, systems, or components that have been physically damaged by the *loss insured*.

   *We* will not pay for legally required changes to specific *building structure* features, systems, or components that have not been physically damaged by the *loss insured*.

4. **Building Ordinance or Law Coverage Limitations.**

   a. *We* will not pay for any increased cost of construction:

      (1) until the *building structure* is actually repaired or replaced at the same or another premises in the same general vicinity;

      (2) unless the repairs or replacement are made as soon as reasonably possible after the loss, not to exceed two years; and

      (3) due to any original or subsequent construction, addition, modification, renovation, remodel, or repair to a *building structure* that did not comply with a building, zoning, or land use ordinance or law in effect when the construction, addition, modification, renovation, remodel, or repair was performed.

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

b.  *We* will not pay more under this coverage than the amount *you* actually spend:

   (1)  for the increased cost to repair or rebuild the *building structure* at the same or another premises in the same general vicinity if relocation is required by ordinance or law; and

   (2)  to demolish and clear the site of the undamaged portions of the *building structure* caused by enforcement of building, zoning, or land use ordinance or law.

*We* will not pay for more than a *building structure* of the same height, floor area, and style on the same or similar premises as the *building structure*, subject to the limit provided in paragraph 1. **Coverage Provided** of this option.

**Option SG – Silverware and Goldware Theft.** The **COVERAGE B – PERSONAL PROPERTY, Special Limits of Liability**, item i., for theft of silverware and goldware is increased to be the amount shown in the *Declarations* for this option.

©, Copyright, State Farm Mutual Automobile Insurance Company, 2017

**State Farm Fire and Casualty Company**
*A Stock Company With Home Offices in Bloomington, Illinois*

PO Box 853907
Richardson, TX 75085-3907

AT2            H-26-2271-FA8F   F H W
      000295 3200
BYRD, DAVID ALAN & REGINA S
11109 WINELAKE DR
OKLAHOMA CITY OK  73170-2515



| POLICY NUMBER | 36-EJ-4452-8 |
|---|---|

**HOMEOWNERS AVAILABLE COVERAGE NOTICE**

**SEE RENEWAL DECLARATIONS**

IT IS IMPORTANT THAT YOU OCCASIONALLY REVIEW THE COVERAGE S AND LIMITS IN YOUR HOMEOWNERS POLICY TO BE CERTAIN YOUR NEEDS ARE BEING MET. THE FOLLOW ING INFORMATION WILL ASSIST YOU IN THE REVIEW PROCESS.

THE COVERAGE LIMITS FOR COVERAGE A - DWELLING, COVERAGE B - PERSONAL PROPERTY, COVERAGE L - PERSONAL LIABILITY, AND COVERAGE M - MEDICAL PAYMENTS TO  OTHERS ARE LISTED ON THE ACCOMPANYING RENEWAL DECLARATIONS. PLEASE REVIEW THESE LIMITS TO DETER MINE IF THEY ARE ADEQUATE IN THE EVENT OF A LOSS.

THE FOLLOWING IS A **PARTIAL LIST** OF THE OPTIONAL COVERAGES YOU HAVE **NOT** ADDED TO YOUR POLICY. THEY MAY BE AVAILABLE TO YOU FOR AN ADDITIONAL PREMIUM.

Business Property (for higher limits)

Business Pursuits Liability (for teachers, school administrators, sales persons, and clerical employees)

Child Care Liability (for those providing child care in their home)

Firearms (for broadened coverage and higher limits)

Cyber Event, Identity Restoration, and Fraud Loss

Incidental Business Liability (for those with an incidental office, studio, or school in the home)

Loss Assessment (for neighborhoods with Homeowners Associations)

Nurses' Professional Liability (for those in the nursing profession)

Personal Injury (for your liability to others caused by certain acts of libel, slander, invasion of privacy, or false arrest)

Silverware/Goldware (for broadened coverage and higher limits)

Adult Day Care Liability (for those providing adult day care in their home)

Energy Efficiency Upgrade (for replacing damaged heating unit, air conditioning unit, or water heater with equipment that is more energy efficient)

Home Rental (for those who rent out their home for more than 30 nights yearly)

**\*\*Continued on Reverse Side\*\***

Prepared  DEC 08 2020        **Agent**        RITA WALLENBERG INS AGY INC
                        **Telephone**     (405) 691-2464  or  (405) 691-5279

001665   420
N     GA,GB,R3,EH



EXHIBIT
2

Home Systems Protection (for covering the breakdown of permanently installed equipment)

Service Line (for the cost of repairing damaged underground utility lines)

Increased Personal Property (for higher limits above the standard policy limit, which is a percentage of your Coverage A-Dwelling amount)

**This notice contains only a general description of the co verages and is not a contract. All coverages are subject to the provisions in the policy itself.** Should you have a need for any of these coverages or high er limits, contact your State Farm Agent to discuss details, cost and eligibility.

### IMPORTANT INFORMATION ABOUT DAMAGE CAUSED BY FLOODING

This policy does not cover damage to your property caused   by flooding. You may be eligible for such coverage through the National Flood Insurance Program ("NFIP"), if you live in  a participating community. For more information, contact your State Farm® agent or visit floodsmart.gov.

**State Farm Fire and Casualty Company**
*A Stock Company With Home Offices in Bloomington, Illinois*

PO Box 853907
Richardson, TX 75085-3907

**State Farm**

AT2          H-26-2271-FA8F  F H W
                    3200
BYRD, DAVID ALAN & REGINA S
11109 WINELAKE DR
OKLAHOMA CITY OK   73170-2515

# RENEWAL DECLARATIONS

| | |
|---|---|
| **AMOUNT DUE:** | **None** |
| **Payment is due by** BILLED THROUGH SFPP | |

**Policy Number:**    36-EJ-4452-8

**Policy Period:**   12 Months
**Effective Dates:** JAN 26 2021 to JAN 26 2022
The policy period begins and ends at 12:01 am standard time at the residence premises.

## Homeowners Policy

**Location of Residence Premises**
11109 WINELAKE DR
OKLAHOMA CITY OK  73170-2515

**Your State Farm Agent**
 RITA WALLENBERG INS AGY INC
2833 SW 119TH ST STE C
OKLAHOMA CITY OK   73170-2659

**Phone:** (405) 691-2464  or  (405) 691-5279

| | | | |
|---|---|---|---|
| **Construction:** | Masonry | **Roof Material:** | Composition Shingle |
| **Year Built:** | 1998 | **Roof Installation Year:** | 2010 |

**Automatic Renewal**
If the **POLICY PERIOD** is shown as **12 MONTHS**, this policy will be renewed automatically subject to the premiums, rules, and forms in effect for each succeeding policy period. If this policy is terminated, we will give you and the Mortgagee/Lienholder written notice in compliance with the policy provisions or as required by law.

## IMPORTANT MESSAGES

NOTICE: Information concerning changes in your policy language is included.  Please call your agent with any questions.
Coverage A has increased $43,000.00 over last year.
Please help us update the data used to determine your premium. Contact your agent with the year each of your home's utilities (heating/cooling, plumbing, or electrical) and roof were last updated.

## PREMIUM

| | |
|---|---|
| Annual Premium | $4,448.00 |
| *Your premium has already been adjusted by the following:* | |
| Home/Auto Discount          Claim Record Discount | |
| Loyal Customer | |

| | |
|---|---|
| **Total Premium** | **$4,448.00** |

Prepared  DEC 08 2020
HO-2000
001666   420
N      GA,GB,R3,EH

*Thanks for letting us serve you...*

Page  1 of  4

(a1F1680B) 04-04-2016

 **StateFarm**

| NAMED INSURED | MORTGAGEE AND ADDITIONAL INTERESTS |
|---|---|

BYRD, DAVID ALAN & REGINA S

## SECTION I - PROPERTY COVERAGES AND LIMITS

| Coverage | Limit of Liability |
|---|---|
| A Dwelling | $    510,300 |
| Other Structures | $    107,800 |
| B Personal Property | $    382,725 |
| C Loss of Use | $    153,090 |

**Additional Coverages**

| | |
|---|---|
| Arson Reward | $1,000 |
| Credit Card, Bank Fund Transfer Card, Forgery, and Counterfeit Money | $1,000 |
| Debris Removal | Additional 5% available/$1,000 tree debris |
| Fire Department Service Charge | $500 per occurrence |
| Fuel Oil Release | $10,000 |
| Locks and Remote Devices | $1,000 |
| Trees, Shrubs, and Landscaping | 5% of Coverage A amount/$750 per item |

## SECTION II - LIABILITY COVERAGES AND LIMITS

| Coverage | Limit of Liability |
|---|---|
| L Personal Liability (Each Occurrence) | $    500,000 |
| Damage to the Property of Others | $    1,000 |
| M Medical Payments to Others (Each Person) | $    2,000 |

## INFLATION

Inflation Coverage Index: 272.7

## DEDUCTIBLES

| Section I Deductible | Deductible Amount |
|---|---|
| Earthquake  5% | $    25,515 |
| Other Losses 1% | $    5,103 |

## LOSS SETTLEMENT PROVISIONS

A1  Replacement Cost - Similar Construction
B1  Limited Replacement Cost - Coverage B

DEC 06 2020

e-Form A

HO-2000

**36-EJ-4452-8**

 **StateFarm**

## FORMS, OPTIONS, AND ENDORSEMENTS

| | |
|---|---|
| HW-2136 | Homeowners Policy |
| Option JF | Jewelry and Furs $2,500 Each |
| | Article/$5,000 Aggregate |
| Option ID | Increase Dwlg up to $102,060 |
| Option OL | Ordinance/Law  10%/  $51,030 |
| HO-2444 | Back-Up Of Sewer Or Drain - |
| | 5% of Coverage A/$ 25,515 |
| HO-2414 | Earthquake Endorsement |
| HO-2310 | *Amendatory Endorsement |
| HO-2356 | *Amendatory End - Liability |
| | *New Form Attached |

## ADDITIONAL MESSAGES

State Farm® works hard to offer you the best combination of price, service, and protection. The amount you pay for homeowners insurance is determined by many factors such as the coverages you have, the type of construction, the likelihood of future claims, and information from consumers reports.

**Other limits and exclusions may apply - refer to your policy**

Your policy consists of these Declarations, the Homeowners Policy shown above, and any other forms and endorsements that apply, including those shown above as well as those issued subsequent to the issuance of this policy.

This policy is issued by the State Farm Fire and Casualty Company.

**Participating Policy**

You are entitled to participate in a distribution of the earnings of the company as determined by our Board of Directors in accordance with the Company's Articles of Incorporation, as amended.

In Witness Whereof, the State Farm Fire and Casualty Company has caused this policy to be signed by its President and Secretary at Bloomington, Illinois.

Secretary          President

Prepared  DEC 08 2020
HO-2000
001667  420
N

**State Farm**

**Your coverage amount....**
It is up to you to choose the coverages and limits that meet your needs. We recommend that you purchase a coverage limit at least equal to the estimated replacement cost of your home. Replacement cost estimates are available from building contractors and replacement cost appraisers, or, your agent can provide an Xactware estimate using information you provide about your home. We can accept the type of estimate you choose as long as it provides a reasonable level of detail about your home. State Farm® does not guarantee that any estimate will be the actual future cost to rebuild your home. Higher limits are available at higher premiums. Lower limits are also available, which if selected may make certain coverages unavailable to you. We encourage you to periodically review your coverages and limits with your agent and to notify us of any changes or additions to your home.

DEC 08 2020

a5F5161A

HO-2000

36-EJ-4452-8      001668

# IMPORTANT NOTICE

## Regarding Changes to Your Policy



Effective with this policy term, HO-2310 HOMEOWNERS AMENDATORY ENDORSEMENT (Oklahoma) is added to your policy.

This notice summarizes the changes being made to your policy.  Please read the new endorsement carefully and note the following changes:

- Under DEFINITIONS, the definition of "occurrence" has been updated as it relates to bodily injury and property damage. In order to be considered one occurrence, bodily injury and property damage may occur from continuous or repeated exposure.
- Editorial changes have been made to the following provisions:
  - SECTION I – CONDITIONS, Mortgagee Clause
  - SECTION I AND SECTION II – CONDITIONS, Cancellation
  - SECTION I AND SECTION II – CONDITIONS, Nonrenewal
  - OPTIONAL POLICY PROVISIONS, Option ID – Increased Dwelling Limit
- Under SECTION I AND SECTION II – CONDITIONS, Electronic Delivery has been deleted.

Endorsement HO-2310 follows this notice. Please read it thoroughly and place it with your policy. If you have any questions about the information in this notice, please contact your State Farm® agent.

This notice is a general description of coverage and/or coverage changes and is not a statement of contract. This message does not change, modify, or invalidate any of the provisions, terms, or conditions of your policy, or any other applicable endorsements.

---

## HOMEOWNERS AMENDATORY ENDORSEMENT (Oklahoma)

This endorsement modifies insurance provided under the following: HOMEOWNERS POLICY

### DEFINITIONS

The definition of *"occurrence"* is replaced by the following:

*"occurrence"*, when used in Section II of this policy, means an accident, including accidental exposure to conditions, which first results in:

a. *bodily injury*; or

b. *property damage*;

during the policy period. All *bodily injury* and *property damage* resulting from one accident, series of related accidents, or from continuous or repeated exposure to the same general conditions is considered to be one *occurrence*.

### SECTION I – CONDITIONS

Under Mortgagee Clause, paragraph 10.c. is replaced by the following:

c.  If *we* cancel this policy, the mortgagee will be notified at least 10 days before the date cancellation takes effect.

### SECTION I AND SECTION II – CONDITIONS

Under Cancellation, 5.b. is replaced by the following:

b.  *We* may cancel this policy by providing notice to a named insured shown on the *Declarations*. The notice will provide the date cancellation is effective.

(1) When *you* have not paid the premium, *we* may cancel at any time by providing notice at least 10 days before the date cancellation takes effect.  This condition applies whether the premium is payable to *us* or *our* agent or under any finance or credit plan.

(2) When this policy has been in effect for less than 45 business days and is not a renewal with *us*, *we* may cancel for any reason. *We* may cancel by providing notice at least 10 days before the date cancellation takes effect.

(3) When this policy has been in effect for 45 business days or more, or at any time if it is a renewal with *us*, *we* may cancel for the following reasons:

©, Copyright, State Farm Mutual Automobile Insurance Company, 2019

ST-0406-0000

(a) discovery of fraud or material misrepresentation in the procurement of the insurance or with respect to any claims submitted thereunder;

(b) discovery of willful or reckless acts or omissions on the part of the named insured which increase any hazard insured against;

(c) a change in the risk which substantially increases any hazard insured against after insurance coverage has been issued or renewed;

(d) violation of any local fire, health, safety, building, or construction regulation or ordinance with respect to any insured property or the occupancy thereof which substantially increases any hazard insured against;

(e) a determination by the Insurance Commissioner that the continuation of the policy would place the insurer in violation of the insurance laws of this state; or

(f) conviction of the named insured of a crime having as one of its necessary elements an act increasing any hazard insured against.

*We* may cancel this policy by providing notice at least 30 days before the date cancellation takes effect.

(4) When this policy is written for a period longer than one year, *we* may cancel for any reason at anniversary. *We* may cancel by providing notice at least 30 days before the date cancellation takes effect.

**Nonrenewal** is replaced by the following:

**Nonrenewal.** If *we* decide not to renew this policy, then, at least 30 days before the end of the current policy period, *we* will provide a nonrenewal notice to a named insured shown on the *Declarations*.

HO-2310

**Electronic Delivery** is deleted.

**OPTIONAL POLICY PROVISIONS**

Option ID is replaced by the following:

**Option ID – Increased Dwelling Limit.** *We* will settle losses to damaged *building structures* covered under COVERAGE A – DWELLING according to the **Loss Settlement Provision** shown in the *Declarations*.

1. If the amount *you* actually and necessarily spend to repair or replace the damaged *dwelling* exceeds the limit of liability shown in the *Declarations* for Coverage A – Dwelling, *we* will pay the additional amounts not to exceed the Option ID limit shown in the *Declarations*.

2. If the amount *you* actually and necessarily spend to repair or replace damaged *building structures* covered under COVERAGE A – DWELLING, Other Structures exceeds the limit of liability shown in the *Declarations* for Other Structures, *we* will pay the additional amounts not to exceed 10% of the Option ID limit shown in the *Declarations*.

**Report Increased Values.** *You* must notify *us* within 90 days of the start of construction on any new *building structure* costing $5,000 or more; or any additions to or remodeling of *building structures* that increase their values by $5,000 or more. *You* must pay any additional premium due for the increased value. *We* will not pay more than the applicable limit of liability shown in the *Declarations* if *you* fail to notify *us* of the increased value within 90 days.

All other policy provisions apply.

©, Copyright, State Farm Mutual Automobile Insurance Company, 2019

(CONTINUED)

36-EJ-4452-8      001669

HO-2356C
Page 1 of 1

# IMPORTANT NOTICE

### Regarding Changes to Your Policy



Effective with this policy term, **HO-2356 AMENDATORY ENDORSEMENT – SECTION II – LIABILITY COVERAGES** is added to your policy.

This notice summarizes the changes being made to your policy. Please read the new endorsement carefully and note the following changes:

- Under **SECTION II – EXCLUSIONS**, Under item 2.a., language has been added to the exclusion to create exceptions for written contracts that directly relate to the ownership, maintenance, or use of any insured location and when the liability of others is assumed by you.
- Under **SECTION II – EXCLUSIONS**, Under item 2.c., language has been added to the exclusion to create an exception for pet damage to property rented to, used or occupied by, or in the care, custody, or control of any insured.

Endorsement HO-2356 follows this notice. Please read it thoroughly and place it with your policy. If you have any questions about the information in this notice, please contact your State Farm® agent.

This notice is a general description of coverage and/or coverage changes and is not a statement of contract. This message does not change, modify, or invalidate any of the provisions, terms, or conditions of your policy, or any other applicable endorsements.

## AMENDATORY ENDORSEMENT– SECTION II – LIABILITY COVERAGES

This endorsement modifies insurance provided under the following: HOMEOWNERS POLICY, CONDOMINIUM UNITOWNERS POLICY, and RENTERS POLICY

**SECTION II – EXCLUSIONS**

Under **SECTION II – EXCLUSIONS**, 2.a. and 2.c. are replaced by the following:

2. Coverage L does not apply to:

   a. liability:

      (1) for *your* share of any loss assessment charged against all members of any type of association of property owners; or

      (2) imposed on or assumed by any *insured* through any unwritten or written contract or agreement. This exclusion does not apply to:

         (a) liability for damages that the *insured* would have in absence of the contract or agreement; or

         (b) written contracts:

            (i) that directly relate to the owner-ship, maintenance, or use of any *insured location*; or

            (ii) when the liability of others is assumed by *you* prior to the *occurrence*;

            unless excluded elsewhere in the policy;

   c. *property damage* to property rented to, used or occupied by, or in the care, custody, or control of any *insured* at the time of the *occurrence*. This exclusion does not apply to *property damage* caused by:

      (1) fire;

      (2) smoke;

      (3) explosion;

      (4) abrupt and accidental damage from water; or

      (5) household pets, up to $500 in excess of *your* security deposit;

All other policy provisions apply.

HO-2356

©, Copyright, State Farm Mutual Automobile Insurance Company, 2019

36-EJ-4452-8     001670

553-2634.1

## PREMIUM DISCOUNT AVAILABLE FOR USE OF IMPACT-RESISTIVE ROOFING PRODUCTS

State Farm® offers a premium discount for homes that have qualified impact-resistive roofing materials.

Underwriters Laboratories (UL) and Factory Mutual (FM) are nationally recognized testing laboratories that develop safety standards and test products to verify they meet specific performance standards.  Both UL and FM have developed testing standards that measure the impact resistance of various roofing materials.  The roofing products tested by UL and FM are rated from Class 1 to Class 4, with Class 4 providing the greatest roofing protection.

State Farm offers a premium discount when qualified UL certified or FM approved Class 3 or Class 4 roofing materials have been installed on your home.  The discount applies to both new and replacement roofs installed since May 1996 with UL certified products, and since July 2005 with FM approved products.

Discounts are not available for wood roofs, or roofs (other than qualifying metal roofs) that have been overlaid on to existing roofing.  Discounts are also subject to limitations and may not be available on all UL or FM Class 3 and 4 impact-resistant roofing products.

Manufacturers continue to bring UL certified and FM approved roofing products to the consumer marketplace.  You can visit our web site at http://www.statefarm.com/insurance/other/roofinfo.asp for a list of qualifying products in your state.

If you have any questions about the discounts available for installing an impact-resistive roof or to see if your roof qualifies, please contact your State Farm agent.

**This discount program does not constitute an endorsement or any warranty of performance on the part of State Farm for any particular roofing product.  Please research and determine what roofing material is best suited for your home, location and environmental conditions.**

553-2634.1 (C)          (12/09)

553-4157

## NOTICE TO POLICYHOLDER

For a comprehensive description of coverages and forms, please refer to your policy.

Policy changes that you requested before the "Date Prepared" on your Renewal Declarations are effective on the renewal date of this policy unless indicated otherwise by a separate endorsement, binder or Amended Declarations Page.  Any coverage forms or endorsements included with your Renewal Declarations are effective on the renewal date of this policy.

Policy changes that you requested after the "Date Prepared" on your Renewal Declarations will be sent to you as an Amended Declarations Page or as an endorsement to your policy.  You will be billed for any resulting premium increase later.

If you have acquired any valuable property items, made any improvements to your home, or have questions about your insurance coverage, please contact your State Farm® agent.

553-4157 (C)

(CONTINUED)

553-4156

# PREMIUM ADJUSTMENT

Insurance premiums have been adjusted and continue to reflect the expected cost of claims. Some policyholders will see their premiums increase while other policyholders may see their premiums decrease or stay the same. The amount your premium changed, if at all, depends on several factors including the expected claim experience in your area, the coverage you have, and any applicable discounts or charges.

The enclosed Renewal Declarations reflects your new premium.

State Farm® works hard to offer you the best combination of cost, protection, and service. We will continue doing our best to make the most effective use of your premium dollars and give you superior service when you need it.

If you have any questions about your premium, or policy coverages, please contact your State Farm agent.

553-4156

553-2798.1

# IMPORTANT NOTICE ABOUT YOUR POLICY

With our Claim Record Rating Plan, your savings will typically increase the fewer claims you have and the longer you're insured with State Farm®. We adjust premiums based on the number of claims under the rating plan. Depending on your state, claims under the plan generally include those resulting in a paid loss and may include weather-related claims where permitted. In addition, any claims with your prior insurer resulting in property damage or injury may also influence your premium.

Our Loyal Customer Discount provides a premium discount based on the number of years that you have been with us.

For more information about whether the Claim Record Rating Plan applies in your state, the claims we consider for the plan, or whether the Loyal Customer Discount is in effect in your state, please contact your State Farm agent.

553-2798.1

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

MICHAEL MARINO,                    )
                                   )
          Plaintiff,               )
                                   )
vs.                                )        NO. CIV-22-0885-HE
                                   )
STATE FARM FIRE AND CASUALTY       )
COMPANY, *et al.*,                 )
                                   )
          Defendants.              )

## ORDER

Plaintiff Michael Marino filed this case in Oklahoma state court, asserting claims against State Farm Fire and Casualty Company ("State Farm"). The claims arise out of State Farm's denial of plaintiffs' hail damage claim under a homeowner's policy issued by State Farm. Plaintiffs assert claims for breach of contract and bad faith breach of contract against State Farm. Plaintiffs also assert claims against defendant Yearout Insurance Agency, Inc. ("Yearout"), a State Farm agent involved in procuring and issuing the policy.

State Farm removed the case to this court on the basis of diversity of citizenship of the parties. The notice of removal acknowledged that both plaintiff and defendant Yearout are citizens of Oklahoma and hence not diverse but argued that Yearout was fraudulently joined as a defendant and that its citizenship should be disregarded. Plaintiffs dispute that Yearout was fraudulently joined and contend that valid claims are stated against it. After plaintiff's motion to remand was fully briefed, the court granted State Farm's motion for jurisdictional discovery. That discovery is now complete and both parties have filed supplemental responses to the motion to remand. For the reasons stated below, the court

EXHIBIT

3

concludes the motion to remand should be denied and the claims against Yearout dismissed.

"[U]pon allegations of fraudulent joinder designed to prevent removal, federal courts may look beyond the pleadings to determine if the joinder, although fair on its face, is a sham or fraudulent device to prevent removal." Smoot v Chicago, R.I. & P. R.R. Co., 378 F.2d 879, 881-82 (10th Cir. 1967) (citation omitted). Fraudulent joinder may be established either by showing actual fraud in the pleading of jurisdictional facts or the inability of the plaintiff to establish a cause of action against the non-diverse defendant in state court. Dutcher v. Matheson, 733 F.3d 980, 988 (10th Cir. 2013). There must be a "reasonable basis to believe plaintiff might succeed in at least one claim against the non-diverse defendant." Nerad v. AstraZeneca Pharms., Inc., 203 Fed. Appx. 911, 913 (10th Cir. 2006). A court should avoid pre-trying disputed factual issues, but, where an inquiry beyond the pleadings is warranted, "the issue must be capable of summary determination and be proven with complete certainty." Id. (citation omitted).

As noted, a court ordinarily avoids inquiring into the underlying facts in connection with a motion to remand. But this is not an ordinary case. As noted in the court's prior orders (Order, Jan. 26, 2023 [Doc. #37], referencing similar order in Goebel v. State Farm Fire & Cas. Co., CIV-22-0882 [Doc. #37]), the use of substantially identical, cookie-cutter allegations as to the claimed role of local State Farm agents, included in petitions filed in dozens of cases by the same group of lawyers, at the very least raises substantial questions as to whether a good faith basis exists for claims asserted here against the non-diverse agent. As a result, the court has considered the underlying facts and circumstances as

reflected by the parties' post-discovery supplemental submissions.  Having done so, the court concludes Yearout is fraudulently joined within the meaning of the removal cases.

As a threshold matter, it is now clear that many of the cookie-cutter allegations offered to state a claim against Yearout are false or at least unsupported.[1]   The petition says that Yearout represented that plaintiff's roof was in good condition and eligible for a full replacement cost policy.  But Ms. Marino says that in her conversations with Yearout, there were no "discussions about the roof" and that she simply assumed others were doing any necessary check of the roof.[2]  (The parties' submissions raise the possibility that Mr. Marino may have had discussions with Yearout personnel, but there are no evidentiary submissions to support that.)   The petition more specifically alleges that Yearout represented that plaintiff's roof met all of State Farm's underwriting standards, but Ms. Marino recalls no conversations about underwriting standards.[3]

As in the dozens of other cases, the petition alleges that the local State Farm agent, here Yearout, represented to plaintiffs[4] that obtaining full replacement cost coverage

---

[1] *Plaintiff relies principally on the deposition testimony of Machele Marino, the wife of the named plaintiff, for proof of the dealings with Yearout. Ms. Marino was an insured under the policy, was involved in the various interactions with Yearout, and was apparently the person to whom most of the alleged misrepresentations were made, but is not a named plaintiff in the case due to a "scrivener's error." Mr. Marino, the named plaintiff, has apparently been seriously ill for several years and has apparently not been deposed or otherwise involved in addressing the present motion.*

[2] *Deposition of Machele Marino, Doc. #50-2, page 78 (hereafter "Marino deposition; page numbers are to the numbering in the deposition transcript).*

[3] *Marino deposition, p. 108. The testimony of Janis Yearout is not to the contrary:  she answered "yes" when asked "Do you ever share these underwriting guidelines or requirements with the insureds?" but was not asked about the Marino's specifically. Janis Yearout deposition, Doc. #50-1, p. 307.*

[4] *This order sometimes refers to the plaintiffs — plural — though only Mr. Marino is literally a plaintiff at this point.*

"would be no problem whatsoever," but Ms. Marino has no recollection of those words being used.[5]   It is unremarkable that she would not recall that language, given that the policy was originated in 2004, some seventeen years before the storm and hail claim now at issue. But, in any event, there is no evidentiary support for that allegation of the petition.

The petition also says Yearout represented to plaintiffs that she would be getting the "broadest form of coverage available today" but Ms. Marino has no recollection of those words being used and indicated she had no conversations with Yearout as to coverage beyond plaintiffs' request for a full cost replacement policy.[6]   The petition alleges that Yearout represented to plaintiffs that they should insure their home to 100% of replacement cost value as determined by Yearout using State Farm's software, but Ms. Marino does not now recall any conversations with Yearout personnel as to determining coverage amounts.[7]  The petition alleges Yearout made representations as to how State Farm would follow Oklahoma law and that it would fully and fairly investigate all claims; there is no evidentiary support from Marino as to that. Indeed, Ms. Marino's deposition makes it clear that there were minimal discussions of any kind as to the details of the policy being obtained (beyond it being a full cost replacement policy), because this was the third house State Farm had insured for plaintiffs, the in-depth discussions had occurred as to the first house years before, and plaintiffs assumed the agency would understand what they wanted.[8]

---

[5] *Marino deposition, p. 110-11.*
[6] *Marino deposition, p. 109.*
[7] *Marino deposition, p. 124.*
[8] *Marino deposition, p. 107.*

There are, in short, multiple allegations going to the potential liability of Yearout for which there is zero evidence, indicating that those allegations were made without a valid, good faith basis. The court is left with the firm impression that many, and perhaps most, of the most significant factual allegations as to Yearout were included because they met someone's formulaic view of what a court might accept as a basis for claim against Yearout, not because there was a real factual basis for them. Those circumstances support viewing Yearout as fraudulently joined on the basis of the first potential grounds for doing so — actual fraud in the pleading of at least some of the jurisdictional facts.

The alternate basis for concluding fraudulent joinder — the absence of a viable claim against the challenged defendant — also applies here. The claims alleged against Yearout in the petition are for negligent procurement of insurance and constructive fraud/negligent misrepresentation. It is true that Oklahoma recognizes a negligent procurement claim where, by reason of the agent's actions, insurance is not provided as promised and the insured suffers a loss as a result. Swickey v. Silvey Cos., 979 P.2d 266, 268 (Okla.Civ.App. 1999). But here, it is undisputed that the policy the Marinos wanted — one for full cost replacement coverage of their property — was in fact delivered. Plaintiff seeks to avoid the impact of that fact by arguing that the policy delivered was illusory, relying on cases where the policy delivered was so limited by exclusions that plaintiffs did not get the coverage they reasonably expected. See, e.g., Yeary v. Safeco Ins. Co., Case No. 22-CV-0250-CVE-SH, 2022 WL 3447120 (N.D. Okla. Aug. 17, 2022). But that circumstance is not present here. There is nothing in the policy delivered which

implausibly limits its reach.[9]  Rather, plaintiff's complaint is with the way State Farm has applied the policy language, arguing that it unreasonably requires damage to penetrate to the back side of the shingle mat.  But that complaint, if ultimately established, is a basis for claim against State Farm, essentially that it has failed to fairly apply the contract language in the claims administration process.  That is something different from proving that the agent failed to deliver the policy promised.

Plaintiff attempts to make out other negligent procurement and misrepresentation claims they may have against the agent, but they also fall short for one reason or another. Plaintiffs argue Yearout was the "first line of underwriting" for State Farm and therefore had a duty to inspect plaintiffs' property and to advise them of the condition of their house. Further, they contend Yearout had a continuing duty to inspect the property and advise plaintiffs of anything that might impact some future claim.  None of the cases cited by plaintiffs suggest that Oklahoma law imposes, without more, such a duty on the agent.  In particular, plaintiff has not identified any Oklahoma case suggesting that whatever role an agent plays in the underwriting process results in a duty owed to the insured.[10]  Plaintiff's point to various documents obtained in discovery addressing an inspection/underwriting function for State Farm agents, but none of those suggest some duty to the insured.  In other

---

[9] *Marino deposition, p.136.*
[10] *Defendant references multiple cases from other jurisdictions indicating an agent does not have underwriting duties owed to the insured and no Oklahoma case to the contrary has been cited or located by the court. Ms. Marino herself appeared to understand the distinction, acknowledging that whether Yearout's inspection in 2004 was sufficient (such as whether she took appropriate pictures of the house) was a matter of State Farm's benefit, not hers.  Marino deposition, pp. 80-81.*

words, State Farm may well have multiple requirements as to what it expects its agents to do as part of its underwriting process, but that is not the same thing as concluding there is some underwriting duty <u>owed to the insured</u>.

Plaintiff attempts to invoke the principle that an agent may assume, by its representations or conduct, duties beyond those it would automatically have by reason of the relationship. But plaintiffs' evidence falls short in that regard as well. Ms. Marino repeatedly says that the representations she relied on from the agent over the years were to the effect that the coverage remained in place, and it undisputedly did.[11] As noted above, State Farm's denial of the hail claim, even if proven to be wrong and unreasonable, does not translate into a conclusion that plaintiff's policy did not cover the peril or that the agent's representations in connection with it were wrong.

There do not appear to be any other representations of Yearout which would be a basis for claim here (i.e. representations for which there is actual evidence rather than just a formulaic assertion in the petition). Ms. Marino's deposition testimony makes it explicitly clear that what she viewed as the basis for complaint against Yearout was that Yearout did not act as an advocate for plaintiffs in the claims administration process with State Farm.[12] Plaintiffs have not cited, and the court has not located, any Oklahoma authority which would suggest that an insurance agent, particularly a captive agent like Yearout, had a duty to act as an advocate for the insured against the company. No doubt there are financial and other reasons why it may be in the interest of an agent to "advocate"

---

[11] *Marino deposition, p. 146.*
[12] *Marino deposition, p. 84.*

7

for the insured on occasion, but that is not the same thing as saying an agent has a legal duty to advocate for the insured in the claims process or that it could be held liable for not advocating vigorously enough.

Plaintiffs also suggest they have claims arising out of Yearout's involvement in selecting the amount of coverage under the policy. It is not altogether clear whether plaintiffs' assertion is that Yearout did a bad job of estimating replacement value and therefore secured a policy with too little or too much coverage or whether the argument is that plaintiffs paid too much in premiums because their claim didn't ultimately get paid. If the argument is some variation of the former, it suffices to say that it is undisputed that the amount of coverage under the policy greatly exceeded the potential cost of totally replacing the roof if total replacement was otherwise justified.[13]   There is therefore no basis for concluding that the denial of plaintiffs' hail claim was due to inadequate coverage obtained by Yearout.

If the objection is to the amount of premiums plaintiffs paid, two things are apparent from the parties' submissions. One is that Mr. and Mrs. Marino were actively involved in setting the amount of their coverage on the house and that they sometimes sought and got increases of coverage beyond what State Farm or its agents recommended.[14]   So if the complaint is that they paid too much as a result of being overinsured, Ms. Marino's testimony is that those amounts were the result of the insistence of the plaintiffs and hence

---

[13] *Marino deposition, pp. 112-113, indicating the cost of a total roof replacement was approximately $30,000 and total coverage on the dwelling was $244,000.*
[14] *Marino deposition, pp. 93, 113-4, and 127.*

8

no basis for claim against Yearout. If, on the other hand, the argument is that they paid too much premium because they did not get what they paid for, that argument is essentially the same one noted above as to whether the policy was illusory. And the argument is unavailing. What plaintiffs paid for was a policy providing coverage based on full replacement value. Full replacement value does not mean that an insured is guaranteed that its claims will always be paid in full. There is therefore no claim available against Yearout based on the determination of policy coverage.

In short, there is no reasonable basis to believe that plaintiff could establish either a negligent procurement claim or a constructive fraud/negligent misrepresentation claim against Yearout in the circumstances existing here.

Accordingly, for the reasons state above, Yearout is a fraudulently joined defendant for removal purposes and its citizenship must be disregarded. Plaintiff's motion to remand [Doc. #18] is therefore **DENIED.** The claims against Yearout Insurance Agency, Inc. are **DISMISSED** without prejudice but without leave to amend.

**IT IS SO ORDERED.**

Dated this 7th day of August, 2023.

JOE HEATON
UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

CHARLES GOEBEL, *et al.*,  )
                              )
          Plaintiffs,  )
                              )
vs.  )          NO. CIV-22-0882-HE
                              )
STATE FARM FIRE AND CASUALTY  )
COMPANY, *et al.*,  )
                              )
          Defendants.  )

## ORDER

Plaintiffs Charles and Christina Goebel filed this case in the District Court of Cleveland County, State of Oklahoma, asserting claims against State Farm Fire and Casualty Company ("State Farm"). They assert claims for breach of contract and bad faith breach of contract, arising out of State Farm's denied of a hail damage claim under a homeowner's policy issued by it. Plaintiffs also assert claims against defendant Paul J. Garetson Insurance Agency, LLC ("Garetson"), a State Farm agent involved in procuring and issuing the policy.

State Farm removed the case to this court on the basis of diversity of citizenship of the parties. The notice of removal acknowledged that both plaintiffs and defendant Garetson are citizens of Oklahoma and hence not diverse but argued that Garetson was fraudulently joined as a defendant and that its citizenship should be disregarded. Plaintiffs dispute that Garetson was fraudulently joined and contend that valid claims are stated against it. After plaintiff's motion to remand was fully briefed, the court granted State Farm's motion for jurisdictional discovery. It did so as a result of substantial doubts

EXHIBIT
4

existing as to the plausibility of the factual allegations against the agent, due to substantially identical allegations having been made in dozens of other cases filed against State Farm by plaintiffs represented by same the same lawyers. The jurisdictional discovery is now complete and both parties have filed supplemental responses to the motion to remand. For the reasons stated below, the court concludes the motion to remand should be denied and the claims against Garetson dismissed.

"[U]pon allegations of fraudulent joinder designed to prevent removal, federal courts may look beyond the pleadings to determine if the joinder, although fair on its face, is a sham or fraudulent device to prevent removal." Smoot v Chicago, R.I. & P. R.R. Co., 378 F.2d 879, 881-82 (10th Cir. 1967) (citation omitted). Fraudulent joinder can be shown either by establishing actual fraud in the pleading of jurisdictional facts or by establishing the plaintiff's inability to make out a cause of action against the non-diverse defendant in state court. Dutcher v. Matheson, 733 F.3d 980, 988 (10th Cir. 2013). There must be a "reasonable basis to believe plaintiff might succeed in at least one claim against the non-diverse defendant." Nerad v. AstraZeneca Pharms., Inc., 203 Fed. Appx. 911, 913 (10th Cir. 2006).

Courts generally avoid pre-trying disputed facts in this context but may, as noted above, look beyond the pleadings in a proper case. In resolving disputed factual issues and reaching related conclusions, however, "the issue must be capable of summary determination and be proven with complete certainty." *Id.* (citation omitted).

Having considered the parties' supplemental submissions following jurisdictional discovery, the court concludes Garetson should be viewed as a fraudulently joined

2

defendant on both of the grounds referenced above. It reaches that conclusion fully mindful

of the exacting standard required to be established and recognizing the various deferential

standards (to the non-removing plaintiffs) which apply.

In evaluating whether there is fraud in the pleading of jurisdictional facts, the court

has relied primarily on the deposition testimony of plaintiff Charles Goebel, who was the

plaintiff primarily involved in the dealings with Garetson and to whom any representations

would have been made.[1]   It has done so, however, against the backdrop of substantially

identical allegations being implausibly made against State Farm agents in dozens of other

cases, including at least two before this court which involved substantially the same issues.[2]

The petition filed by plaintiffs is replete with false statements. Although Mr. Goebel

more or less replied, in response to a question from his counsel, that the allegations in the

petition were true so far as he knew,[3] his responses to multiple specific questions make it

clear they are not and that he had little familiarity with the petition filed on his behalf.

The petition alleges that Garetson[4] represented to Goebels that his roof was in good

condition, when in fact Garetson made no representation to him about it. Mr. Goebel knew,

as did Garetson, that the house and roof were new in 2011, when the initial policy was

---

[1] *Video Deposition of Charles Goebel, Doc. #57-2, pp. 23 & 82 (the "Goebel deposition"
hereafter; page numbers refer to pagination in the deposition.*
[2] See Case No. CIV-22-0882, *Marino v. State Farm* and Case No. CIV-22-928, *Baltasar v. State
Farm.*
[3] *Goebel deposition, p. 162-3. The question was not a model of clarity as to what was being asked.*
[4] *As noted above, the defendant in this case, referenced as "Garetson" is the Garetson Agency,
not Paul Garetson personally. Although the petition refers to various representations "he" made,
it is clear from Mr. Goebel's testimony that none of the claimed statements at issue were made by
Mr. Garetson, but were, crediting plaintiffs' account, made by other unidentified persons at the
Garetson agency.*

3

written, and Mr. Goebel simply assumed the roof must be okay if, as Garetson told him, the policy was issued as requested.[5]  The petition alleges that Garetson represented that the house met State Farm's underwriting guidelines, but Mr. Goebel testified there was no discussion of underwriting.[6]  The petition alleges that Garetson represented to plaintiffs that the policy issued was the "best policy State Farm offered" and that it provided the "broadest coverage available."  Mr. Goebel testified that no one said any such thing.[7]

The petition alleges that Garetson represented that the coverage limits in the policy should be set at 100% of replacement cost value "as determined by him" and that the coverage amount represented "100 percent to insurance to value."  Mr. Goebel testified he "had never heard that" and that the only representation made to him was that he would get a full cost replacement policy.[8]

The petition alleges that the amount of coverage recommended by Garetson was determined by using State Farm's valuation software and that Garetson and State Farm "represented to Plaintiffs that State Farm's valuation software was a reliable and accurate tool . . . ."  Mr. Goebel testified there was no discussion about State Farm's valuation tool.[9]

The petition alleges that State Farm and Garetson represented to plaintiffs that they "would conduct themselves in accordance with Oklahoma law and would fully and fairly investigate and pay claims."  Mr. Goebel testified there was no discussion of Oklahoma

---

[5] *Goebel deposition, pp. 56-7.*
[6] *Goebel deposition, pp. 88-9.*
[7] *Goebel deposition, pp. 102-3.*
[8] *Goebel deposition, p. 116-7.*
[9] *Goebel deposition, p. 117-8.*

law and that the only representation as to claims handling by Garetson was "just submit the claim to us and we'll handle the rest."[10]

In short, there are multiple allegations in the petition which are simply false. One or two such instances might be overlooked as the sort of mistake or inconsistency that will often occur at the outset of a case before the factual circumstances are explored and before the details are fully known to counsel. But that explanation does not explain the nature and extent of the false allegations here, particularly when viewed against the backdrop of the same formulaic, cookie-cutter allegations used in this and dozens of other similar cases. The submissions before the court establish that there is no good faith basis for a substantial portion of the facts alleged and which are relied on in an effort to state a claim against the resident defendant. That circumstance constitutes fraud in the pleadings of jurisdictional facts, within the meaning of the authorities addressing removal and remand, and warrants viewing Garetson as a fraudulently joined defendant whose citizenship should be ignored for present purposes.

The same conclusion follows from application of the second possible basis for finding fraudulent joinder — the absence of a viable claim against the resident defendant. The claims alleged in the complaint against Garetson are for negligent procurement and constructive fraud/negligent misrepresentation.

With respect to the negligent procurement claim, it is true that Oklahoma recognizes such a claim where, by reason of the agent's actions, insurance is not provided as promised

---

[10] *Goebel deposition, pp. 117-8.*

and the insured suffers a loss as a result. <u>Swickey v. Silvey Cos.</u>, 979 P.2d 266, 268 (Okla.Civ.App. 1999). But here, it is undisputed that the policy Mr. and Mrs. Goebel wanted — a full cost replacement policy — is exactly what they got. Plaintiffs attempt to avoid the impact of that fact by arguing the policy they got was illusory, but there is no factual basis for such an assertion. The policy is not one where the exclusions and limitations in it are so extensive as to be inconsistent with an insured's reasonable expectations of coverage. *See, e.g.* <u>Yeary v. Safeco Ins. Co.</u>, Case No. 22-CV-0250-CVE-SH, 2022 WL 3447120 (N.D. Okla. Aug. 17, 2022). Rather, plaintiffs' complaint is that State Farm has applied the policy language in an unreasonable way. That contention, if established at trial, may well make out a successful breach of contract or bad faith breach claim, but it does not render the contract illusory or otherwise state a basis for claim against the agent who procured it. An agent does not deliver an "illusory" policy just because, ten-plus years later, a claim is denied on disputed grounds.

Plaintiffs' attempts to make out negligence or other claims against Garetson also fall short. Plaintiffs contend, as to their purported negligence and constructive fraud claims, that Garetson owed them a duty to advise them about the condition of their roof over the years and point to State Farm documentation indicating that agents were the "first line of underwriting" and had obligations to physically inspect and reinspect properties. But neither the State Farm documentation nor the cases cited by plaintiffs support the notion that Oklahoma law imposes any such a duty on an agent. Whatever underwriting duties Garetson may have owed to State Farm, as agent to principal, do not necessarily translate into a duty <u>to the insured</u>. In short, there is no basis shown here for a duty to

plaintiffs, grounded in Garetson's "underwriting" function, that could plausibly be a basis for a negligence or other claim based on some legal duty to plaintiffs.

It is true, as plaintiffs argue, that an agent may by its representations or conduct, assume duties beyond those inherently tied to its role as agent. But here, plaintiffs' evidence goes no further than to support an inference that Garetson represented it would continue to be involved as necessary to assure plaintiffs had a full replacement cost policy in place. And is undisputed that they did — plaintiffs were covered by a State Farm replacement cost policy from 2011, when the house was first insured, through the period in 2021 when the insurance claim was submitted.

Bottom line, there is no basis shown for concluding that Garetson undertook or otherwise had a duty beyond securing the issuance of the initial and renewal policies for full replacement coverage. Plaintiffs' arguments essentially contend that an agent has a duty to anticipate, and advise the insured as to, anything that might conceivably limit the payment of a future claim. Such a contention goes beyond any duty contemplated by Oklahoma law.

Plaintiffs also contend that Garetson did not properly value their house when State Farm issued their replacement cost policy. But it is undisputed that the amount of coverage obtained — $225,000 initially with increases in later years — substantially exceeded the amount necessary to pay for a full replacement of plaintiffs' roof (approximately $26,000). So, any issue as to coverage amounts did not lead to any of the damages that plaintiffs assert via their claim for damage to the roof. To the extent that plaintiffs' contention as to valuation is intertwined with the argument that they did not get what he paid for, the answer

7

is as noted above. That an insurance company eventually denies a claim under a policy does not, without more than appears here, translate into a conclusion that the policy was illusory or that the agent breached some duty by delivering it.

In sum, there is no reasonable basis in these facts to believe that plaintiff could establish either a negligent procurement claim or a constructive fraud/negligent misrepresentation claim against Garetson under the circumstances existing here.

Accordingly, for the reasons stated above, the court concludes Garetson is a fraudulently joined defendant for removal purposes and its citizenship must be disregarded. Plaintiffs' motion to remand [Doc. #17] is therefore **DENIED**. The claims against the Paul J. Garetson Insurance Agency LLC are **DISMISSED** without prejudice but without leave to amend.

**IT IS SO ORDERED**.

Dated this 7th day of August, 2023.

JOE HEATON
UNITED STATES DISTRICT JUDGE

8

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

EDITA BALTASAR,                          )
                                         )
                    Plaintiff,           )
                                         )
. vs.                                    )         NO. CIV-22-0928-HE
                                         )
STATE FARM FIRE AND CASUALTY             )
COMPANY, *et al.*,                       )
                                         )
                    Defendants.          )

## ORDER

Plaintiff Edita Baltasar filed this case in Oklahoma state court, asserting claims

against State Farm Fire and Casualty Company ("State Farm") and one of its agents, Cal

Kiburz Agency Inc. ("Kiburz"). The claims arise out of State Farm's denial of plaintiff's

hail damage claims under two insurance policies issued by State Farm.

State Farm removed the case to this court on the basis of diversity of citizenship of

the parties. The notice of removal acknowledged that both plaintiff and defendant Kiburz

are citizens of Oklahoma and hence not diverse. However, defendant contended in the

notice that Kiburz was fraudulently joined as a defendant and that its citizenship should be

disregarded. Plaintiff disputes that Kiburz was fraudulently joined and has moved to

remand the case to state court.

The citizenship of a fraudulently joined defendant is ignored in determining whether

diversity exists. Smoot v. Chicago, Rock Island and Pac. R.R. Co., 378 F.2d 879, 882

(10th Cir. 1967). In order to establish fraudulent joinder in these circumstances, the

removing party must demonstrate either (1) actual fraud in the pleading of jurisdictional



facts or (2) the inability of the plaintiff to establish a cause of action against the non-diverse party in state court. Dutcher v. Matheson, 733 F.3d 980, 988 (10th Cir. 2013). The burden of showing fraudulent joinder is on the party asserting it and it is a "heavy burden." Id. Generally, the court only evaluates removability based on the original pleadings. Dodd v. Fawcett Publ'ns, Inc., 329 F.2d 82, 85 (10th Cir. 1964). "But upon specific allegations of fraudulent joinder the court may pierce the pleadings, consider the entire record, and determine the basis of joinder by any means possible." Id. (quotations and citation omitted).

Here, having pierced the pleadings and considered the various submissions of the parties, the court concludes that Kiburz should be deemed a fraudulently joined defendant. That conclusion follows from the extensive false allegations made and relied on, at least initially, by plaintiff as a basis for claim against Kiburz.

The list of factual allegations now known to be false is lengthy. According to the petition filed in state court, plaintiff was suing on polices that covered two of her "homes." It is now clear (and acknowledged by plaintiff) that State Farm had issued policies on eleven structures, not two, and that those structures were rental units, not Ms. Baltasar's "homes" or "residences." According to the petition, Ms. Baltasar contacted Kiburz and requested a replacement policy that covered her homes. It is now undisputed that Ms. Baltasar's policies with State Farm had been in force for many years prior to their eventual reassignment to Kiburz and that they were renters policies, not homeowners policies. According to the petition, Kiburz assured plaintiff that obtaining coverage for her homes would be no problem and made a number of other representations to her about replacement

2

cost coverage, all substantially identical to representations allegedly made by dozens of State Farm agents in dozens of other cases filed by the same plaintiffs' counsel, including one that the agent independently established the replacement cost policy limits for the homes. Perhaps most remarkably, the petition alleged that, consistent with all those alleged statements by its agent about replacement coverage, State Farm in fact "issued a homeowner's full replacement cost insurance policy on each property . . . ." The petition then proceeds to allege identical facts like those alleged in other suits to the effect that the coverage was illusory. It is now undisputed that State Farm did not in fact issue a homeowner's policy to plaintiff and that, at least as to the roof, it did not provide full cost replacement coverage. In short, virtually none of the factual allegations upon which plaintiff relied to state a purported claim against Kiburz have proven to be true.

Faced with those circumstances, plaintiff argues in its motion that at least some of this was just a "scrivener's error", that there is nothing wrong with using forms, and that State Farm's motion does not give her the benefit of the presumption of accuracy as to the alleged facts that she thinks she is entitled to. She then proceeds to construct a new theory of liability as to Kiburz using the new "facts" she now claims or concedes to be true.

The court declines to play plaintiff's — more accurately plaintiff's counsels' — game. To suggest that factual discrepancies like those described above are "scrivener's errors" is ridiculous on its face. Similarly, suggesting that reliance on forms is okay misses the mark. The use of forms is obviously fine if there is a basis in fact and law for the particular form, but a lawyer's use of forms from other cases does not relieve him or her of the duty to assure that, after reasonable inquiry, factual contentions have evidentiary

3

support. Fed.R.Civ.Pro. 11(b). Plainly, many of the central allegations here as to Kiburz

not only lack evidentiary support — they are simply false. No presumption against removal

jurisdiction can or should insulate a plaintiff from misrepresentations like those involved

here, and the court declines to allow plaintiff to now attempt to create some new set of

theories based on different facts from those initially alleged.[1]

The court concludes the above circumstances establish, for purposes of the

fraudulent joinder standard referenced above, actual fraud in the pleading of jurisdictional

facts or at least factual allegations so egregiously and recklessly false as to be tantamount

to actual fraud.

In other circumstances, the court might pursue sanctions against plaintiff's counsel

based on the false representations involved. However, the false or misleading allegations

at issue here were made in a state court filing, which impacts the propriety of sanctions

being imposed by a federal court. *See* Griffen v. City of Oklahoma City, 3 F.3d 336, 339

(10th Cir. 1993). As a result, the court merely cautions plaintiff's counsel that the filing of

a pleading in this court containing false and/or inaccurate statements like those discussed

above is likely to result in significant sanctions. Fed.R.Civ.Pro. 11.

Plaintiff's motion to remand [Doc. #12] is **DENIED**. The purported claims against

defendant Cal Kiburz Insurance Agency, Inc. are **DISMISSED** without prejudice but

without leave to amend.

---

[1] *Even relying on the "new" facts and theories plaintiff advances, a basis for plausible claim against Kiburz appears unlikely.*

4

**IT IS SO ORDERED.**

Dated this 8th day of August, 2023.

JOE HEATON
UNITED STATES DISTRICT JUDGE

CAR INDEX: 22 EJ-44528  B  36


ROUTED FROM ALQT TO 1SPL ON 02-18-14.
        OK TO UPDATE POLICY WITH INFOMRATION ON COMP ROOF
        REPLACEMENT
ROUTED FROM C1G6 TO 1UPL ON 02-13-14.

                    FIRE POLICY TRANSACTIONS
                OKLAHOMA          OKLAHOMA FIREFIGHTERS      AGT/AFO: 2271/FA8F
F 36-EJ-4452-8  HO - HOMEOWNERS     EFF/EXP: 01-26-14 01-26-15 STATUS: 01

BYRD, DAVID ALAN & REGINA S        CHGS INCL: RMKS
11109 WINELAKE DR
OKLAHOMA CITY OK  73170-2515       INS PH: HOME (405) 691-1193



EFF DATE: (02-05-14) RECD DATE: (02-06-14) WRTN DATE: (02-05-14) TIME: (09:11A)
**REMARKS**

        NEED TO UPDATE INFO ON HIS ROOF. HE REPLACED HIS ROOF FROM THE 5.1
0.2010 STORM. REPLACED 5/2010.
SOURCE: ECHO AGT  RITA WALLENBERG INS AGY , Rita    PHONE: 405-691-2464
                INITIALS: (SHE)



EXHIBIT
6